IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MINISTRY OF OIL OF THE REPUBLIC OF IRAQ, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | C.A. NO. 3:14-cv-249 |
| 1,032,202 BARRELS OF CRUDE OIL ABOARD THE UNITED KALAVRVTA and the MINISTRY OF NATURAL RESOURCES OF THE KURDISTAN REGIONAL GOVERNATE OF IRAQ, | § § § § § § § | ADMIRALTY FED. R. CIV. P. 9(h) |
| Defendants. | § § § | |

**OPPOSED MOTION TO VACATE ORDER TO SEIZE CARGO OF THE
MINISTRY OF NATURAL RESOURCES OF THE
KURDISTAN REGIONAL GOVERNMENT OF IRAQ**

TO THE HONORABLE JUDGE OF SAID COURT:

The Ministry of Natural Resources of the Kurdistan Regional Government of Iraq ("KRG")[1] files this Motion to Vacate the Order to Seize Cargo, dated July 28, 2014 ("the Order"), and respectfully submits that the Order should be vacated for lack of subject matter jurisdiction, and because if the Plaintiff's allegations were true the Order would be in contravention of the Foreign Sovereign Immunities Act.[2]

---

[1] The KRG is incorrectly described in the plaintiff's pleadings as the "Kurdistan Regional Governate of Iraq". There is no such thing as a "governate" in Iraq. The Iraqi constitution refers, at the sub-federal level, to "governorates" and "regions" (Article 116). The constitution clearly identifies the Kurdistan Region as a "region" (Article 117), and recognizes that a region will have a "government" (Article 121).

[2] The KRG hereby reserves and does not waive any and all additional defenses and objections, including but not limited to lack of personal jurisdiction, improper venue, *forum non conveniens*, insufficient process, insufficient service of process, failure to state a claim, failure to join a party, sovereign immunity, international comity, the political question doctrine, and the act of state doctrine. The KRG makes its restricted appearance under Rule E(8) as set forth in its Restricted Appearance.

# TABLE OF CONTENTS

I.  STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS          5

II.  BACKGROUND FACTS          5

III.  THE ALLEGED CONVERSION          6

IV.  SUMMARY OF THE ARGUMENT          8

V.  ARGUMENT          8

    A.  Statement of the Issues and Standard of Review          8

    B.  Admiralty Rule B Requires the Existence of Admiralty Jurisdiction and an Absence of Statutory Bars to Attachment          9

    C.  Admiralty Rule D Requires Admiralty Jurisdiction          10

    D.  Admiralty Rule C Requires Admiralty Jurisdiction and, Regardless, Does Not Apply          11

    E.  The MoO's Claims Are Not Within the Court's Admiralty Jurisdiction          12

        1.  The MoO's claim does not meet the Location or Locus Test          14

        2.  The MoO's claim fails the Connection or Nexus Test          17

            a.  Conversion of oil from land-based wells has no "potential to disrupt maritime commerce"          18

            b.  The alleged conversion of oil from land-based wells does not bear a "substantial relationship to maritime commerce"          19

    F.  The FSIA Requires That the Order Be Vacated          21

        1.  Kurdistan is a "Foreign State" Within the Meaning of the FSIA          22

        2.  Sovereign Property is Immune from Prejudgment Attachment          24

VI.  CONCLUSION          24

## Cases

*Alphamate Commodity GMBH v. CHS Europa SA*, 627 F.3d 183 (5th Cir. 2010) ...................10

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pte Ltd.*, 460 F.3d 434 (2d Cir. 2006) ...................10

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). ...............................21

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989).........22

*Continental Ins. Co. v. Adriatic Tankers Shipping Co.*, 1995 U.S. Dist. LEXIS 16876 (E.D.La.
    1995). ...................................................................................................................................11

*Del Mar Seafoods Inc. v. Cohen*, 2007 AMC 2173 (N.D.Ca. 2007) ...........................................11

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90 (1st Cir. 1993)......14

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) .........23

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) ...........................................................22

*Gulf Coast Shell and Aggregate LP v. Newlin*, 623 F.3d 235 (5th Cir. 2010) ...........................11

*Hunt v. A Cargo of Petroleum Products Laden on the Steam Tanker Hilda*, 378 F.Supp. 701
    (E.D. Pa. 1974). ..............................................................................................................11, 19

*In re: Ocean Club Services, LLC*, 355 B.R. 886 (S.D.Fl.Bankr. 2006) ........................................12

*Jakil, S.P.A. v. Agrimpex Co. Ltd.*, 08 CIV. 5613 (DC), 2009 WL 57479 (S.D.N.Y. Jan. 8, 2009)
    .............................................................................................................................................6, 9

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ..13, 18, 19, 20

*Maersk, Inc. v. Neewra, Inc.*, 3 F. Supp. 2d 519 (S.D.N.Y. 2006) ..............................................9

*Magness v. Russian Fed'n*, 247 F.3d 609 (5th Cir.2001) .............................................................21

*Matsuda v. Wada*, 101 F.Supp.2d 1315 (D.HI. 1999) .............................................................14, 15

*Middleton v. M/V GLORY SKY I*, 2014 WL 2198524, ___ Fed.Appx. ___ (11th Cir. May 28,
    2014). ...................................................................................................................................14

*Naftomar Shipping and Trading Co. v. KMA Intern., S.A.*, No. V-11-2, 2011 WL 888951
    (S.D.Tx. Mar. 10, 2011) ......................................................................................................10

*Newport News Shipbuilding & Dry Dock Co. v. S.S. INDEPENDENCE*, 872 F.Supp. 262
    (E.D.Va. 1994) .....................................................................................................................11

*O'Bryan v. Holy See*, 490 F. Supp. 2d 826 (W.D. Ky. 2005)......................................................23

*ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 594 F.3d 687 (9th Cir. 2010))............................10

*Ramirez v. Butler*, 319 F.Supp.2d 1034 (N.D.Cal. 2004)............................................................18

*Richmond Material Co. v. Dredge LA CONCHA*, 2009 WL 2407952 (S.D.Tx. Aug. 3, 2009) ...11

*S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292 (11th Cir.2000)................................21

*Scarborough v. Clemco Industries*, 391 F.3d 660 (5th Cir. 2004)......................................14, 17, 19

