UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| MINISTRY OF OIL OF THE REPUBLIC OF IRAQ, § § *Plaintiff*, § § v. § § 1,032,212 BARRELS OF CRUDE OIL ABOARD § THE UNITED KALAVRVTA and the MINISTRY § OF NATURAL RESOURCES OF THE KURDISTAN § REGIONAL GOVERNATE OF IRAQ, § § *Defendants*. § | CIVIL ACTION G-14-249 |

**MEMORANDUM OPINION & ORDER**

Pending before the court are two motions: (1) a motion to vacate an order to seize cargo, Dkt. 8, filed by defendant Ministry of Natural Resources of the Kurdistan Regional Government of Iraq ("Kurdistan"); and (2) a motion to strike an appendix attached to the motion to vacate, Dkt. 12, filed by plaintiff Ministry of Oil of the Republic of Iraq ("Iraq").[1] After considering the motions, responsive briefing, record evidence, oral arguments of counsel, and applicable law, Kurdistan's motion to vacate (Dkt. 8)[2] is **GRANTED**, and Iraq's motion to strike (Dkt. 12) is **DENIED AS MOOT**. Before explaining the reasoning for its decision, the court briefly reviews the genesis and evolution of the instant dispute.

---

[1] The Ministry of Oil of the Republic of Iraq, by its own admission, is an organ of the Republic of Iraq and maintains its principal office in the national capital of Baghdad. Dkt. 7 (amended complaint) at 2 ¶ 3. The named *in personam* defendant Ministry of Natural Resources of the Kurdistan Regional Governate of Iraq (which claims to be a regional *government* rather than a "governate" under the Iraqi constitution) also appears to be a Kurdish instrumentality with its principal office in Erbil, within the Kurdistan region of Iraq. *Id.* at 2 ¶ 5; Dkt. 8 (opposed motion to vacate) at 1 & n.1. For ease of reference, except where noted or where context demands, the court will refer to the plaintiff as simply "Iraq" and the *in personam* defendant as "Kurdistan."

[2] Kurdistan filed its motion to vacate subject to a restricted appearance under Rule E(8) of the supplemental admiralty rules. *See* FED. R. CIV. P. SUPP. E(8) ("An appearance to defend against an admiralty and maritime claim . . . may be expressly restricted to the defense of such claim, and in that event is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served.").

I. BACKGROUND

*A.     Factual Background*[3]

The disputed cargo at issue in this case (which is also named as an *in rem* defendant) is 1,032,212 net barrels of crude oil, weighing over 143 million metric tons and valued at over $100 million. Dkt. 7 at 3 ¶ 10. Iraq alleges that the oil was extracted by wells situated in Kurdistan, and not from any other Iraqi region. *Id.* at 4 ¶ 11. Iraq claims a proprietary interest in the cargo, citing its own constitution, which states that "[o]il and gas are owned by all the people of Iraq in all the regions and governorates." *See* Article 111, Doustour Joumhouriat al-Iraq [The Constitution of the Republic of Iraq] of 2005; Dkt. 7-2 (declaration of Laith Al-Shaher), Ex. 1 at 1.[4] Iraq also claims that under its law the Ministry of Oil has the "exclusive authority to export, manage and market the oil resources of the Republic of Iraq." Dkt. 7-2 at 2 ¶¶ 4–5 (citing Article 110, Section 1, Doustour Joumhouriat al-Iraq [The Constitution of the Republic of Iraq] of 2005 (stating that the "federal government shall have exclusive authorities in . . . [f]ormulating foreign policy and . . . foreign sovereign economic and trade policy"); Organization of the Ministry of Oil Law No. 101, art. 5(1), of 1976 (Iraq) (stating that "[t]he Ministry of Oil is in charge of the management of the oil sector [including] exploration, drilling and extraction of oil and gas, [and] the transportation and marketing of crude oil, gas and their products . . . .")). The Ministry has delegated the *exclusive* authority to export Iraqi oil to its State Oil Marketing Organization ("SOMO"). Dkt. 7-2 at 2 ¶ 5.