*See also A. Coker & Co. v. Nat'l Shipping Agency Corp.*, 1999 U.S. Dist. LEXIS 7442 (E.D.La.
    2007)......................................................................................................................................11

*Servaas Inc. v. Republic of Iraq*, No. 10-828-cv, 2011 WL 454501 (2d Cir. Feb. 10, 2011) .......22

*Sisson v. Ruby*, 497 U.S. 358 (1995). .........................................................................................13

*The LYDIA*, 1 F.2d 18 (2d Cir. 1924) ........................................................................................14

*Thypin Steel Co. v. Certain Bills of Lading Issued for Cargo of 3017 Metric Tons, More or Less,
    of Hot Rolled Steel Plat Laden on Board the M/V GEROI PANFILOVSKY*, No. 96-cv-2166,
    1998 WL 912100 (S.D.N.Y. Dec. 30, 1998)..........................................................................14

*Thyssen, Inc. v. S.S. RIO CAPAYA*, 1988 A.M.C. 1878 (M.D.Fl. 1988)....................................12

*Ullises Shipping Corp. v. Fal Shipping Co. Ltd.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006))..............9

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1993) ...............................................21

*Wahba, et al. v. National Bank of Egypt*, 457 F. Supp. 2d 721 (E.D. Tex. 2006)........................21

*Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273 (11th Cir. 1998)...................................12

## Statutes

28 U.S.C. § 1333.................................................................................................................10, 13

28 U.S.C. § 1602...........................................................................................................................22

28 U.S.C. § 1603...........................................................................................................................22

28 U.S.C. § 1609...........................................................................................................................21

28 U.S.C. § 1610....................................................................................................................11, 26

28 U.S.C. § 1611...........................................................................................................................26

## Other Authorities

Comment, Developments in the Law of Maritime Liens, 45 Tul. L. Rev. 574, 588 (1971))........11

Department Fact Sheet, Regional Reconstruction Team in the Iraqi Kuridstan Region (2009),
    *available at* http://2001-2009.state.gov/documents/organization/79901.pdf. ...........................22

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, reprinted in 1976 U.S.Code Cong. & Ad.News
    6604, 6613 ..............................................................................................................................21

State Department 2013 Investment Climate Statement – Iraq (Feb. 2013), *available at*
    http://www.state.gov/e/eb/rls/othr/ics/2013/204661.htm. ......................................................22

White House Press Release, Readout of Vice President Biden's Call with Iraqi Kurdistan
    Regional Government President Masoud Barzani (Oct. 28, 2013), *available at*
    http://www.whitehouse.gov/the-press-office/2013/10/28/readout-vice-president-bidens-call-
    iraqi-kurdistan-regional-government-p. ..................................................................................22

## Rules

Fed. R. Civ. P. Supp. A...................................................................................................................8

Fed. R. Civ. P. Supp. B...................................................................................................................9

Fed. R. Civ. P. Supp. C.................................................................................................................11

Fed. R. Civ. P. Supp. D.................................................................................................................10

Fed. R. Civ. P. Supp. E...................................................................................................................8

## Treatises

G. Gilmore & C. Black, The Law of Admiralty, 628-29 (2d Ed. 1975) ......................................11

Jenner, B. Chase, and J. Loo, 2 Benedict on Admiralty Section 6 (1986) ...................................11

Maritime Liens in Tort, General Average, and Salvage,47 Tul. L. Rev. 569 (1973)...................11

Moore's Federal Practice § 705.05[2][b]ii] (3d ed. 2000)...........................................................10

Thomas J. Schoenbaum, Admiralty and Maritime Law§ 9-1 (3d ed. 1994) ...............................11

## I.
## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

On July 28, 2014, Magistrate Johnson signed an Order to Seize Cargo. By this motion, the KRG moves the Court to vacate this order.

## II.
## BACKGROUND FACTS

On July 28, 2014, the MoO filed this action praying that the Court seize a cargo of oil which is the subject of a dispute pending in the Iraqi Supreme Federal Court. As will be shown below, the claims alleged in the MoO's original complaint were well outside the admiralty jurisdiction of this Honorable Court, rendering the MoO's reliance on Admiralty Rule B and D improper and unsustainable.

On August 1, 2014, the MoO filed an Amended Complaint in which it alleges a new (and equally improper) claim under Admiralty Rule C. In addition, though, the MoO used the filing of its Amended Complaint as an opportunity to politicize its lawsuit and, by extension, the Court itself, alleging myriad "facts" which, in addition to being fictitious, bear absolutely no relation to the issues before the Court. Although the KRG does not believe that this motion is an appropriate vehicle to raise these issues, the KRG is nonetheless compelled to respond to and provide context for the MoO's false allegations, lest the KRG's silence be taken as an admission. Accordingly, attached herewith as Appendix A ("Statement of KRG on Iraq's MoO Claims") the KRG respectfully offers the Court a brief overview of the Iraqi constitutional provisions, as well as an account of the proceedings pending before the Iraqi Supreme Federal Court, which has already denied the MoO the relief it now seeks from this Court reasoning that it "contradicts the

judicial process."[3]   The KRG hopes that the attached will benefit the Court in its broader consideration of the case before it.

The above notwithstanding, the KRG now moves to vacate the Order, and shows that there is no basis upon which the MoO can sustain the July 28 Order or its more recent attempt to assert a maritime lien under Admiralty Rule C.   Accordingly, the Order must be vacated forthwith.

## III.
## THE ALLEGED CONVERSION

Although the KRG does not admit any of the facts as alleged in the MoO's Amended Complaint and specifically denies that a conversion took place, as explained above, for purposes of this motion only the KRG accepts as true the allegations of the Amended Complaint, as it must under Rule E(4)(f).[4]   Even under the most favorable view of those allegations, the attachment was improper.

On July 26, 2014, the M/V UNITED KALAVRYTA[5] arrived in international waters off the coast of Galveston, Texas, loaded with 1,032,212 barrels of crude oil (the "Cargo").   Prior to its arrival off of Texas's coast, the Cargo was extracted from oilfields in the region of Iraq governed by the KRG, pumped through a pipeline to a Mediterranean terminal at Ceyhan in Turkey, loaded onto a vessel designated by the KRG, and then transferred from that vessel to the UNITED KALAVRYTA.   The Cargo has not yet been transshipped and brought into U.S. territory, but the KRG expects that it will enter the territorial jurisdiction of the Southern District of Texas in the near future.