Against this legal background, Iraq alleges that in December 2013, without the authorization of the Ministry of Oil, "a division, agency or instrumentality of the Kurdistan Regional Government

---

[3] For purposes of Kurdistan's motion to vacate, the parties agree that the court should consider all well-pleaded allegations in Iraq's amended complaint as true. *See* Dkt. 8 at 6; Dkt. 13 (Iraq's response in opposition) at 3 & n.6; *Jakil, S.P.A. v. Arimpex Co. Ltd.*, 08 CIV. 5613 (DC), 2009 WL 57479, at *1 (S.D.N.Y. Jan. 8, 2009).

[4] The court considers documents attached to Iraq's live pleading as part of its allegations. FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

began pumping the illegally produced crude oil through a pipeline originating in Iraq and running to Ceyhan in Turkey, known as the 'Iraq-Turkey Pipeline' or 'ITP.'"[5] Dkt. 7 at 4 ¶ 11. Upon learning of this oil delivery, Iraq instructed the Turkish government and its pipeline operator, the BOTAS Petroleum Pipeline Corporation ("BOTAS"), to hold the cargo for Iraq's account. *Id.*

BOTAS allegedly rejected Iraq's instructions and transferred the cargo to Kurdistan's possession by loading it on the UNITED KALAVRVTA (the "vessel")[6] in the navigable waters off of Ceyhan, Turkey, on or about June 22, 2014. *Id.* at 4 ¶ 12. Iraq argues that an act of conversion occurred upon this oil transfer to Kurdistan. *Id.* According to Iraq, Kurdistan "is not the owner of the oil nor does it have any title to the oil, which has been illegally misappropriated." *Id.* Laith Al-Shaher, the Chief Legal Officer of the Ministry of Oil, states that Kurdistan's actions are unlawful and avers as follows:

> [T]he crude oil aboard the United Kalavrvta is owned by the people of the Republic of Iraq, not [Kurdistan], and [Kurdistan] did not have the right to load the crude oil for export or to market or sell it without the authorization of the Ministry of Oil. No such authorization has been granted. [Kurdistan] violated Iraqi law by exporting this crude oil without the participation of SOMO.

Dkt. 7-2 at 2–3 ¶ 7.

On June 23, 2014, the vessel departed Turkish waters with the cargo. Dkt. 7 at 4 ¶ 13. Kurdistan concurrently caused a bill of lading to be issued, specifying that the cargo was "to be delivered . . . unto order" of Kurdistan. *Id.* (citing Dkt. 7, Ex. B (bill of lading)). While the cargo

---

[5] The ITP is a pipeline running from Kirkuk, Iraq to Ceyhan, Turkey, constructed and operated under the Crude Oil Pipeline Agreement of August 27, 1973, between the Republic of Turkey and the Republic of Iraq, and its subsequent amendments and protocols (the "ITP agreement"). Ceyhan is a marine terminal on the eastern shore of the Mediterranean Sea. Under the ITP agreement, both Turkey and Iraq agreed "to operate, maintain, manage and finance, and to provide all requirements for the part of the system located within its own territory to transport Crude Oil through the pipelines across Iraqi and Turkish territories and to deliver [the oil] into Ceyhan terminal . . . ." ITP Agreement, art. 2.1. Iraq cites this agreement for its contention that "crude oil may only be transported, stored and loaded through ITP facilities upon the instruction of [the Ministry of Oil] or . . . SOMO." Dkt. 7 at 4 n.1.

[6] The parties dispute whether the vessel's true name is the "UNITED KALAVRVTA" or the "UNITED KALAVRYTA." Dkt. 8 at 6 n.5; Dkt. 13 at 1 n.1. Because resolving this dispute is unnecessary to the court's analysis, the court will refer to the vessel by the name provided by Iraq in its live complaint.

was en route, Iraq alleges that additional "acts of conversion may have occurred." *Id.* at 4 ¶ 14. The ship changed destinations several times, and the cargo now sits in international waters off the coast of Galveston, Texas, where it has remained since late July. *See id.* at 4–5 ¶ 14.