---

[3] Amended Complaint, Docket No. 7, Ex. G.
[4] *See Jakil, S.P.A. v. Agrimpex Co. Ltd.*, 08 CIV. 5613 (DC), 2009 WL 57479 at *1 (S.D.N.Y. Jan. 8, 2009).
[5] The vessel is incorrectly referred to in the plaintiff's pleadings as the UNITED KALAVRVTA.

First, if the MoO's allegations are true, there has been no conversion at all.  In its Amended Complaint, the MoO alleges that the Cargo is the "property of MoO", but at the same time concedes that the "people of the Republic of Iraq have legal title to the Cargo."[6]  These are contradictory assertions, and it is unclear how the Cargo can be the "property of MoO" if title is held by others.  The MoO also alleges that pursuant to Iraqi laws, "MoO must **approve** the storage, transport, export or sale of any oil products **belonging to the people of the Republic of Iraq**, including the crude oil contained in the subject Cargo."[7]  As such, even according to the MoO's own allegations, it supposedly has authority over the marketing of oil products, but it does not own the Cargo itself (which according to MoO belongs to the people of the Republic of Iraq).  If the MoO itself does not have title, then it cannot have a claim for conversion (and, therefore, the KRG cannot have interfered with those non-existent rights).[8]  Thus, this dispute is really about who (as between the KRG and the MoO) has the authority to export and sell the Cargo, and it is not an ownership claim sounding in conversion.

Second, as is clear from the Amended Complaint, the alleged conversion by the KRG – if it took place at all – occurred on land in the Kurdistan Region, not on a ship or in navigable waters.  The MoO alleges that the oil was "illegally produced" in the "Kurdistan region of Iraq," and that in December, 2013, the KRG "began pumping the illegally produced crude oil through a pipeline originating in Iraq and running to Ceyhan in Turkey."[9]  Notably, the MoO alleges that these actions occurred "without the consent of the MoO."[10]  The MoO further alleges that it instructed the Government of Turkey and the operator of the land-based pipeline to hold the oil for the MoO, but that the pipeline operator ignored those instructions and instead loaded the oil

---

[6] Amended Complaint, Docket No. 7, ¶¶ 4, 10,
[7] Amended Complaint, Docket No. 7, ¶ 10 (emphasis added).
[8] In the admiralty context, conversion is an intentional and wrongful exercise of dominion or control over a chattel, which seriously interferes with the owner's rights in the chattel.
[9] Complaint, Docket No. 1, ¶ 10.
[10] *Id.*

as directed by the KRG onto a vessel designated by the KRG.[11]  Although the MoO argues that "an act of conversion occurred on or about June 22, 2014 when the Defendant [KRG] purposed to take or acquire a proprietary interest in the Cargo from a division, agency or instrumentality of Turkey and loaded it on the tanker UNITED KALAVRVTA" [sic, read "KALAVRYTA"],[12] the Amended Complaint itself alleges contrary facts showing that the KRG exercised dominion and control over the oil when it was first extracted in Kurdistan, long before it arrived in Turkey.  For example, the MoO alleges that the oil was "illegally produced" from wells within the "Kurdistan region."[13]  Thus, according to the MoO's own Amended Complaint, if there were any validity to the MoO's legal theory of ownership (which the KRG expressly denies), then the alleged "conversion" occurred (if at all) on land, in the landlocked KRG-controlled region of Iraq, long before any oil was loaded onto any ship and transported on navigable waters.

## IV.
## SUMMARY OF THE ARGUMENT

The remedies provided by Admiralty Rules  B, C, and D are only available if the underlying claim is within the admiralty jurisdiction of the Court.  Since the alleged conversion of the Cargo does not meet the requirements of admiralty tort jurisdiction, the Court did not have jurisdiction to issue the Order of Seizure.  In addition, the Order of Seizure is in contravention of the Foreign Sovereign Immunities Act.

## V.
## ARGUMENT

### A.    Statement of the Issues and Standard of Review

At issue is whether this Court had jurisdiction to order the seizure of the Cargo, and whether the seizure of the Cargo is barred by the Foreign Sovereign Immunities Act.

---

[11] *Id.*
[12] *Id.* ¶ 11.
[13] *Id.* ¶ 10.

Admiralty Rule E(4)(f) provides in relevant part that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with" the rules.[14]  Thus, "it is the plaintiff's burden to show that the attachment should not be vacated.  In reviewing a Motion to Vacate, a court accepts all well-pled facts contained in the plaintiff's verified complaint as true.[15]

The MoO asserts claims under Admiralty Rules B, C and D.  Fatal to all of the MoO's claims, though, is Admiralty Rule A (entitled "Scope of Rules") which plainly states that all other Admiralty Rules apply only where admiralty jurisdiction exists.[16]  Thus, if the MoO fails to establish jurisdiction under 28 U.S.C. § 1333, all three bases for the seizure of the cargo necessarily fail.  The KRG addresses the specific standards required for MoO to sustain its seizure under Admiralty Rules B, C, and D below, followed by an analysis of the controlling jurisdictional question.

**B.**   **Admiralty Rule B Requires the Existence of Admiralty Jurisdiction and an Absence of Statutory Bars to Attachment**

At a Rule E(4)(f) hearing addressing an Admiralty Rule B attachment, the plaintiff's burden is to demonstrate that 'reasonable grounds' exist for the attachment and that all technical requirements for effective attachment have been met."[17]  In order to properly state a cause of action under Admiralty Rule B, a plaintiff must show: "(1) that it has a valid *prima facie* admiralty claim against the defendant; (2) that the defendant cannot be found within the district;

---

[14] Fed. R. Civ. P. Supp. R. E(4)(f).
[15] *See Jakil*, 2009 WL 57479 at *1.
[16] *See* Fed. R. Civ. P. Supp. A ("These Supplemental Rules apply to: (A) the procedure in admiralty and maritime claims within the meaning of Rule 9(h) with respect to the following remedies: (i) maritime attachment and garnishment; (ii) actions in rem; (iii) possessory, petitory, and partition actions…").
[17] *Maersk, Inc. v. Neewra, Inc.*, 3 F. Supp. 2d 519, 527 (S.D.N.Y. 2006) (citing *Ulises Shipping Corp. v. Fal Shipping Co. Ltd.*, 415 F. Supp. 2d 318, 322-23 (S.D.N.Y. 2006)).