B.      *Procedural Background*

On July 28, 2014, Iraq filed an original complaint in admiralty and requested that the court seize the cargo, claiming that it had been converted by Kurdistan. Dkt. 1. Iraq alleged that the vessel and cargo were, or soon would be, within the Southern District of Texas and within the court's jurisdiction. *Id.* at 2 ¶ 4. Later that evening, Magistrate Judge Nancy K. Johnson issued an order directing the United States Marshal to seize the cargo and allow the plaintiff to move the oil, under the Marshal's supervision, to a storage facility for safekeeping. Dkt. 2 at 1–2. The following day, on July 29, Judge Johnson held a status conference in the case, at which time Iraq informed the court that the vessel was situated more than 60 miles off the coast of Galveston, outside U.S. territorial waters. Dkt. 6. Judge Johnson acknowledged that the cargo could not be seized until it came within the court's jurisdiction. *Id.*

On August 1, 2014, Iraq amended its complaint. Dkt. 7. Iraq clarified in its live pleading that the issues of ownership over the cargo should be heard and determined by competent courts within the Republic of Iraq. *Id.* at 5 ¶ 15. To that end, Iraq initiated proceedings in the Iraqi Supreme Court in Baghdad in July 2012, seeking to stop Kurdistan's unauthorized export of crude oil, which would naturally include the cargo at issue in this case. *Id.* at 5–6 ¶ 17–18 ("The Supreme Court was requested, *inter alia*, to order [Kurdistan] to [follow] the Constitution and the relevant laws by ceasing its illegal crude oil exports."). However, according to Iraq, Kurdistan has not accepted service of process or responded to summonses to appear and present its case to the federal Supreme Court. *Id.* at 6 ¶ 18. This refusal has essentially frozen Iraq's constitutional case, as there "is no

4

procedural mechanism to obtain a default judgment in a case before the [Iraqi] Supreme Court." *Id.* at 6 ¶ 19. Iraq therefore filed the instant case in support of its local proceedings. *Id.* at 8 ¶ 23. "Specifically, the purpose of the attachment is to secure satisfaction of the judgment that may ultimately be entered against [Kurdistan]." *Id.*

Iraq's amended complaint asserts three causes of action, under Rules B, C, and D of the supplemental admiralty rules. *Id.* at 8–10 ¶¶ 24–35. On August 4, 2014, Kurdistan filed a motion to vacate Judge Johnson's seizure order. Dkt. 8. Kurdistan's argument boils down to a single issue, namely whether admiralty jurisdiction is present to sustain Iraq's causes of action under the admiralty rules. *See* FED. R. CIV. P. SUPP. A(1)(A) ("These Supplemental Rules apply to the procedure in admiralty and maritime claims within the meaning of Rule 9(h). . ."). Kurdistan also attached, as an appendix to its motion, a "Statement of [Kurdistan] on Iraq's Claims" that presents allegations of law and fact contradicting Iraq's complaint. Dkt. 8, Ex. A.

Iraq responded to the motion with detailed arguments regarding Kurdistan's alleged maritime tort committed on June 22, 2014, when the cargo was transferred from Turkish possession in Ceyhan to the vessel on navigable waters in the Mediterranean Sea. Dkt. 13. Iraq also filed a motion to strike Kurdistan's appendix, alleging that it was an unsworn declaration submitted outside the court's normal procedures and constituted inadmissible hearsay. Dkt. 12.

The parties filed a reply and surreply regarding the motion to vacate, Dkts. 16-1, 18-1, and the court held an oral hearing on the motion on August 22, 2014. Dkt. 19. The motions are ripe for disposition.

## II. LAW & ANALYSIS

Kurdistan's motion to vacate raises two primary issues: (1) whether it is premature for the court to hear vacatur arguments before an arrest of the cargo; and, if not, (2) whether the court has admiralty jurisdiction to sustain the order of seizure under the supplemental admiralty rules. The court considers each issue in turn.