(3) that the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment."[18]

As will be shown, at least two of these elements are lacking.   First, there is no *prima facie* admiralty claim against the KRG.  It is well settled that "[a] party may only seek Rule B attachment if the underlying claim satisfies admiralty jurisdiction under 28 U.S.C. § 1333."[19] Conversely, "[i]f the underlying dispute or claim does not fall within admiralty jurisdiction, the court lacks the authority to issue the Rule B attachment."[20]  As set forth below, admiralty jurisdiction does not exist over the MoO's claims.

Second, assuming *arguendo* the truth of the allegations as pled by the MoO, there is a statutory bar to the attachment because the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.* (at § 1610) would expressly bar pre-judgment attachment here.

## C.   Admiralty Rule D Requires Admiralty Jurisdiction

The MoO's Amended Complaint alternatively alleges that the MoO "has legal title or a legal claim to the Cargo" and is therefore entitled to seize the cargo via a petitory action under Admiralty Rule D.  Admiralty Rule D provides in relevant part as follows:

> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, in all actions so maintainable with respect to the possession of cargo or other maritime property … the process shall be by a warrant of arrest of the vessel, cargo, or other property, and by notice in the manner provided by Rule B(2) to the adverse party or parties.[21]

---

[18] *E.g.*, *Naftomar Shipping and Trading Co. v. KMA Intern., S.A.*, No. V-11-2, 2011 WL 888951, at *2 (S.D.Tx. Mar. 10, 2011) (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pte Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006) ).
[19] *E.g.*, *Alphamate Commodity GMBH v. CHS Europa SA*, 627 F.3d 183, 186 (5th Cir. 2010) (citing *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 594 F.3d 687 (9th Cir. 2010)).
[20] *Alphamate*, 627 F.3d at 186.
[21] Fed. R. Civ. P. Supp. D.

Similar to Admiralty Rule B, Admiralty Rule D's petitory or possessory action requires admiralty jurisdiction over the plaintiff's substantive claim.[22]  Thus, a possessory action to regain cargo or other maritime property other than a vessel "can be maintained only if the allegedly wrongful possession resulted from a maritime tort or breach of a maritime contract."[23]  As will be shown, the claim underlying the MoO's Admiralty Rule D action is not within the admiralty jurisdiction and therefore does not support the MoO's petitory or possessory action.

## D.   Admiralty Rule C Requires Admiralty Jurisdiction and, Regardless, Does Not Apply.

On August 1, 2014, the MoO amended its complaint to allege a right to proceed against the Cargo pursuant to Admiralty Rule C, alleging that it possesses a maritime lien against the Cargo due to the alleged tort of conversion.  Although the KRG respectfully asserts that none of the MoO's claims have any merit in light of the glaring jurisdictional deficiencies and statutory bars, the MoO's Admiralty Rule C claim is perhaps the least meritorious of the group.

In the context of a Rule E(4)(f) hearing to address a claim under Admiralty Rule C "the burden is on plaintiffs responding to a motion to vacate to come forward with sufficient evidence to show probable cause for the arrest."[24]  Further, "this probable cause requirement translates roughly to requiring that plaintiff show entitlement to a maritime lien."[25]

---

[22] *See, e.g., Gulf Coast Shell and Aggregate LP v. Newlin*, 623 F.3d 235, 239 (5th Cir. 2010) ("A Rule D claim asserting only equitable interests, with no separate basis for admiralty jurisdiction, is not cognizable in admiralty"); *Richmond Material Co. v. Dredge LA CONCHA*, 2009 WL 2407952, *1 (S.D.Tx. Aug. 3, 2009) ("The remedies available under Rule D are available only if the district court has admiralty jurisdiction over the action."); *Hunt v. A Cargo of Petroleum Products Laden on the Steam Tanker Hilda*, 378 F.Supp. 701, 704 (E.D. Pa. 1974), *aff'd*, 515 F.2d 506 (3d Cir. 1975), *cert. den.*, 96 S.Ct. 132 (1975).

[23] *See Hunt v. A Cargo of Petroleum Products Laden on the Steam Tanker Hilda*, 378 F. Supp. 701, 703-704 (E.D.Pa. 1974); .Moore's Federal Practice § 705.05[2][b]ii] (3d ed. 2000).

[24] *Continental Ins. Co. v. Adriatic Tankers Shipping Co.*, 1995 U.S. Dist. LEXIS 16876, *1-2 (E.D.La. 1995). *See also A. Coker & Co. v. Nat'l Shipping Agency Corp.*, 1999 U.S. Dist. LEXIS 7442, *2-3 (E.D.La. 2007) ("At a post-arrest hearing, the plaintiff has the burden to establish probable cause for the arrest."); *Newport News Shipbuilding & Dry Dock Co. v. S.S. INDEPENDENCE*, 872 F.Supp. 262, 265 (E.D.Va. 1994) (recognizing that to maintain an arrest the plaintiff must show "probable cause for arrest of a vessel").

[25] *Del Mar Seafoods Inc. v. Cohen*, 2007 AMC 2173, *8 (N.D.Ca. 2007); *Newport News*, 872 F.Supp. at 265.

Most importantly, the same jurisdictional issues which plague the MoO's original Admiralty Rules B and D claims render improper the Admiralty Rule C and maritime lien claims in its Amended Complaint.  As with all other remedies provided by the Admiralty Rules, it is well settled that "[a]dmiralty jurisdiction is a prerequisite for the existence of a maritime lien."[26] Because, as shown below, admiralty jurisdiction simply does not exist over the tort alleged by the MoO, the MoO's arrest and assertion of a maritime lien must also be vacated.