### A.     *Prematurity & Rule E(4)(f)*

Kurdistan states in its motion to vacate that "[t]he Cargo has not yet been transshipped and brought into U.S. territory, but the KRG expects that it will enter the territorial jurisdiction of the Southern District of Texas in the near future." Dkt. 8 at 6. Iraq argues that because the cargo remains outside the court's jurisdiction and has not yet been arrested or seized, Kurdistan's motion to vacate is premature under Rule E(4)(f). Dkt. 13 at 6–8.

Rule E(4)(f) provides, in pertinent part:

> *Whenever property is arrested or attached*, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

FED. R. CIV. P. SUPP. E(4)(f) (emphasis added). The court agrees that the language of Rule E(4) suggests that a motion to vacate is cognizable only upon an arrest or attachment. *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438 (2d Cir. 2006) (explaining that "the defendant has an opportunity under Rule E(4)(f) to . . . contest the attachment *once its property has been restrained*") (emphasis added), *overruled on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd*, 585 F.3d 58, 61–62 (2d Cir. 2009); *World Fuel Servs. Singapore v. M/V Bulk Juliana*, No. 13-5421, 2014 WL 2719252, at *2 (E.D. La. June 16, 2014) ("Rule E(4)(f) . . . calls for a prompt, *post-attachment and post-arrest* hearing in proceedings under Supplemental Rules B and C.") (emphasis added). However, it would be illogical and inconsistent with the court's

independent review duties to permit a jurisdictional attack only *after* an arrest has occurred.  *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102, 118 S. Ct. 1003 (1998) (reaffirming that the court must examine its subject-matter jurisdiction, even on its own motion, at any time before final judgment).  The court will therefore treat Kurdistan's motion to vacate as a jurisdictional challenge that may be considered prior to the cargo's arrest.

### B. *Admiralty Jurisdiction*

The United States Constitution "extend[s]" federal judicial power "to all Cases of admiralty and maritime Jurisdiction."  U.S. CONST. art. III, § 2, cl. 1.  In the Constitution's division of labor, maritime law was placed under federal control "because of its intimate relation to navigation and to interstate and foreign commerce."  *Panama R.R. Co. v. Johnson*, 264 U.S. 375, 386, 44 S. Ct. 391 (1924).  Under 28 U.S.C. § 1333(1), Congress delineated the federal courts' original jurisdiction over admiralty civil suits.  *Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 239 (5th Cir. 2010).

The court's admiralty jurisdiction is generally limited to cases raising claims sounding in contract or tort.  *Id.*;[7] *see Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23, 125 S. Ct. 385 (2004) ("When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531–34, 115 S. Ct. 1043 (1995) (discussing the historical development and expansion of maritime tort jurisdiction since the Founding).  While the contours of admiralty tort jurisdiction have evolved

---

[7] In *Newlin*, the court intimated that a federal court has admiralty jurisdiction over a Rule D action, even in the absence of the existence of a maritime contract or tort.  *Newlin*, 623 F.3d at 239.  However, *Newlin* addressed a challenge over possession of an oyster dredge, and the court cited a previous Fifth Circuit case that found Rule D jurisdiction in a "possesory suit by the legal owner of a *vessel* who has been wrongfully deprived of possession."  *Id.* (emphasis added) (citing *Gallagher v. Unenrolled Motor Vessel River Queen*, 475 F.2d 117, 119 (5th Cir. 1973) (internal quotation marks omitted)).  By contrast, a federal court has admiralty jurisdiction over a Rule D *cargo* action only when "questions concerning title or possession of [the] cargo [are] based on a maritime contract or tort."  *Hunt v. A Cargo of Petroleum Prods. Laden on the Steam Tanker Hilda*, 378 F. Supp. 701, 703–04 (E.D. Pa.1974), *aff'd*, 515 F.2d 506 (3d Cir. 1975).  To be sure, issues relating to the title and possession of a seagoing vessel necessarily implicate maritime law and the court's admiralty jurisdiction, as opposed to cases in which cargo or other moveable property is merely found on a ship.  A greater connection to maritime law must be present in the latter situation for admiralty jurisdiction to vest.

over the years, under current law a party seeking a federal forum for an alleged maritime tort claim "must satisfy conditions both [1] of location and [2] of connection with maritime activity." *Grubart*, 513 U.S. at 534. Here, because Iraq has not satisfied the location element, the court restricts its analysis to that issue.