Moreover, even if the MoO's claim could somehow give rise to admiralty jurisdiction – which plainly it cannot – its assertion of a lien against the Cargo for the alleged conversion by the KRG would still be improper.  In the context of the tort of conversion, "[t]he maritime law has long recognized that conversion *by a ship* supports a maritime lien *against the ship*."[27] Here, the MoO's alleges that it "is entitled to arrest the Cargo for its claims" – an allegation which is somewhat nonsensical, given that the maritime tort of conversion gives rise to a lien *against the ship* that converted property (rather than against the property itself) and only for conversion done *by a ship* (as opposed to by an entity like the KRG).[28]  Again, the MoO plainly alleges that it was the KRG that converted the oil, and there is no authority whatsoever for the proposition that an alleged maritime tort by a party other than a vessel can create a maritime lien.

**E.     The MoO's Claims Are Not Within the Court's Admiralty Jurisdiction.**

---

[26]Thomas J. Schoenbaum, Admiralty and Maritime Law§ 9-1 n.5  (3d ed. 1994). 552*Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir. 1998); *In re: Ocean Club Services, LLC*, 355 B.R. 886, 889 (S.D.Fl.Bankr. 2006) ("The import of this is that the admiralty jurisdiction, which is a prerequisite to asserting a maritime lien, is absent, and [plaintiff's] efforts to assert a maritime lien necessarily fail.").

[27] *Thyssen, Inc. v. S.S. RIO CAPAYA,* 1988 A.M.C. 1878, 1879 (M.D.Fl. 1988) (citing A. Jenner, B. Chase, and J. Loo, 2 *Benedict on Admiralty* Section 6, at 1-46 (1986); G. Gilmore & C. Black, *The Law of Admiralty,* 628-29 (2d Ed. 1975); Richards, *Maritime Liens in Tort, General Average, and Salvage,*47 Tul. L. Rev. 569, 582-83 (1973); Comment, *Developments in the Law of Maritime Liens,* 45 Tul. L. Rev. 574, 588 (1971)) (emphasis added).

[28] *Id.*; Amended Complaint, Docket No. 7, ¶ 26.

Section 1333 of Title 28 of the United States Code grants to the federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction."[29]  It is well recognized that admiralty jurisdiction may arise either by virtue of a dispute involving a maritime contract or through the occurrence of a maritime tort.  Here, the MoO's Amended Complaint asserts claims only in tort and makes no reference to any maritime contract as a basis for its suit.

In *Sisson v. Ruby*, the Supreme Court established a two-part test for determining whether a tort bears sufficient relation to maritime activity to give rise to admiralty jurisdiction.[30]  That two-part test—focused on the occurrence of a tort at a maritime "location" and the "connection" of the tort to maritime activity—was explained most succinctly in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, where the Supreme Court wrote:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with a maritime activity.  A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  The connection test raises two issues.  A court, first, must "assess the general features of the type of incident involved," to determine whether the incident has "a potentially disruptive impact on maritime commerce."  Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."[31]

---

[29] 28 U.S.C. § 1333.
[30] *Sisson v. Ruby*, 497 U.S. 358 (1995).
[31] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534  (1995) (citations omitted).

### 1.     The MoO's claim does not meet the Location or Locus Test.

Generally, the location test for federal admiralty jurisdiction can be satisfied in two ways: "1) showing that the tort occurred on navigable water, or 2) showing that the injury was caused by a vessel in navigable water."[32]  Here, plaintiff has failed to make either showing.

First, plaintiff has not even alleged that its injury was caused by a vessel, *i.e.*, that the vessel was a proximate cause of the alleged harm.[33]  Plaintiff does not suggest that any act of the UNITED KALAVRYTA itself was tortious or caused the alleged conversion of the oil cargo.

Second, MoO fails to show that its action is based on any other alleged tort on navigable waters.  "In the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel, which seriously interferes with the owner's rights in the chattel."[34]  Under the locality test, admiralty jurisdiction depends on whether the chattel "was on navigable waters" at the time it was allegedly converted by the defendant.[35]  The courts have expressly recognized that "[a] cause of action for the federal maritime tort of conversion exists only if the wrong occurred on navigable waters."[36]  Therefore, the determinative issue for purposes of the locality test is the precise location of the oil at the moment the KRG allegedly converted it.

A very recent decision by the Eleventh Circuit Court of Appeals, sitting in admiralty, clearly demonstrates why the MoO's claims do not satisfy the location test.  In *Middleton v. M/V*

---

[32] *Scarborough v. Clemco Industries*, 391 F.3d 660, 663-64 (5th Cir. 2004) (citing *Grubart*, 513 U.S. at 534-35).
[33] *Scarborough*, 391 F.3d at 664 ("For [a] vessel to be a cause of [] injuries… the vessel must have been the proximate cause of [the] injuries.").
[34] *Middleton v. M/V GLORY SKY I*, 2014 WL 2198524, ___ Fed.Appx. ___ (11th Cir. May 28, 2014) (*citing Evergreen*, 4 F.3d at 94).
[35] *Id.* at *2 (quoting *Evergreen*, 4 F.3d at 94).
[36] *Thypin Steel Co. v. Certain Bills of Lading Issued for Cargo of 3017 Metric Tons, More or Less, of Hot Rolled Steel Plat Laden on Board the M/V GEROI PANFILOVSKY*, No. 96-cv-2166, 1998 WL 912100, at *5, (S.D.N.Y. Dec. 30, 1998) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 94 (1st Cir. 1993); *The LYDIA*, 1 F.2d 18, 23 (2d Cir. 1924).  *See also Matsuda v. Wada*, 101 F.Supp.2d 1315, 1320 (D.HI. 1999) (finding no admiralty jurisdiction over conversion claim where "[t]here is no allegation that any injury to Plaintiff occurred on navigable waters" and "the alleged fraud by Defendant was committed on land").