The location test is satisfied if either the tort occurred on navigable waters or if the injury suffered on land was caused by a vessel on navigable waters. *Grubart*, 513 U.S. at 534; *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999). In determining whether the tort occurred on navigable waters, the court focuses on where the alleged wrong took effect, not necessarily where the conduct took place. *Egorov*, 183 F.3d at 456; *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 288–89 (5th Cir. 1989).

Kurdistan argues that Iraq cannot meet the first option under the location test, that its claims are based on a tort on navigable waters, because the alleged conversion occurred when the Kurds extracted and exported the oil from Kurdistan, thereby exercising dominion over the resource. Dkt. 8 at 15–17. Iraq responds that Kurdistan committed conversion when it exercised control over the cargo and loaded it on the vessel near Ceyhan, Turkey. Dkt. 13 at 10; Dkt. 7 at 4 ¶ 12.

Under general common-law principles, conversion "occurs when, wrongfully and without authorization, one assumes and exercises control and dominion over the personal property of another, either inconsistently with or to the exclusion of the owner's rights." *United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 381 (5th Cir. 2012); *see also Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 87 (5th Cir. 1979); *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 94 (1st Cir. 1993); *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); RESTATEMENT (SECOND) OF TORTS § 222A (1965) (defining conversion under modern law as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right

of another to control it that the actor may justly be required to pay the other the full value of the chattel"). A person may convert property through a manual taking or by committing an act constituting such active interference with the owner's rights that it deprives him of his free use and enjoyment. *Pierson v. GFH Fin. Servs. Corp.*, 829 S.W.2d 311, 314 (Tex. App.—Austin 1992, no writ). Importantly, conversion applies to personal property, not real property. *See, e.g.*, *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 108 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Salma v. Capon*, 161 Cal. App. 4th 1275, 1295, 74 Cal. Rptr. 3d 873, 889 (Cal. Ct. App.—1st Dist. 2008). The parties do not dispute the general legal principle that oil and gas, *in situ*, is a part of the realty. *See Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 879 (Tex. Civ. App.—Dallas 1962, writ ref'd n.r.e.). However, once the oil is produced and severed from the land, it becomes personal property subject to conversion. *Id.*; *see also Rogers v. Ricane Enters., Inc.*, 930 S.W.2d 157, 165 (Tex. App.—Amarillo 1996, writ denied).

It is hornbook law that a cause of action sounding in tort generally accrues when the tort is committed. *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex. 1967). Specifically, when oil or gas is extracted from the land and dominion is asserted in a manner inconsistent with the owner's rights, a claim for conversion accrues. *See Harrington v. Texaco, Inc.*, 339 F.2d 814, 821 (5th Cir. 1964). This may occur either immediately when the oil is produced, or if it is originally produced in a lawful manner, the claim accrues when return of the minerals has been demanded and refused or "until the person in possession has unequivocally exercised acts of domination over the property inconsistent with the claims of the owner or the person entitled to possession." *Rogers*, 930 S.W.2d at 166; *Hutchison v. Union Pac. Res. Co.*, 2001 WL 1337888, at *3 (Tex. App.—Austin 2001, pet. denied) ("Union Pacific Resources drilled the CML Harbers well [under a void lease] in August 1992. The well drained Hutchison's acreage. Once the oil was removed from the ground, an action for

9

conversion accrued."). By its nature, this rule fixes accrual upon the tortfeasor's initial assertion of unlawful ownership or control, regardless of future acts during the pendency of its claim.