*GLORY SKY I*, a warehouseman agreed to store 5,500 fifty pound bags of black beans for a food distributor.[37]   After several authorized disbursements left 3,800 bags remaining, the warehouseman removed the beans from his warehouse without authorization, loaded them onboard the M/V GLORY SKY I, transported them to Haiti, and sold them.  The distributor brought a suit for conversion, alleging admiralty jurisdiction.  Upon finding that the conversion had taken place and been completed before the beans were "on navigable water," the district court dismissed the claim for lack of admiralty jurisdiction.  On appeal, the Eleventh Circuit affirmed the dismissal with language particularly instructive here:

> Destin removed Middleton's beans from the warehouse in Hialeah [Florida] without permission and with intent to take them to Haiti and sell them.  This act constituted a conversion because it was an unauthorized, intentional, and substantial interference with Middleton's ownership of the beans.  ***Because no other acts were necessary to satisfy the elements of a conversion, Destin's conversion of the beans was complete at the time he first removed the beans from the warehouse.***  *See Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007) ("[I]t is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action.").  Consequently, Destin converted the beans in the warehouse, not on navigable water, and Middleton must point to some other conversion that occurred on navigable water to establish admiralty jurisdiction.[38]

Here, the MoO alleges that the oil at issue was, under Iraqi law, the property of the people of Iraq when it was "illegally produced"  and "illegally pump[ed]" from within the Kurdistan Region across international borders—***by land, not sea***—to Turkey, thus taking it outside of the Iraqi government's territory.  Accepting the MoO's own allegations, which the Court must for the purposes of this motion (although KRG vigorously denies that there was anything wrongful about its actions), any conversion of the oil was completed when the oil left the well (as the functional equivalent of the warehouse in *Middleton*), and ***certainly*** by the time

---

[37] *Middleton*, 2014 WL 2198524  at *1.
[38] *Id.* at *2 (emphasis added).

the oil left Iraqi territory. In the words of the Eleventh Circuit, "no other acts were necessary to satisfy the elements of conversion"– the KRG's removal of the oil from the ground and transportation out of Iraq being allegedly unauthorized, intentional, and substantially inimical to the Iraqi people's ownership of the oil.  Indeed, to the extent the MoO might attempt to salvage its maritime tort theory by arguing that the conversion was not completed until the product was loaded onto the vessel or the vessel departed (and, indeed, the MoO's Amended Complaint provides specific dates for these events, suggesting that it intends just such an argument), the MoO would have to show that the KRG never interfered with the MoO's exercise of dominion and control over the oil until it was on a ship.  Obviously, the MoO could never make such a showing where, as here, the KRG extracted the oil in the Kurdistan Region and pumped it through Kurdistan to Turkey.  This argument is also belied by the MoO's own Amended Complaint, which concedes these facts and further alleges that although the MoO instructed the government of Turkey to hold the product for its account and not to release it to the KRG, the Turkish government did exactly the opposite and followed the direction of the KRG.  The alleged conversion occurred, if at all, long before the property was loaded onto a vessel on navigable waters.

Moreover, *Middleton* decisively forecloses any attempt by the MoO to construe loading onto a vessel as a separate act of conversion or to rely on what the MoO's Amended Complaint alleges are "[s]ubsequent acts of conversion [that] may have occurred on navigable waters as the vessel was in transit." In *Middleton*, the food distributor advanced two identical theories in its attempt to bring its claim within the court's admiralty jurisdiction: (1) that the vessel committed a "new, maritime conversion when Destin loaded the converted beans onto it;" and (2) that the warehouseman's refusal to return the beans during a post-loading encounter aboard the GLORY

SKY "effectively brought the vessel into the conversion."[39]   The Eleventh Circuit rejected both arguments, holding that although the GLORY SKY was a separate juridical person from the warehouseman, it could act only through its operator and therefore "could not re-appropriate the beans for its own purpose and thereby commit a new conversion separate from [the warehouseman's]"; and second, that demand and refusal are not elements of the tort of conversion, and therefore did not constitute a "new conversion."[40]   The court further explained its basis for rejecting the distributor's argument in language fully applicable to the MoO's claims:

> Under [the distributor's] view, conversions invariably give rise to admiralty jurisdiction if the tortfeasor ever loads the converted property onto a ship he controls, even if this occurs long after and far removed from the actual conversion of the property. This result undermines the situs prong of the test for admiralty jurisdiction and uses the fictional separateness of a ship in admiralty to expand the reach of admiralty jurisdiction to torts that are otherwise entirely land based.[41]

Under the Eleventh Circuit's analysis and holding in *Middleton*, any alleged conversion by the KRG was completed on land, not on navigable waters.  Accordingly, this factor alone precludes admiralty jurisdiction, renders the MoO's Admiralty Rules B, C, and D claims unsustainable, and requires that the Order of Seizure be vacated.

### 2. *The MoO's claim fails the Connection or Nexus Test.*

To satisfy the connection test, a plaintiff's claim must meet two requirements.  First, "the activity at issue must be of a sort with potential to disrupt maritime commerce."[42]  Second, the

---

[39] *Id.* at *2.
[40] *Id.* at *2.
[41] *Id.* at *2.
[42] *Scarborough*, 391 F.3d at 665 (citing *Grubart*, 513 U.S. at 534).

plaintiff must show that the "general character of the activity giving rise to the incident bears a substantial relationship to particularly maritime activity."[43]

        a.     *Conversion of oil from land-based wells has no "potential to disrupt maritime commerce."*

In analyzing a claim for its potential to disrupt maritime commerce, "the Court's focus should be on the disruptive impact the activity *could* have had, not on what actually transpired."[44]   In addition, the analysis must focus "on a description of the incident at an intermediate level of possible generality" – that is to say, "damage by a vessel in navigable water to an underwater structure."[45]

In *Ramirez v. Butler*, the court focused on the potential for disruption of maritime commerce in deciding whether admiralty jurisdiction existed over a claim for the theft and sale of two sailboats used for noncommercial purposes.[46]  The court held that no jurisdiction existed, reasoning that "[p]laintiff does not allege that the vessels were converted or taken in a manner that posed a safety hazard to other vessels" or "that the alleged conversion by Defendant was part of a widespread pattern or practice of conversion affecting commercial (as well as non-commercial) vessels and thus interfering with maritime commerce."[47]  Here, as in *Ramirez*, there is no allegation that the manner in which the oil was allegedly converted posed any safety hazard or other risk to maritime commerce, as might occur when cargo is forcibly taken from a ship on the high seas.  The activity alleged by the MoO is even further removed from satisfying the *Grubart* test than was the conversion of sailboats complained of in *Ramirez*, as in *Ramirez* the converted property was at least maritime in nature and its conversion necessarily impacted

---

[43] *Id.*

[44] *Grubart*, 513 U.S. at 538.

[45] *Id.*  As an example, the Supreme Court has described that describing an incident as "fire" would be too general, while describing it as "fire [] damaging nothing but pleasure boats and their tie-up facilities" would be too broad. *Id.*

[46] *Ramirez v. Butler*, 319 F.Supp.2d 1034, 1035 (N.D.Cal. 2004).