Iraq argues that Kurdistan "violated Iraqi law by exporting [the] crude oil without the participation of SOMO." Dkt. 7-2 at 2–3 ¶ 7. By Iraq's own pleading, the Kurds' unauthorized, land-based export of oil without SOMO's participation constituted a completed act of conversion. *Id.* The fact that Kurdistan took further steps to emphasize its purported ownership and control over the cargo, by receiving the oil on the vessel in the Mediterranean Sea, and through alleged acts during the vessel's voyage, is merely additional evidence to support Iraq's conversion claim. In other words, Kurdistan's offshore conduct merely strengthens Iraq's claim of a terrestrial tort. It does not create a maritime one.[8]

This holding is consistent with the authorities cited by Iraq. *See, e.g.*, *Adams v. Unione Mediterranea di Sicurta*, 220 F.3d 659 (5th Cir. 2000). In *Adams*, the court addressed a maritime salvage dispute and held, in pertinent part:

> As a salvor, American Eagle had the right to possess the steel and the duty to either return the steel to the Plaintiffs or file a salvage lien to obtain compensation. American Eagle did not do that. Instead, American Eagle intentionally transferred possession of the steel to A.K. Steel, who subsequently consumed the steel. This transfer, purchase and consumption negligently interfered with the Plaintiffs'

---

[8] The court pauses to consider Iraq's argument at the oral hearing that Kurdistan committed multiple conversions through unlawful exports and after several transfers of possession, first to Iraq (when the oil traveled in the ITP), then to Turkey (as a bailee for either Iraq or Kurdistan), and then back to Kurdistan on the vessel. This argument fails, however, because it conflates principles of possession and assertions of ownership. Certain courts have indeed stated that "[w]hen the possession of personal property is wrongfully acquired in the first instance, and is transmitted successively to several [parties], each possession is a new conversion." *Sandford v. Wilson*, 2 Willson 188, 1884 WL 8120, at *1 (Tex. 1884) (citing *Wells v. Ragland*, 31 Tenn. (1 Swan) 501, 1852 WL 1792, at *3 (1852)). While loosely worded, these cases stand for the proposition that wrongful transfers of possession can effect a new conversion claim against the transferee, but they do not do so as to the transferor whose alleged conversion has already occurred. *Harpending v. Meyer*, 55 Cal. 555, 560–61 (1880) (holding that a conversion claim against a pawnbroker who wrongfully accepted plaintiff's jewelry accrued upon receipt, not upon a later sale). By extension, only if the transferor relinquishes possession *and* its claim of ownership will a future *reacquisition* constitute a potential new conversion by that party. *See, e.g.*, *Stanley v. Morgan Guar. Trust Co. of N.Y.*, 570 N.Y.S.2d 22, 22 (N.Y. App. Div. 1991) (holding that after the defendant broker purchased and sold stolen bonds in 1983, it may have committed a second conversion when it reacquired some of those stolen bonds in 1987–88). In other words, as long as the converter maintains its exercise of dominion over the property, even if it gives up nominal possession, *e.g.*, to a bailee, a new conversion will not result for every consistent act of dominion.

ownership of the steel. Therefore, American Eagle and A.K. Steel committed negligent conversion.

*Id.* at 678. American Eagle, a salvor with a limited possesory right over salvaged cargo, first committed a wrongful act inconsistent with the plaintiff's rights by selling the cargo to A.K. Steel. At that time, the plaintiff's conversion claim against American Eagle & A.K. Steel accrued. A.K. Steel's consumption of the steel did not create a second conversion claim; rather, it provided more evidence of A.K. Steel's negligence.

Lastly, the court finds little support for Iraq's expansive, alternative view of the location test for admiralty jurisdiction, and the *Doe* case from the Eleventh Circuit is distinguishable. In *Doe*, the plaintiff (Jane Doe) was a passenger on a round-trip Celebrity cruise from New York City to Bermuda. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 893 (11th Cir. 2004). On the third morning of the cruise, the ship arrived in Hamilton, Bermuda, a scheduled port-of-call. *Id.* at 897. That evening, Doe and her friends went to the Oasis, a disco club less than a ten-minute walk away from where the ship was docked. *Id.* at 897–98. After the club closed early the following morning, one of the ship's waiters who was also at the Oasis offered to help Doe, who was nauseous and visibly intoxicated, back to the ship. *Id.* at 898 & n.6. Although Doe trusted the waiter and walked with him as he led her to a public park near the docked ship, he betrayed that trust and raped her. *Id.* at 898. Afterwards, Doe returned to the ship, and she reported to a nurse that she "was just raped by one of the crew-members." *Id.* The ship's doctor administered a rape kit, and Doe filed a report with the ship's security personnel. *Id.*