[47] *Id.* at 1040.

navigable waters.   Thus, the MoO cannot satisfy the requirement that its claim has the potential to threaten or disrupt maritime commerce.

> b.  *The alleged conversion of oil from land-based wells does not bear a "substantial relationship to maritime commerce."*

Second, to find that the connection test is met the court must determine that the "general character of the activity giving rise to the incident bears a substantial relationship to particularly maritime activity."[48] This inquiry focuses on "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand."[49] As examples, the Supreme Court has found that operating vessels in navigable waters is clearly substantially related to maritime commerce, as is storing vessels at a marina (though somewhat more remote), whereas flying in an airplane over or swimming in navigable waters are too attenuated to maritime commerce and therefore outside of admiralty jurisdiction.[50]

The Eastern District of Pennsylvania's decision in *Hunt v. Cargo of Petroleum Products Laden on the Steam Tanker HILDA* addressed the relation to maritime commerce in a suit with facts highly analogous to those presented here.   In *Hunt*, the Libyan government seized oil fields in Libya operated by a number of oil producers.  A cargo of oil produced at one of these oilfields in Libya was arrested by the Libyan government upon its arrival in Philadelphia.[51]   The producers claimed that the Libyan government had wrongfully seized the oilfield from which the oil was produced in violation of their right to the oil.   In holding that the government's suit was not cognizable within the admiralty jurisdiction, the Court reasoned:

---

[48] *Scarborough*, 391 F.3d at 665 (citing *Grubart*, 513 U.S. at 534).
[49] *Grubart*, 513 U.S. at 539.
[50] *Id.* at 538.
[51] *Hunt*, 378 F.Supp. at 702-3 (E.D.Pa. 1974).

> Unlike an action to try title or possession to a ship, questions
> concerning title or possession of cargo not based on a maritime
> contract or tort do not bear a significant relationship to maritime
> commerce.  Cargo obtains its maritime character solely because it
> is on the navigable waters.  Questions involving its ownership or
> possession will depend upon relationships foreign to traditional
> maritime interest.  This case presents an apt illustration.  The
> merits of this case involve the legality of the actions by the Libyan
> government in seizing the oil fields owned by the plaintiffs and the
> claimants [sic] title to the oil when purchased from a third party.
> Marine interests will be of no concern to a just adjudication of the
> merits.  For these reasons, we conclude that as an admiralty court
> we lack jurisdiction.[52]

Similarly, the KRG's alleged conversion stems from the dispute between KRG and the

MoO over the KRG's right to produce, market, and export certain oil from the Kurdistan Region

- a dispute arising out of the parties' differing interpretations of their respective rights and

obligations under the Iraqi Constitution and related foreign laws.  The subsequent involvement of

a vessel in this dispute is entirely happenstance and irrelevant to the dispute involving the

parties' respective rights.  Neither the alleged conversion of oil from a land-based well nor the

parties' dispute under Iraqi law are "so closely related to activity traditionally subject to

admiralty law that the reasons for applying special admiralty rules would apply in the suit at

hand."[53]  The underlying issues governed by Iraqi and Kurdistan law are divorced from the

issues encompassed by maritime law and handled by federal courts pursuant to the admiralty

jurisdiction conferred by the Constitution and 28 U.S.C. § 1333.  Accordingly, MoO cannot meet

the second prong of the connection test required for maritime jurisdiction.

In sum, while the MoO is required under *Sisson* and *Grubart* to meet each of three tests

required for admiralty tort jurisdiction, the allegations of the MoO's Amended Complaint plainly

demonstrate that it cannot establish even one of the required elements.  Because admiralty tort

---

[52] *Id.* at 704.
[53] *Grubart*, 513 U.S. at 539.

jurisdiction does not therefore exist over the MoO's claims, its reliance on the distinctly maritime remedies afforded under Admiralty Rules B, C, and D was improper. Accordingly, the Court must vacate the Order authorizing the attachment of the subject oil, as the foundation upon which the MoO persuaded the Court to issue the Order is nonexistent.

## F.      The FSIA Requires That the Order Be Vacated.

Throughout its Amended Complaint, the MoO variably alleges that the Cargo is the property of the MoO or that the KRG is presently holding itself out as the owner of the Cargo. To the extent the Amended Complaint and seizure Order rest on the allegation that the KRG owns the Cargo, the claim is subject to an absolute statutory bar to attachment under the FSIA, and thus also fails under Admiralty Rule B.

The Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq.*, "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."[54] Under the FSIA, a foreign state is presumptively immune from the jurisdiction of United States courts. Unless a specific exception to the FSIA applies, federal courts lack subject-matter jurisdiction over a claim against a foreign state,[55] and suits against a foreign state are "presumptively outside the jurisdiction of the federal courts."[56]

Further, "the property in the United States of a foreign state shall be immune from attachment arrest" subject to exceptions not applicable here.[57] Because the KRG[58] is a "foreign

---

[54] *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).
[55] *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1993)
[56] *Wahba, et al. v. National Bank of Egypt*, 457 F. Supp. 2d 721, 729 (E.D. Tex. 2006)
[57] 28 U.S.C. § 1609.
[58] That the Defendant here is the Ministry and not Kurdistan itself is of no moment. Courts have held that government departments or ministries qualify as political subdivisions of a foreign state under the FSIA. *See, e.g.*, *Magness v. Russian Fed'n*, 247 F.3d 609, 613 n. 7 (5th Cir.2001) (characterizing the Russian Ministry of Culture as a political subdivision of Russia for purposes of FSIA's service of process provision); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir.2000) (characterizing Yemeni Ministry of Supply & Trade as a political subdivision of Yemen).

state" within the meaning of FSIA,[59] its property is immune from attachment, and thus if the allegations of the KRG's ownership were true the warrant issued by the attachment of the Cargo would be improper.

### 1. Kurdistan is a "Foreign State" Within the Meaning of the FSIA.

Under the FSIA, a "foreign state" is defined to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."[60]   A "political subdivision includes all governmental units beneath the central government."[61]   Kurdistan is a "federal region" under the Constitution of Iraq, and therefore a political subdivision of Iraq.[62]   As such, it is a "foreign state" within the meaning of the FSIA and thus, it is entitled to sovereign immunity.