The *Doe* court found that, even though the rape occurred on land, the location test for admiralty tort jurisdiction had been met. *Id.* at 900–02. The Eleventh Circuit acknowledged that "this case may represent the outer boundaries of admiralty jurisdiction over torts." *Id.* at 901. Nevertheless, the court found that the following factors justified its result: (1) the assault occurred

11

during a scheduled port-of-call, which was an integral part of the entire cruise experience; (2) the tort occurred near the docked ship in an area frequented by passengers and crew-members; (3) the incident would not have occurred absent certain onboard acts, namely Doe's previous interactions with her assaulter; and (4) a uniform application of maritime law should be applied to intentional torts in these circumstances, regardless of the incidental location of a port-of-call. *Id.* at 901–02.

Unlike *Doe*, in which the assault occurred by a crew-member during a scheduled stop just minutes from the ship, Kurdistan's purported conversion was far removed from any maritime activity. Indeed, the alleged tort accrued either upon extraction of the minerals or their export to Turkey, seven months or more before the cargo was loaded onto the vessel. And *Doe*'s concern regarding the uniform application of maritime law has little force here, as the oil was severed and exported from Iraqi soil. *Doe*'s reasoning is inapplicable in these circumstances.

In sum, Iraq has pled facts showing that its claim for conversion accrued on land, when Kurdistan allegedly first exercised dominion over the crude oil without Iraq's authorization or consent. The location test for admiralty jurisdiction is not met, and Iraq's maritime claims for relief under the supplemental admiralty rules are **DISMISSED WITHOUT PREJUDICE**.

### C.     *Jurisdictional Discovery & Leave to Amend*

Based on Iraq's unequivocal allegations of Kurdistan's unlawful intervention and export of the disputed cargo, the court finds that Iraq has not demonstrated a need for jurisdictional discovery. *See Freeman v. United States*, 556 F.3d 326, 341–42 (5th Cir. 2009) (holding that a plaintiff seeking to avoid dismissal "is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a [jurisdictional challenge]"). Iraq's request is therefore **DENIED**. Lastly, while Iraq has not stated—and likely cannot state—any claims within the court's admiralty jurisdiction, the court finds that Iraq may be able to state an *in personam* claim against Kurdistan arising under the jurisdictional grant of the Foreign Sovereign Immunities

Act ("FSIA"). *See* 28 U.S.C. §§ 1330(a), 1605. Iraq's request for leave to amend its complaint is **GRANTED** for the limited purpose of potentially alleging additional facts and claims against Kurdistan that arise under any applicable FSIA immunity exception of 28 U.S.C. § 1605.

### III. CONCLUSION

As John Paul Getty once quipped: "The meek shall inherit the earth, but not its mineral rights." MARTIN H. MANSER, THE FACTS ON FILE DICTIONARY OF PROVERBS 186 (2007). Oil, a fugitive and lucrative resource, has been the subject of vigorous disputes for more than a century. When such debates involve overseas governments, issues of foreign law and relations are invariably complex. Today's holding, however, is quite narrow: Kurdistan's unauthorized export of oil over land—and later overseas—may violate Iraqi law, but it does not violate U.S. maritime law.

Kurdistan's motion to vacate (Dkt. 8) is **GRANTED**, and because the court reached its decision without reference to the motion's appendix, Iraq's motion to strike (Dkt. 12) is **DENIED AS MOOT**. Iraq's request for jurisdictional discovery is **DENIED**, and Iraq's request for leave to amend its complaint is **GRANTED** for the limited purpose of potentially alleging additional facts and claims against Kurdistan, *in personam*, arising under FSIA jurisdiction. Iraq's amended complaint (Dkt. 7) is therefore **DISMISSED WITHOUT PREJUDICE** for want of jurisdiction, but Iraq may amend its complaint within ten (10) days of the date of this order.

It is so **ORDERED**.

Signed at Houston, Texas on August 25, 2014.

_____
Gray H. Miller
United States District Judge