Iraqi law plainly recognizes Kurdistan as a "foreign state" within the meaning of the FSIA.[63]   Iraq's Constitution provides that the Iraqi government is comprised of a "capital, regions, and governorates, as well as local administrations."[64]   The Constitution further expressly recognizes Kurdistan as a "federal region" of Iraq,[65] and grants it "[a]ll powers not stipulated in the exclusive powers of the federal government."[66]   The crucial "paramountcy" clause in the Constitution, Article 115, goes further still, stating that where powers are shared between the federal government and the KRG, "priority shall be given" to the laws of the KRG.   The executive, legislative, and judicial powers of the KRG are further elaborated in Article 121 of the

---

[59] 28 U.S.C. § 1603(a).

[60] 28 U.S.C. § 1603.

[61] *Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2006) (*quoting* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6613).

[62] Article 117 of the Iraqi Constitution.  See Exhibit 1

[63] *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1176 (5th Cir. 1989) (to determine whether an entity is a foreign state for FSIA purposes, courts look first to the law of the foreign country at issue); *see also Servaas Inc. v. Republic of Iraq*, No. 10-828-cv, 2011 WL 454501, at *2-3 (2d Cir. Feb. 10, 2011) (holding, based on the Iraqi Constitution, that the Iraqi Ministry of Industry is considered a foreign state under the FSIA). Under the Federal Rules of Civil Procedure, when "determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. FED. R. CIV. P. 44.1.

[64] Iraqi Constitution, Article 116.

[65] *Id.*, Article 117.

[66] *Id.*, Article 115.

Constitution.  The KRG's possession of these governmental powers confirms that it is a *bona fide* political subdivision of Iraq and thus a "foreign state" entitled to sovereign immunity in court of the U.S.[67]

In addition, the executive branch of the U.S. Government has long recognized Kurdistan's sovereign status and authority under Iraqi law, providing further evidence that the KRG is a foreign state under the FSIA.[68]   Indeed, the State Department recognizes Kurdistan as having its own regional government, with its own oil and gas laws.[69]  Similarly, a 2009 State Department Fact Sheet refers to the "Kurdistan Region" and recognizes Kurdish authoritative bodies, including the Kurdish National Assembly (i.e., the legislature) and the Kurdistan Regional Investment Board.[70]  In addition, President Obama and Vice President Biden (as well as leaders from Turkey, Germany, England, France, Italy, China and many other nations) have met regularly with Kurdistan's leaders in recognition of Kurdistan's independent governance of a federal region in Iraq.[71]  The KRG maintains its own diplomatic presence in many world capitals, including in Washington, D.C.

Plaintiffs do not appear to dispute—nor could they—that Kurdistan is entitled to immunity as a political subdivision of Iraq and thus a "foreign state" under the FSIA.  Indeed, their Amended Complaint appears to concede the relevant facts for purposes of immunity under the FSIA as it refers to the KRG's territory as a "subsidiary region of Iraq under Iraqi law," and

---

[67] *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("government instrumentalities established as juridical entities distinct and independent from their sovereign[s] should normally be treated as such").
[68] *See, e.g.*, *O'Bryan v. Holy See*, 490 F. Supp. 2d 826, 829-30 (W.D. Ky. 2005) (stating that an executive branch decision to recognize an entity as a foreign sovereign conclusively establishes that the entity is entitled to FSIA immunity).
[69] *See* State Department 2013 Investment Climate Statement – Iraq (Feb. 2013), *available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204661.htm.
[70] State Department Fact Sheet, Regional Reconstruction Team in the Iraqi Kuridstan Region (2009), *available at* http://2001-2009.state.gov/documents/organization/79901.pdf.
[71] *See* White House Press Release, Readout of Vice President Biden's Call with Iraqi Kurdistan Regional Government President Masoud Barzani (Oct. 28, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/10/28/readout-vice-president-bidens-call-iraqi-kurdistan-regional-government-p.

recognizes that the KRG has a Ministry of Natural Resources located in the "Kurdistan region of Iraq."[72]

### 2.     *Sovereign Property is Immune from Prejudgment Attachment*

The FSIA instructs that sovereign property "shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611."[73]   Here, there are no applicable exceptions to immunity and, in any case, plaintiff has not even alleged an exception, much less attempted to carry its burden of proving one.[74]   Therefore, if the allegations are taken as true, the pre-judgment attachment must be vacated under the FSIA.

## VI.
## CONCLUSION

For the foregoing reasons, the Ministry of Natural Resources for the Kurdistan Regional Government of Iraq respectfully submits that the Order to Seize Cargo should be vacated.

Respectfully submitted,

*/s/ Harold K. Watson*
HAROLD K. WATSON
Texas Bar No. 20938500
Federal I.D. No. 4345
Attorney-in-Charge
DIMITRI P. GEORGANTAS
Texas Bar No. 07805100
Federal I.D. No. 2805
EUGENE W. BARR
Texas Bar No. 24059425
Federal I.D. No. 1144784
801 Travis Street, Suite 1910
Houston, Texas 77002
(713) 546-9800 (Telephone)
(713) 546-9806 (Facsimile)

ATTORNEYS FOR MINISTRY OF
NATURAL RESOURCES OF THE

---

[72] Complaint, Docket No. 1, at 2.
[73] 28 U.S.C. § 1609.
[74] *See Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 182 F.3d 380, 388 (5th Cir. 1999).

24

KURDISTAN REGIONAL GOVERNMENT

OF COUNSEL
CHAFFE McCALL, LLP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of August, 2014, I served a true and correct copy of the foregoing Motion to Vacate Order to Seize Cargo by the Ministry of Natural Resources of the Kurdistan Regional Governate of Iraq pursuant to Rule 5 of the Federal Rules of Civil Procedure, via the CM/ECF Filing System and/or by depositing the same in the United States Mail, postage prepaid and properly addressed to all known counsel of record:

Phillip B. Dye, Jr.
John J. Michael
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002
pdye@velaw.com
jmichael@velaw.com

Liane Noble
Vinson & Elkins LLP
2801 Via Furtuna, Suite 100
Austin, Texas 78746-7568
lnoble@velaw.com

*/s/ Harold K. Watson*
HAROLD K. WATSON