**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| MINISTRY OF OIL OF THE REPUBLIC OF IRAQ, | § § § | |
| *Plaintiff*, | § § | CIVIL ACTION G-14-249 |
| vs. | § § | **ADMIRALTY** – FED. R. CIV. P. 9(h) |
| 1,032,212 BARRELS OF CRUDE OIL, THE KURDISTAN REGION OF IRAQ, AND JOHN DOE BUYER, | § § § § | |
| *Defendants*. | § | |

**PLAINTIFF MINISTRY OF OIL OF THE REPUBLIC OF IRAQ'S MEMORANDUM
OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff the Ministry of Oil of the Republic of Iraq ("MoO") files this Memorandum of Law in Response to the Motion to Dismiss (Dkt. 44-1), filed by the Kurdistan Region of Iraq ("Iraqi Kurdistan"). The Motion to Dismiss should be denied because: (1) the claims asserted in the Second Amended Complaint ("Complaint" or "Compl." (Dkt. 39)) concerning title to a commercial cargo of oil are justiciable and not precluded under the political question doctrine, (2) this Court has jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), because the oil cargo was sold or will be sold into the United States; (3) the Court has admiralty jurisdiction because Iraqi Kurdistan tortiously interfered with a contract related to the loading of a vessel, which took effect on navigable waters; (4) Plaintiff is entitled to a sequestration order under Texas law; (5) the act of state doctrine does not bar Plaintiff's claims, and (6) the Complaint states a claim for relief under Iraqi law based on Iraqi Kurdistan's illegal export for sale a cargo of oil that does not belong to it.

## Table of Contents

I.    STATEMENT OF THE NATURE OF THE PROCEEDING ............................................1

II.   STATEMENT OF THE ISSUES TO BE RULED UPON AND STANDARD OF
      REVIEW .................................................................................................................2

      A.    Whether the Court Has Subject Matter Jurisdiction over This Dispute.......................2

      B.    Whether Plaintiff Alleged Sufficient Factual Matters, Accepted as True, to
            State a Claim to Relief That Is Plausible on Its Face ....................................3

III.  SHORT SUMMARY OF THE ARGUMENT ..................................................3

IV.   THIS COURT HAS CONSTITUTIONAL AND STATUTORY AUTHORITY
      TO ADJUDICATE THIS DISPUTE. ..........................................................5

      A.    The Dispute Raises Legal, Not Political, Questions That Can Properly Be
            Resolved by This Court. ........................................................................5

            (1)   There Is No Textually Demonstrable Constitutional Commitment of the
                  Issue to a Coordinate Political Department and Therefore No Potential
                  Expression of Lack of Respect or Embarrassment. .................................7
            (2)   This Case Requires Basic Statutory Interpretation and Application of the
                  Law to the Facts. ..........................................................................10

      B.    This Court has Jurisdiction under the Foreign Sovereign Immunities Act.................12

            (1)   Plaintiff's Claims Are Based upon Commercial Activity in or with a
                  Direct Effect in the United States. ......................................................12
            (2)   KRG Engaged in Commercial, Not Sovereign, Activities ....................15

      C.    Plaintiff's Pleadings Satisfy the Requirements for Admiralty Jurisdiction. ...............16

            (1)   KRG Committed the Tortious Interference on Navigable Waters, and
                  Those Tortious Acts Had an Effect on Navigable Waters.....................16
            (2)   Ordering the Loading of Cargo Aboard a Vessel in Navigable Waters
                  Against the Contractual Rights of the Cargo's Owner to Direct the
                  Loading Is Disruptive to Maritime Commerce.....................................17
            (3)   The Court Has Admiralty Jurisdiction Over the John Doe Claims. ................19

      D.    Plaintiff Is Entitled to Pre-Judgment Attachment Remedies. .......................20

V.    PLAINTIFF'S COMPLAINT CONTAINS SUFFICIENT FACTUAL MATTER
      TO STATE A CLAIM TO RELIEF THAT IS PLAUSIBLE ON ITS FACE. .................21

      A.    The Act of State Doctrine Does Not Bar Plaintiff's Claims.......................21

            (1)   Iraq Is the State Actor, Not Iraqi Kurdistan........................................21

(2)  Because Iraq Is a State Actor Seeking Relief in U.S. Court, the Act of State Doctrine Does Not Apply to KRG...............................................22

(3)  The Acts at Issue Did Not Occur in Iraqi Kurdistan................................23

B.  Plaintiff Has Stated a Claim for Relief under Iraqi Law. ............................24

(1)  Iraq's Interpretation of Its Own Law Is Due Substantial Deference. ...................24

(2)  The Cargo Was Exported in Violation of Iraqi Law.................................24

(a)  By Exporting the Cargo Without Authorization from MoO, KRG Violated the Iraqi Constitution and Iraqi Law ................................25

(b)  KRG's Construction of the Iraqi Constitution Is Erroneous...........................30

(c)  KRG Recognized the Federal Government's Authority over Oil Exports, But Failed to Comply with Its Obligations.......................................33

VI.  CONCLUSION....................................................................................35

## Table of Authorities

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
   425 U.S. 682 (1976)..................................................................................................... 21

*Alphamate Commodity GMBH v. CHS Europe SA*,
   627 F.3d 183 (5th Cir. 2010) ....................................................................................... 17

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)..................................................................................................... 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................................3

*Baker v. Carr*,
   369 U.S. 186 (1962)............................................................................................6, 7, 10

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)..................................................................................................7, 21

*Baragona v. Kuwait Gulf Link Transp. Co.*,
   691 F. Supp. 2d 1346 (N.D. Ga. 2007)
   *vacated on jurisdictional grounds*, 691 F. Supp. 2d 1351 (N.D. Ga. 2009)............ 11

*Barkanic v. Gen. Admin. of Civil Aviation of Peoples Republic of China*,
   822 F.2d 11 (2d Cir. 1987) ........................................................................................... 13

*Bd. of Comm'rs of Port of New Orleans v. New Orleans Terminal, LLC*,
   No. 11-CV-2899, 2013 WL 5934609 (E.D. La. Oct. 31, 2013) ................................. 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................................3

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) ................................................................................... 20, 21

*Callejo v. Bancomer, S.A.*,
   764 F.2d 1101 (5th Cir. 1985) ................................................................................ 13, 21

*Chevron U.S.A. Inc. v. National Res. Defense Council, Inc.*,
   467 U.S. 837 (1984)..................................................................................................... 24

*Coastal Prod. Servs. Inc. v. Hudson*,
   555 F.3d 426 (5th Cir. 2009) ....................................................................................... 18

*Commerzbank Aktiengesellschaft v. M/V UTOPIE*,
   Nos. 13–6622, 13-6761, 14–472, 2014 WL 1572438 (E.D. La. Apr. 17, 2014)............... 16, 17

*Connecticut Bank of Commerce v. Republic of Congo*,
   309 F.3d 240 (5th Cir. 2002) ....................................................................................... 15

*Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*,
   183 F.3d 453 (5th Cir. 1999) ....................................................................................... 16

*Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C.*,
   693 F. Supp. 2d 4 (D.D.C. 2010) ................................................................. 11

*Guevara v. Republic of Peru*,
   468 F.3d 1289 (11th Cir. 2006) ................................................................. 16

*Hamm v. TRTB, LLC*,
   No. 08–1710, 2010 WL 4627078 (W.D. La. July 30, 2010) ................................. 18

*In re Oil Spill by Amoco Cadiz*,
   954 F.2d 1279 (7th Cir. 1992) ................................................................. 24

*Jackson v. People's Republic of China*,
   550 F. Supp. 869 (N.D. Ala. 1982) .............................................................. 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) .................................................................... 6, 10

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
   513 U.S. 527 (1995) ................................................... 16, 17, 19, 20

*Kirby Inland Marine L.P. v. MedStar Funding, LC*,
   No. H-12-03107, 2013 WL 2180017 (S.D. Tex. May 17, 2013) ............................ 17

*Kirkham v. Societe Air France*,
   429 F.3d 288 (D.C. Cir. 2005) ................................................................. 13

*Lane v. Halliburton*,
   529 F.3d 548 (5th Cir. 2008) ................................................................. 8

*Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*,
   No. 3:12–CV–304, 2013 WL 4505987 (S.D. Tex. Aug. 22, 2013).......................... 18

*Maltina Corp. v. Cawy Bottling Co.*,
   462 F.2d 1021 (5th Cir. 1972) ................................................................. 24

*McGee v. Arkel Int'l, LLC*,
   671 F.3d 539 (5th Cir. 2012) ................................................................. 11

*McKesson Corp. v. Islamic Republic of Iran*,
   753 F.3d 239 (D.C. Cir. 2014) ................................................................. 11

*Oaxaca v. Roscoe*,
   641 F.2d 386 (5th Cir. 1981) ................................................................. 19

*Occidental of Umm al Qaywayn, Inc. v. Certain Cargo of Petrol. Laden Aboard Tanker
   Dauntless Colocotronis*,
   577 F.2d 1196 (5th Cir. 1978) ........................................................... 9, 10

*Oetjen v. Central Leather Co.*,
   246 U.S. 297 (1918)............................................................................ 22

*Paterson v. Weinberger*,
   644 F.2d 521 (5th Cir. 1981) ................................................................. 3

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992)............................................................................ 14

*Republic of Iraq v. ABB AG*,
   920 F. Supp. 2d 517 (S.D.N.Y. 2013) ............................................................ 6, 22, 23

*Republic of Iraq v. First Nat'l City Bank*,
   241 F. Supp 567 (S.D.N.Y. 1965) ............................................................ 11

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) ............................................................ 23

*Republic of Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) ............................................................ 23

*Riggs National Corp. & Subsidiaries v. C.I.R.*,
   163 F.3d 1363 (D.C. Cir. 1999) ............................................................ 23

*Rong v. Liaoning Province Gov't*,
   452 F.3d 883 (D.C. Cir. 2006) ............................................................ 15

*Rush–Presbyterian–St. Luke's Med. Ctr. v. Hellenic Republic*,
   877 F.2d 574 (7th Cir. 1989) ............................................................ 15

*Servaas Inc. v. Republic of Iraq*,
   686 F. Supp. 2d 346 (S.D.N.Y. 2010) ............................................................ 14

*Spectrum Stores, Inc. v. Citgo Petrol. Corp.*,
   632 F.3d 938 (5th Cir. 2011) ............................................................ passim

*Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*,
   392 F.2d 706 (5th Cir. 1968) ............................................................ 24

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
   752 F.3d 239 (2d Cir. 2014) ............................................................ 18

*The Maret*,
   145 F.2d 431 (3d Cir. 1944) ............................................................ 9

*Underhill v. Hernandez*,
   168 U.S. 250 (1897) ............................................................ 21

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ............................................................ 6

*W.S. Kirkpatrick & Co., Inc., v. Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990) ............................................................ 21

*Wagstaff v. U.S. Dep't of Educ.*,
   509 F.3d 661 (5th Cir. 2007) ............................................................ 3

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ............................................................ 19

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   132 S. Ct. 1421 (2012) ............................................................ 5, 6, 11

**Statutes**

28 U.S.C. § 1333(1) ............................................................................................. 16, 19

28 U.S.C. § 1605(a)(2) ........................................................................................ 12, 16

28 U.S.C. § 517 ......................................................................................................... 9

28 U.S.C. §§ 1609-1610 .......................................................................................... 20

Tex. Civ. Prac. & Rem. Code § 62.001 ................................................................... 20

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 2

Fed. R. Civ. P. 12(b)(6) .............................................................................. 3, 12, 24

Fed. R. Civ. P. 44.1 .................................................................................................. 11

Fed. R. Civ. P. 64 .................................................................................................... 20

Fed. R. Civ. P. 9(h) ................................................................................................... 1

Tex. R. Civ. P. 696 .................................................................................................. 20

**Constitutional Provisions**

Iraq Const. art. 110 ...................................................................................... 22, 26, 31

Iraq Const. art. 111 ............................................................................................ 25, 26

Iraq Const. art. 112 ................................................................................................. 31

Iraq Const. art. 112 (First) ............................................................................ 30, 31, 32

Iraq Const. art. 112 (Second) ........................................................................ 30, 31, 32

Iraq Const. art. 115 ............................................................................................ 31, 32

Iraq Const. art. 121 ................................................................................................. 33

Iraq Const. art. 121 (Second) ................................................................................... 32

Iraq Const. art. 130 ................................................................................................. 28

Iraq Const. art. 8 ..................................................................................................... 29

Iraq Const. art. 93 .................................................................................................... 1

Iraq Const. Section Two (Rights and Liberties) ....................................................... 30

U.S. Const. art. I, § 10 ............................................................................................. 22

**Other Authorities**

Ashley S. Deeks & Matthew D. Burton, *Iraq's Constitution: A Drafting History*, 40
    Cornell Int'l L.J. 1 (2007) ................................................................................... 31

Brendan O'Leary, *Federalizing Natural Resources*, in *Iraq: Preventing a New Generation of Conflict* (Markus Bouillon et al. eds., 2007) ...................................................... 33

H.R. Rep. No. 94–1487 (1976),
*reprinted in* 1976 U.S.C.C.A.N. 6604 ..................................................................... 14

James Crawford, *The Authority of the Kurdistan Regional Governemnt over Oil and Gas under the Constitution of Iraq* (Jan 29, 2008) ........................................................ 31

Peter W. Galbraith, *The End of Iraq; How American Incompetence Created a War Without End* (2006) ............................................................................................. 33

Restatement (Third) of Foreign Relations Law § 201 (1987) ...................................... 22

Rex Zidalis, *The Legal Dimensions of Oil and Gas in Iraq: Current Reality and Future Prospects* (2009) ............................................................................................. 32

I.       **STATEMENT OF THE NATURE OF THE PROCEEDING**

This is a case of admiralty jurisdiction brought *in rem* pursuant to Federal Rule of Civil Procedure 9(h) and the Supplemental Rules for Certain Admiralty or Maritime Claims & Asset Forfeiture Actions ("Supplemental Rules"), and *in personam* against Iraqi Kurdistan under FSIA and John Doe Buyer pursuant to federal maritime law and Texas state law.  Plaintiff seeks repossession of 1,032,212 net barrels of crude oil (the "Cargo") to which Plaintiff holds title on behalf of the Iraqi people under the Constitution of Iraq, and which Plaintiff has the exclusive right to export under Iraqi law.[1]  The Cargo was misappropriated and unlawfully exported from Iraq by KRG,[2] and unlawfully loaded on the UNITED KALAVRVTA (IMO# 92090397) (the "Vessel").  To achieve this, KRG tortiously interfered with a valid contract between the Republic of Iraq and the Republic of Turkey.  After loading, KRG appears to have unlawfully sold all or part of the Cargo to John Doe Buyer on navigable waters.  To the extent a sale did occur, a factual point that KRG continues to sidestep, Plaintiff may recover for conversion against John Doe Buyer.

It has always been MoO's contention that the issues at bar should be resolved in Iraq.[3]  To that end, MoO instituted legal proceedings before the Iraqi Federal Supreme Court, which is empowered to interpret the Iraqi Constitution and to resolve disputes between the federal government and Iraq's regions.[4]  Iraqi Kurdistan has thwarted those legal proceedings by refusing to appear in court.  Compl. ¶ 30, Ex. G.

---

[1]        MoO has been authorized to pursue the above-captioned matter by the Ministry of Justice of the Republic of Iraq.  *See* Ex. 2, Decl. of Hanan Munther Nisaef ¶ 4 (Nov. 12, 2014).

[2]        Upon information and belief, Iraqi Kurdistan is represented in this action by the Ministry of Natural Resources of the Kurdistan Regional Government of Iraq ("KRG").  KRG entered a restricted appearance under Supplemental Rule E(8) to file its Motion to Vacate.  Dkt. 8.

[3]        Compl ¶ 26 ("The determination of the ownership of the Cargo aboard the Vessel requires resolution of important issues of interpretation of the Iraqi Constitution and Iraqi law.  These issues should properly be decided by competent courts in Iraq.").

[4]        Iraq Const. art 93 (Dkt. 39-4).

Iraqi Kurdistan used similar tactics to block this Court from exercising the admiralty remedies of arrest and attachment.  The Vessel arrived offshore Galveston on July 28, 2014, and has since remained anchored 60 miles offshore, out of the reach of the United States Marshals.  Iraqi Kurdistan nonetheless remains steadfast in its intention to discharge the Cargo (or the portion that has not already been discharged) in this District if it succeeds in this test case.[5]

It appears to be Iraqi Kurdistan's position that no court in the world may adjudicate this matter.  This, of course, cannot be so, as this Court has jurisdiction over the parties and issues.  While the issues *should* be decided in Iraq, they certainly *may* be decided here.  MoO maintains that it will move to stay these proceedings if KRG agrees to sell the Cargo and place the proceeds into the registry of the Court, pending resolution of the dispute by the Iraqi Federal Supreme Court.[6]  If Iraqi Kurdistan still refuses to have these issues resolved by the Iraqi Federal Supreme Court despite these overtures, this Court should resolve the dispute.

## II.    STATEMENT OF THE ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

### A.    Whether the Court Has Subject Matter Jurisdiction over This Dispute

Iraqi Kurdistan brings its motion pursuant to FED. R. CIV. P. 12(b)(1).  A motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears **certain** that

---

[5]    KRG's congressional representative in the U.S. stated that 100,000 barrels of the Vessel's oil has already been sold and discharged into the United States.  *See* Ex. 3, Matthew Phillips, *A Mysterious Oil Tanker Might Hold the Key to Kurdish Independence*, BLOOMBERG BUSINESSWEEK, Oct. 23, 2014, at 3-4, http://www.businessweek.com/articles/2014-10-23/iraqi-kurds-seek-independence-through-shady-oil-sales ("Bloomberg Art.") (quoting Karwan Zebari, director of Congressional affairs of KRG Representation in the U.S. as follows:  "It's my understanding that some of the oil has been delivered. Maybe 100,000 barrels or so.").  The same article describes this as a test case.  *Id.* at 2 ("If they can establish the legal right to sell oil in the U.S., the Kurds will have gone a long way toward doing so everywhere else.").

[6]    *See* Ex. 4, Official Transcript of July 29, 2014 Hearing Before Mag. Judge Johnson at 8:15-21 ("MR. DYE: . . . maybe we can make some agreement to dispose of the oil and reduce it to cash and put it in the custody of the court . . . .  THE COURT: The Registry of the Court is a very safe place."); Ex. 5, Official Transcript of Aug. 22, 2014 Hearing Before Judge Miller at 18:2-7 ("MR. DYE: . . . What we want is for that oil to be held either by sale or placement in the registry of the Court – this Court's registry pending the outcome of litigation in Iraq. We have a lawsuit in Iraq to settle the constitutional issue of who has this right.").  *See also* Ex. 6, Letter from Phillip B. Dye, Jr. to Harold K. Watson (Nov. 12, 2014).

the plaintiff cannot prove any set of facts in support of his claims entitling him to relief. *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007). The plaintiff has the burden of demonstrating that subject matter jurisdiction exists. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

      **B.**      **Whether Plaintiff Alleged Sufficient Factual Matters, Accepted as True, to State a Claim to Relief That Is Plausible on Its Face**

Iraqi Kurdistan also brings its motion pursuant to FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.     SHORT SUMMARY OF THE ARGUMENT

***Iraqi Kurdistan does not own, and has never owned, the Cargo***. Under the Iraqi Constitution, the Cargo belongs to all people of Iraq, not to any one region of Iraq. Iraqi Kurdistan did not have the right to export the Cargo from Iraq, because under the Iraqi Constitution, foreign trade in oil and international agreements relating to oil are under exclusive federal government authority. The Iraqi federal government's authority over the oil sector, including exports, has been delegated to MoO. The exclusive authority of MoO over oil exports was recognized by the Iraqi Federal Supreme Court in a ruling involving a different political subdivision of Iraq.[7] KRG's exports have also caused Iraq to violate its international obligations. By exporting the Cargo without MoO authorization, Iraqi Kurdistan misappropriated oil that belongs to all Iraqi people, in violation of the Iraqi Constitution and Iraqi law.

---

[7]       The case involved Waset Governorate of Iraq, which is similar to a province. *Minister of Oil v. H.E. the Chair of Waset Governorate* (Decision No. 8/Federal/2012, May 2, 2012) ("*Waset Governorate*"). Unlike Iraqi Kurdistan, the government of Waset Governorate responded to the summons of the Iraqi Federal Supreme Court. The *Waset Governorate* case is discussed in more detail *infra* at Section V.B.(2)(a). *See* Ex. 1-D.1, unofficial English translation of the *Waset Governorate* decision; *see also* Ex. 1-D.2, original Arabic version, *available at* http://www.iraqja.iq/krarat/1/2012/8.pdf (Federal Judicial Authority website).

***This case does not raise any non-justiciable political question.***   Determining whether Iraqi Kurdistan owns (or has ever owned) the Cargo, and whether Iraqi Kurdistan had the right to export the Cargo, requires construction of the Iraqi Constitution and is a classic function for a court.   The claims asserted do not require the Court to adjudicate issues of sovereignty over territory, or to make any foreign policy judgments committed to the political branches of the U.S. Government.   To the contrary, the U.S. describes this dispute as involving a "commercial transaction" with which the U.S. Government "is not involved."[8]   Any question as to the proper party to export oil from Iraq is non-political, and has already been answered.[9]

***Iraqi Kurdistan engaged in commercial activity in and/or with a direct effect in the United States***.   Iraqi Kurdistan's efforts to commercialize oil by the illegal export, loading and discharge (and intended discharge) of the Cargo in the United States provide this Court with jurisdiction under FSIA.   Iraqi Kurdistan (or John Doe Buyer) also arranged for lightering of the Cargo by a U.S. company, and entered into a sale contract with a U.S. refiner relating to the Cargo.

***Iraqi Kurdistan and John Doe Buyer's maritime torts provide this Court with admiralty jurisdiction***.   Iraqi Kurdistan caused the Cargo to be loaded onto the Vessel by giving an instruction to Turkey and its state-owned pipeline operator.   In doing so, Iraqi Kurdistan tortiously interfered with maritime obligations in the Iraq-Turkey Pipeline Agreement (the "ITP Agreement"), an international agreement that provides that oil may be loaded on tankers only at the instruction of MoO.   John Doe Buyer subsequently converted the Cargo on navigable waters.

---

[8]     Dkt. 44-1 at 12 (quoting Ex. 7, Jen Psaki, State Department Daily Press Briefing (Aug. 26, 2014), http://www.state.gov/r/pa/prs/dpb/2014/08/230911.htm)).

[9]     *See* Ex. 8, Jen Psaki, State Department Daily Press Briefing (Nov. 27, 2013), http://www.state.gov/r/pa/prs/dpb/2013/11/218105.htm) ("We don't support oil exports from any part of Iraq without approval of the Iraqi federal government.").

*MoO is entitled to a seizure order under Texas law*. MoO has a valid independent claim to recover the Cargo, which belongs to all Iraqi people, represented by MoO. Iraqi Kurdistan cannot avoid such an order because FSIA precludes prejudgment attachment only where property belongs to the defendant, and the Cargo is not Iraqi Kurdistan's property.

*MoO's claim is not barred by the act of state doctrine*. Contrary to KRG's position, this case is not a dispute between two sovereign states. The Republic of Iraq is a foreign state, and Iraqi Kurdistan is a recalcitrant region within that foreign state. The policy considerations that give rise to the act of state doctrine do not apply to Iraqi Kurdistan's actions, any more than they would bar a claim against Texas if it were to export U.S. federal oil in violation of the federal ban on such exports. The act of state doctrine also does not apply because the act at issue, the loading, sale and discharge of the Cargo, was not completed within the territory of Iraq.

This case relates only to title to, and the right to export, a commercial cargo of oil. The Cargo has been misappropriated by Iraqi Kurdistan and exported in violation of the Iraqi Constitution and Iraqi law. The Cargo or its proceeds must be returned to its rightful owner, MoO, acting on behalf of all the people of Iraq.

## IV. THIS COURT HAS CONSTITUTIONAL AND STATUTORY AUTHORITY TO ADJUDICATE THIS DISPUTE.

### A. The Dispute Raises Legal, Not Political, Questions That Can Properly Be Resolved by This Court.

Iraqi Kurdistan's invocation of the political question doctrine to support dismissal of the Complaint is without merit because MoO's claims raise legal questions that can properly be resolved by this Court, not political questions. In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1428 (2012). One narrow exception to that rule is known as the "political question" doctrine. *See, e.g., Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S.

221, 230 (1986).  The doctrine is "essentially a function of the separation of powers," between

the Executive, Legislative and Judicial branches of the United States Government, *Baker v. Carr*,

369 U.S. 186, 210-11, 217 (1962), existing to restrain U.S courts "from inappropriate

interference in the business of the other branches of [the U.S.] Government."  *United States v.*

*Munoz-Flores*, 495 U.S. 385, 394 (1990).

     The Supreme Court has set forth six factors for determining the existence of a political

question:

> [1.] a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or [2.] a lack of
> judicially discoverable and manageable standards for resolving it;
> or [3.] the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or [4.]
> the impossibility of a court's undertaking independent resolution
> without expressing lack of the respect due coordinate branches of
> government; or [5.] an unusual need for unquestioning adherence
> to a political decision already made; or [6.] the potentiality of
> embarrassment from multifarious pronouncements by various
> departments on one question.

*Baker*, 369 U.S. at 217.  Here, none of these factors supports a finding of non-justiciability.

     Importantly, the existence of political overtones does not make this dispute a political

question.  *Id.*  "[T]he issues here—causation, territoriality, private rights of action—fall squarely

within the Court's competence but happen to involve international and political actors."

*Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 535 (S.D.N.Y. 2013) (in a RICO action over

the Iraqi oil for food program, finding case was justiciable because "the Court does not need to

decide whether or not to recognize the Republic of Iraq as a sovereign state, [as] . . . the

Executive already has recognized the Republic of Iraq") (citation omitted).  KRG invites the

Court to err by confusing the discrete question of the legality of KRG's export, loading, and sale

of oil with the broader political question of the status of the Kurdistan Region of Iraq.  *See*

*Zivotofsky,* 132 S. Ct. at 1426 (circuit court erred where it conflated the specific legal question of

whether plaintiff could record Israel as his place of birth with the broader question of the political status of Jerusalem).  Here, the Court need only decide the specific legal question of whether MoO may repossess 1,032,212 net barrels of crude oil to which all of the Iraqi people, represented by MoO, hold title under the Constitution of Iraq.

> ### (1)   There Is No Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department and Therefore No Potential Expression of Lack of Respect or Embarrassment.

According to Iraqi Kurdistan, "[t]o adjudicate the MoO's claims, this Court would have to be the first court of record to resolve a fundamentally political dispute,[10] between two parts of a foreign federal state,[11] by interpreting the Iraqi Constitution as to the relative powers of their respective governments arising out of actions that have not been alleged to have injured anyone in this country."  Dkt. 44-1 at 6 (emphasis omitted).  Iraqi Kurdistan cites no case in which the need to construe foreign law or the fact that an action involves a foreign state and its political subdivision renders the case non-justiciable on political question grounds.

Moreover, it "cannot . . . be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'"  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (quoting *Baker*, 369 U.S. at 211).  An invocation of "foreign policy," without more, will not suffice.  *Spectrum Stores, Inc. v. Citgo Petrol. Corp.*, 632 F.3d 938, 950 (5th Cir. 2011).  Rather, it is only where the judiciary is asked to render a decision that would interfere with a political branch's policy choices and value determinations affecting U.S. foreign relations that abstention under the political question doctrine may be appropriate.

---

[10]  This Court would not be the first to determine the rights of MoO with respect to Iraqi oil exports.  MoO's exclusive authority over oil exports has been recognized by the Iraqi Federal Supreme Court, in the *Waset Governorate* case.  Ex. 1-D.1, *Waset Governorate* at 3.

[11]  This action, however, is not a dispute between "two parts of a … state," but rather one between the state itself and a recalcitrant region.

Iraqi Kurdistan contends that MoO's claims require resolution of issues involving U.S. foreign policy, arguing that the Court should not decide "how the United States should handle the range of complex diplomatic and related questions the [MoO] presents."  Dkt. 44-1 at 5. Here, MoO does not ask the Court to decide "how the *United States*" should handle anything. Critically, the United States does not share Iraqi Kurdistan's characterization of this case as implicating important U.S. foreign policy considerations.  To the contrary, the Department of State referred to this case as involving a "***commercial*** transaction" as to which the "***United States Government is not involved***."  Dkt. 44-1 at 12 (quoting State Department Daily Press Briefing dated Aug. 26, 2014) (emphasis added).  Accordingly, Iraqi Kurdistan fails to show that this lawsuit presents a direct challenge to actions taken by a coordinate branch of the federal government.  *See Lane v. Halliburton,* 529 F.3d 548, 560 (5th Cir. 2008) (the primary concern of the political question doctrine is with direct challenges to actions taken by a coordinate branch of the federal government).

Iraqi Kurdistan refers to statements by Secretary of State Kerry to the effect that the President's strategy relating to ISIL depends on whether the Iraqi government is "inclusive," (Dkt. 44-1 at 13), without indicating why this is relevant to the present case.  The question of title to this Cargo of crude oil has nothing to do with the inclusivity of the Iraqi government.[12] The President's ISIL strategy has nothing to do with this case.

Iraqi Kurdistan also misplaces its reliance on *Spectrum Stores* and *Occidental of Umm al Qaywayn, Inc. v. Certain Cargo of Petrol. Laden Aboard Tanker Dauntless Colocotronis*, 577

---

[12]   In fact, the current Iraqi government includes ministers from all of Iraq's principal groups.  *See* Ex. 9, Listing of New Iraqi Cabinet (September 12, 2014) (English translation of official Iraqi Government Announcement of new cabinet members), *available at* http://www.iraq-businessnews.com/2014/09/12/listing-of-new-iraqi-cabinet/2/.  *See also* Ex. 10, Qassim Abdul-Zahra, *Iraq lawmakers approve interior, defense ministers to complete formation of government*, U.S. NEWS, Oct. 18, 2014, http://www.usnews.com/news/world/articles/2014/10/18/iraq-lawmakers-approve-interior-defense-ministers (describing the different groups represented among Iraq's ministers).

F.2d 1196, 1203 (5th Cir. 1978).   In *Spectrum*, the court found the case presented a non-justiciable political question because it was being "asked essentially to reprimand foreign nations and command them to dismantle their international agreements" despite a decades-long foreign policy determination of the U.S. Government that OPEC members and their subsidiaries should be able to sell oil in the U.S. without being subjected to claims under U.S. antitrust laws. *Spectrum,* 632 F.3d at 951 (question related to U.S. foreign policy toward OPEC members).   The *Spectrum* court received statements of interest from the United States Departments of State, Treasury, Energy, and Justice under 28 U.S.C. § 517, stating that "adjudication of th[e] case would result in the frustration of various objectives 'of vital interest to the United States' national security.'"   *Id.* at 951-52.   In contrast, (1) the case at bar does not require the Court to interfere with a considered, decades-long foreign policy determination; (2) the U.S. has not submitted any Section 517 statements (rather it has publically stated it is "not involved" in the dispute); and (3) Iraqi Kurdistan is not a recognized "foreign nation,"[13] unlike the entities at issue in *Spectrum.*[14]

Likewise, in *Occidental*, the court found a political question because it could not adjudicate the claims before it without having to "resolve the dispute over [the] Abu Musa [territory]"—an area, which Iraqi Kurdistan acknowledges "had been the subject of conflicting

---

[13]      *See* Ex. 11, Independent States in the World, Bureau of Intelligence and Research, Fact Sheet, http://www.state.gov/s/inr/rls/4250.htm (Department of State official website); *see also The Maret*, 145 F.2d 431, 442 (3d Cir. 1944) ("A policy of nonrecognition when demonstrated by the Executive must be deemed to be as affirmative and positive in effect as a policy of recognition.")  In fact, the U.S. State Department stated that the U.S. supports the "Iraqi Kurdistan Region" only "*within the framework of Iraq's constitution*."  *See* Ex. 12, Media Note, *Readout of Acting Assistant Secretary for Near Eastern Affairs Beth Jones' Meeting with Iraqi Kurdistan Region Delegation*, Office of the Spokesperson, U.S. Department of State, Washington, D.C. (Apr. 12, 2013), http://www.state.gov/r/pa/prs/ps/2013/04/207454.htm (emphasis added).

[14]      For these three reasons, the Republic of Iraq's amicus brief in *Spectrum Stores* is consistent with MoO's position here.  In the amicus brief, Iraq stated that "the history of diplomatic engagement between the United States and the Republic of Iraq supports the court's dismissal on the basis of the political question doctrine by demonstrating the Executive Branch's preference for cooperation rather than confrontation on oil-related issues." Dkt. 44-12.  The oil-related issues here are distinct from the oil-related issues at stake in *Spectrum*, as they do not implicate any "diplomatic engagement between the United States and the Republic of Iraq."

claims by two sovereigns,"[15] Iran and Great Britain as agent of Sharjah. *Occidental*, 577 F.2d at 1199, 1203 ("The resolution of a territorial dispute between sovereigns, however, is a political question which we are powerless to decide."). Here, there is no dispute regarding the sovereignty over the territory that constitutes Iraqi Kurdistan.

In sum, there is no textual commitment to have the questions at issue here resolved by the political branches and no principle of U.S foreign policy that would be adversely affected by the Court's resolution of this case. Nor are the third through sixth *Baker v. Carr* factors implicated here, as it would not be "impossible" to decide this case without making "an initial policy determination of a kind clearly for nonjudicial discretion" or without "expressing lack of the respect due coordinate branches of government." 369 U.S. at 217. Nor is there any "unusual need for unquestioning adherence to a political decision already made" or "potentiality of embarrassment from multifarious pronouncements by various departments on one question." Accordingly, these factors provide no support for invoking the political question doctrine. *Id.*

### (2)   This Case Requires Basic Statutory Interpretation and Application of the Law to the Facts.

Furthermore, there exist judicially discoverable and manageable standards for resolving the legal dispute here. Plaintiff only asks that the Court use traditional rules of statutory construction, and then apply that analysis to the particular set of facts presented. *Japan Whaling*, 478 U.S. at 230 (finding that judicially manageable standards exist, and case is justiciable, where "decision. . . calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below"). MoO asks this Court to review the Iraqi Constitution, relevant Iraqi laws and the prior interpretation of the Constitution and those laws by the Iraqi Federal Supreme Court and scholars, examine the

---

[15]        Dkt. 44-1 at 5.

factual situation with regard to this particular Cargo of crude oil, and apply the law to those facts. *See McKesson Corp. v. Islamic Republic of Iran*, 753 F.3d 239 (D.C. Cir. 2014) (engaging in basic statutory interpretation of Articles 515 and 519 of the Iranian Civil Procedure Act of 2000). Indeed, "[r]esolution of [MoO's] claims demands careful examination of the textual, structural, and historical evidence put forward by the parties" with respect to Iraqi law. *Zivotofsky,* 132 S. Ct. at 1430. "That is what courts do. The political question doctrine poses no bar to the judicial review of this case." *Id.*

More specifically, Plaintiff's *in personam* claim against Iraqi Kurdistan requires interpretation of the Constitution of the Republic of Iraq and Iraqi law to determine the legality of Iraqi Kurdistan's export for sale of the Cargo without the consent or authorization of MoO. Compl. at ¶¶ 35-38. This interpretation will be guided by the text of the Iraqi Constitution and other Iraqi laws and Iraqi case law interpreting the Iraqi Constitution. Indeed, MoO's exclusive authority over oil exports has been recognized by the Iraqi Federal Supreme Court, in its *Waset Governorate* ruling.[16] The Court would also be guided by U.S. case law and legal commentary interpreting Iraqi law. Courts in the U.S. can and have applied Iraqi law without running afoul of the political question doctrine.[17] Such interpretation will not require a policy determination.

Iraqi Kurdistan essentially concedes the existence of judicially manageable standards by devoting the last 6 pages of its Motion to Dismiss to the type of Iraqi constitutional interpretation that it claims is unworkable. Dkt. 44-1 at 28-34. While MoO, of course, disagrees with KRG's

---

[16]     Ex. 1-D.1, *Waset Governorate,* at 2, 3. *See infra* Section V.B.(2)(a).
[17]     *See e.g., McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 546-47 (5th Cir. 2012) (applying Iraqi prescriptive period for a tort of wrongful death of "three years from the day on which the injured person became aware of the injury and of the person who caused it" under Federal Rule of Civil Procedure Rule 44.1); *Baragona v. Kuwait Gulf Link Transp. Co*., 691 F. Supp. 2d 1346, 1347, 1349 (N.D. Ga. 2007) (interpreting Article 5 of the Iraqi Code of Civil Procedure under Federal Rule of Civil Procedure Rule 44.1), *vacated on jurisdictional grounds*, 691 F. Supp. 2d 1351 (N.D. Ga. 2009); *Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C*., 693 F. Supp. 2d 4, 17 (D.D.C. 2010) (evaluating Iraqi estate law regarding procedure to become a "Qassam Sharie" or personal representative in a legal action); *Republic of Iraq v. First Nat'l City Bank*, 241 F. Supp 567, 575 (S.D.N.Y. 1965) (evaluating application of Iraqi law of inheritance).

reading of the Constitution, in analyzing this factor of the political question test, the correct question is whether there are any judicially manageable standards *to be applied*, not whether the judicially manageable standards, *as applied*, actually support the plaintiff's position. The latter question is properly addressed under Rule 12(b)(6).

In addition to the application of Iraqi law, MoO's state and federal law claims also involve statutory interpretation of FSIA, the Texas Rules of Civil Procedure, the Texas Civil Practice and Remedies Code, and the Supplemental Rules. Accordingly, several sources of statutory, administrative and common law exist to guide this Court's decision. *See Spectrum Stores*, 632 F.3d at 948 (defining judicially manageable standards).[18]

### B.  This Court has Jurisdiction under the Foreign Sovereign Immunities Act.

#### (1)  Plaintiff's Claims Are Based upon Commercial Activity in or with a Direct Effect in the United States.

Iraqi Kurdistan is not immune from suit under 28 U.S.C. § 1605(a)(2) because the action against it is based on (a) commercial activity carried on in the United States by or on behalf of Iraqi Kurdistan, and/or (b) acts by or on behalf of Iraqi Kurdistan outside the territory of the United States in connection with a commercial activity of Iraqi Kurdistan elsewhere that caused a direct effect in the United States.

Iraqi Kurdistan conducted commercial activity in the United States by selling and discharging (or causing to be sold and discharged) a portion of the Cargo in the United States. According to a recent statement by KRG's U.S. congressional representative, approximately

---

[18]      Without any citation to supporting authority, Iraqi Kurdistan asserts that "the political question doctrine does not permit courts in the United States to issue declaratory or injunctive relief – or seize property – for the purpose of encouraging foreign sovereigns to negotiate or settle disputes that concededly should be resolved elsewhere."  Dkt. 44-1 at 8.  The relief requested is not sought for the purpose of "encouraging foreign sovereigns to negotiate."  It is sought to prevent the further disbursement of a foreign sovereign's property illegally taken, transported and potentially sold by a non-sovereign political subdivision.  On Iraqi Kurdistan's theory, a state or territory could simply assert sovereignty over stolen property and import it into the U.S. without any possibility of review.

100,000 barrels of the Vessel's oil has been sold into and discharged in the U.S.[19]  Moreover, the U.S. refiner LyondellBassel has publicly acknowledged being the buyer of "disputed" Iraqi crude oil.[20]  Further indicating that at least some of the Cargo has been sold in the U.S., Iraqi Kurdistan admits that KRG is currently "prevented from discharging the cargo and *obtaining the proceeds of the sale.*"  Dkt. 46 at 4 (emphasis added).  It characterizes MoO's claims as an attempt "to *frustrate the KRG's efforts to sell* oil." *Id.* (emphasis added).[21]  In short, KRG has sold at least part of the Cargo, and seeks to sell the balance, in the U.S., which is quintessentially a "commercial activity in the United States," depriving KRG of any sovereign immunity in this action.  *See Kirkham v. Societe Air France*, 429 F.3d 288, 293 (D.C. Cir. 2005) (sales in district, even if through agent, are commercial activity in the United States); *Barkanic v. Gen. Admin. of Civil Aviation of Peoples Republic of China*, 822 F.2d 11, 13 (2d Cir. 1987) (same).

Even if KRG is not the direct party to the sale into the U.S., it has committed acts outside the territory of the U.S. in connection with a commercial activity elsewhere that caused a direct effect in the United States.  If KRG does not now own the Cargo as it sits outside this district, then (a) it transferred the Cargo elsewhere (an act outside the U.S.); (b) in connection with its trading of oil generally and of the Cargo specifically, *see Callejo v. Bancomer, S.A*., 764 F.2d 1101, 1112-25 (5th Cir. 1985) (sale of a service or a product by a foreign entity is commercial in

---

[19]     Ex. 3, Bloomberg Art., *supra* note 5 ("It's my understanding that some of the oil has been delivered. Maybe 100,000 barrels or so.") (quoting Karwan Zebari, director of Congressional affairs of KRG Representation in the U.S.).

[20]     *See* Ex. 13, Jonathan Leff & Terry Wade, *UPDATE 1-LyondellBasell stops buying Kurdish crude amid dispute*, REUTERS, July 31, 2014, http://uk.reuters.com/article/2014/07/31/oil-lyondell-iraq-idUKL2N0Q62GA20140731.

[21]     To effect KRG's sales in the District, Talmay Trading, either as KRG's agent or as John Doe Buyer entered into a contract dated July 17, 2014, with AET, Inc. Ltd. and AET Offshore Services, Inc. to provide lightering services to undertake final delivery of the Cargo from the Vessel to U.S. soil.  Ex. 14, Tanker Lightering Contract.

nature); that (c) caused the arrival of the Cargo into waters adjacent to this District for the purpose of putting the Cargo into the U.S. stream of commerce.[22]

MoO's causes of action are all based on such qualifying commercial activities, whether within or without the United States. Specifically, in stating its claims for admiralty relief and violation of Iraqi and Texas law, Plaintiff alleges as follows:

- "Upon information and belief, the Cargo has been or soon will be loaded onto smaller lightering vessels and brought within this District *for sale and/or delivery, the occurrence of which will be detrimental to Plaintiff's ability to re-possess it* for later sale for the benefit of the people of the Republic of Iraq." Compl. ¶ 25 (emphasis added).

- "The KRG's act of loading the Cargo onto the Vessel *for subsequent sale* in the United States constitutes tortious and commercial activity." *Id.* ¶ 23 (emphasis added).

- "[T]he KRG's unlawful *export for subsequent sale* in and delivery to the United States constitutes commercial activity." *Id.* ¶ 37 (emphasis added) (stated as essential element for *in personam* claim against Iraqi Kurdistan).

- "*Any further sale or resale of the Cargo* by the KRG or John Doe Buyer will irreversibly extinguish the MoO's ability to exercise any meaningful ownership rights over its property." *Id.* ¶ 24 (emphasis added) (stated as essential damage/harm element). *See also* Dye Decl. at ¶ 9 (Dkt. 39-1).

Each disputed act—KRG's export, loading and sale of the Cargo—either anticipated or actually involved sale of a product in the United States. The anticipated or completed sale is an essential element of Plaintiff's causes of action, and such sale is already amply established.

---

[22] *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 618-19 (1992) ("direct effect" element satisfied where a contract provided for the payment of funds to a New York bank); *Servaas Inc. v. Republic of Iraq*, 686 F. Supp. 2d 346, 356 (S.D.N.Y. 2010) (contract between Ministry of Industry of Iraq and Servaas for five tons of shell casings at a designated address in the U.S.A. constituted commercial activity in the United States); *Jackson v. People's Republic of China*, 550 F. Supp. 869, 873 (N.D. Ala. 1982) ("It is clear that the sale, issuance for sale and authorization of issuance for sale in the United States constitutes a 'commercial activity' carried on in the United States by a foreign state"); H.R. Rep. No. 94–1487, at *17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 ("a commercial activity carried on in the United States by a foreign state [includes] a commercial transaction or act having a 'substantial contact' with the United States, [such as] import-export transactions involving sales to, or purchases from, concerns in the United States").

(2)        <b>KRG Engaged in Commercial, Not Sovereign, Activities</b>

Iraqi Kurdistan contends that its disputed conduct is not commercial in nature because control over the natural resources in a territory is an "act that can be taken only by a sovereign." Dkt. 44-1 at 15 (citation omitted).  This proposition conflates the sovereign acts of deciding whether and to what extent a country's oil resources are to be exploited and how the revenues will be used (<u>not</u> at issue in the present case), with the commercial act of exporting and loading a given cargo of oil for subsequent sale to a buyer in a given country (here, the U.S.).  The cases cited by Iraqi Kurdistan all pertain to the former, not the latter.[23]  In *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 263-64 (5th Cir. 2002), the Fifth Circuit considered whether the Congo's natural resource activities were commercial in nature:

> [T]he Congo's actions did not stop with its initial action as sovereign, in the regulation of its natural resources, to open them to exploitation and development.  The Congo went on to step down from its sovereign status and engage in a typical commercial activity, a joint venture . . . for the exploration, production, and sale on the world market of oil and gas.  This is not something that only a sovereign can do.  Even if the Congo's initial action in exposing its minerals to development was sovereign . . . , when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. . . . [O]nce a sovereign enters the marketplace as a commercial actor, it should be subject to all the rules of the marketplace.

*Id.* at 264 (internal citations and quotations omitted) (J. Dennis concurring).  Here, as in *Connecticut Bank*, KRG's act of pumping oil through a pipeline and loading it onto a tanker for

---

[23]    *See Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889–91 (D.C. Cir. 2006) (defendant "declared . . . shares . . .  to be state assets and claimed them as does a sovereign. A private party in the market could not have done what the [defendant] did here."); *Rush–Presbyterian–St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989) (analyzing contract under which government granted a private party a license to exploit the state's natural resources).

15

sale in the U.S. were all acts that any private party could have done. Accordingly, MoO's claims are based on KRG's commercial, not sovereign, activity.[24]

### C.     Plaintiff's Pleadings Satisfy the Requirements for Admiralty Jurisdiction.

Plaintiffs' Complaint properly pleads a maritime tortious interference claim and maritime conversion claim arising under this Court's admiralty jurisdiction, in satisfaction of the U.S. Supreme Court's requirements that: "[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

### (1)     KRG Committed the Tortious Interference on Navigable Waters, and Those Tortious Acts Had an Effect on Navigable Waters.

The *Grubart* location test is readily satisfied here. As alleged in Plaintiff's Complaint, "[t]hrough means currently unknown to MoO, the KRG induced Turkey to breach the ITP Agreement unjustifiably . . . by following the KRG's instructions and not the MoO's instructions and by loading the Cargo onto the UNITED KALAVRVTA in the navigable waters off of Ceyhan, Turkey." Compl. at ¶ 19.

The exercise of admiralty jurisdiction is supported when "'the interfered-with contracts were to have been performed' on navigable waters and, accordingly, the interference took effect on navigable waters." *Commerzbank Aktiengesellschaft v. M/V UTOPIE*, Nos. 13–6622, 13-6761, 14–472, 2014 WL 1572438, at *4 (E.D. La. Apr. 17, 2014) (*citing Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999)).

---

[24]     *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 692 (1989) (suggesting that transporting oil intended for use in this country could satisfy 1605(a)(2) FSIA commercial activity exception); *Guevara v. Republic of Peru*, 468 F.3d 1289, 1300 (11th Cir. 2006) (shipment of oil is "quintessentially commercial" for purposes of FSIA).

While KRG's plotting and planning for the Cargo's shipment out of Ceyhan may have occurred on land, KRG's implementation of its wrongful strategy took effect on navigable waters. Here, as in *Commerzbank*, the interfered-with contract – the ITP Agreement – was to be performed on navigable waters.[25]   Specifically, the maritime performance obligations of the ITP Agreement contemplate the use of marine docks and port facilities to load oil aboard vessels, providing that:  "[t]he Turkish Side guarantees to load all the Crude Oil coming from Iraq to the tankers that will be instructed by the Iraqi Side [defined in the ITP Agreement as the MoO] without delay and to do the necessary port and customs formalities for the departure of the tankers from the port."   Compl. at ¶ 14.   Accordingly, KRG's interference with the ITP Agreement took effect on navigable waters through the loading of the Cargo on KRG's orders, aboard KRG's designated Vessel.

> **(2)      Ordering the Loading of Cargo Aboard a Vessel in Navigable Waters Against the Contractual Rights of the Cargo's Owner to Direct the Loading Is Disruptive to Maritime Commerce.**

MoO's maritime tortious interference claim also satisfies both parts of the *Grubart* connection test – that is, the general type of incident involved has a potentially disruptive effect on maritime commerce, and the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity.  *See Grubart*, 513 U.S. at 534.

In evaluating the potential disruption of the incident on maritime commerce, courts begin by describing the incident "at an intermediate level of possible generality."  *Id*. at 538.  The

---

[25]      Iraqi Kurdistan also attempts to defeat MoO's maritime tortious interference claim through a false requirement that the interfered-with contract be a "maritime contract."  Dkt. 44-1 at ¶ 21.  However, there is no precedent to support this requirement, and whether or not the ITP Agreement is classified as a maritime contract has no bearing on admiralty jurisdiction analysis.  Indeed, when this Court has considered admiralty jurisdiction over a tortious interference claim, it did not consider whether the underlying contract is maritime.  *See Kirby Inland Marine L.P. v. MedStar Funding, LC*, No. H-12-03107, 2013 WL 2180017, at *6 (S.D. Tex. May 17, 2013).  In any event, the ITP Agreement clearly is, in part, a maritime contract.  The ITP Agreement contains distinct and separable maritime obligations, and can therefore be properly classified as a "mixed contract" with admiralty jurisdiction extended to those maritime obligations.  *See Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 187 (5th Cir. 2010).

incident at issue in this case can best be described as: a third party ordering the loading of cargo aboard its designated vessel in navigable waters in contravention of the cargo owner's contractual rights to direct the loading to his designated vessel. Then, in determining whether that type of incident is likely to disrupt maritime commerce (and contrary to the criteria that KRG attempts to apply)[26] a court "look[s] not to the particular facts of the case before [it] – i.e., whether maritime commerce was actually disrupted here – but to whether similar occurrences are likely to be disruptive." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 249 (2d Cir. 2014).

Here, the incident that immediately caused MoO's injuries was the loading of the Cargo, on KRG's orders, aboard KRG's designated Vessel. Loading cargo aboard vessels is among the most traditional of maritime commercial activities.[27] Therefore, there could be no greater threat to potentially disrupting maritime commerce than a third-party interfering with a cargo owner's

---

[26]    Iraqi Kurdistan's view is that somehow MoO's lawsuit has disrupted maritime commerce. Dkt. 44-1 at 22. Yet, it is KRG who has stalled and delayed maritime commerce, and the primary activity of a vessel – which is to load, transport, and deliver cargo – by keeping the Vessel offshore Galveston, Texas, loaded with the Cargo, on a voyage to nowhere since July 28, 2014. Another chilling effect on commerce has been the abstention by many market players who are usually engaged in the shipping, trading and purchase of crude oil from participating in transactions related to the subject Cargo and Vessel because they recognize that KRG lacks clear title to the Cargo. *See* Ex. 15, Alan Greenblatt, *Kurdish Oil Shipment Too Far Offshore for U.S. to Seize*, NPR, July 29, 2014, http://www.npr.org/blogs/thetwo-way/2014/07/29/336342799/court-orders-seizure-of-100-million-oil-shipment;
Ex. 16, Azam Ahmed & Clifford Krauss, *Oil Gives Kurds a Path to Independence, and Conflict With Baghdad*, N.Y. TIMES, Oct. 25, 2014, http://www.nytimes.com/2014/10/26/world/oil-gives-kurds-a-path-to-independence-and-conflict-with-baghdad.html?_r=2 ("Roughly two dozen huge oil tankers are idly turning figure eights around the Mediterranean or on the high seas, loaded with oil pumped from wells in Iraqi Kurdistan but with nowhere to legally offload it."); Ex. 17, Rhiannon Meyers, *Iraqi envoy says his nation in talks with Kurdistan over oil on tanker*, HOUSTON CHRON. Nov. 7, 2014, http://www.houstonchronicle.com/business/energy/article/Iraq-and-Kurdistan-in-talks-over-oil-5879275.php (describing "oil tanker in legal limbo off Galveston for months").

[27]    *See Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 429 n.6 (5th Cir. 2009) (holding that drilling platform was "involved in the loading of vessels – a traditional maritime activity."); *Bd. of Comm'rs of Port of New Orleans v. New Orleans Terminal, LLC*, No. 11-CV-2899, 2013 WL 5934609, at *2 (E.D. La. Oct. 31, 2013) ("[T]he activity giving rise to the incident (unloading cargo from a vessel) bears a substantial relationship to maritime activity."); *Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, No. 3:12–CV–304, 2013 WL 4505987, at *2 (S.D. Tex. Aug. 22, 2013) (holding that "contracted work was for such traditional maritime activities as loading and unloading equipment and supplies from vessels"); *Hamm v. TRTB, LLC*, No. 08–1710, 2010 WL 4627078, at *8 (W.D. La. July 30, 2010) ("loading and unloading of vessels is a traditional maritime activity").

18

contract with a marine terminal to direct the loading of his cargo into vessels that he designates, by ordering the terminal to load that cargo into the third-party's designated vessel.

In addition, because the loading of cargo is such a traditional maritime activity, MoO's tortious interference claim satisfies the second and final part of the *Grubart* maritime connection test. "[A]s long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second nexus prong." *Grubart*, 513 U.S. at 541-42.

Because MoO's maritime tortious interference claim satisfies the location test and both subparts of the connection test under *Grubart*, admiralty tort jurisdiction is proper here under 28 U.S.C. § 1333(1).

### (3) The Court Has Admiralty Jurisdiction Over the John Doe Claims.

Upon information and belief, John Doe Buyer contracted to purchase the Cargo and has or will imminently take possession on navigable waters. Compl. at ¶ 53.[28] As with MoO's tortious interference claim against Iraqi Kurdistan (*see supra*, Section C, 1-2), MoO's conversion claim against John Doe Buyer readily satisfies the conditions of location and connection to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) . John Doe's conversion necessarily occurred on navigable waters,[29] and a putative buyer's unlawful exercise of dominion

---

[28]    As KRG does not challenge that the factual allegations against John Doe Buyer, this Court must accept the allegations of the Complaint as true. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. 1981).

[29]    Based on KRG's own pleadings and public statements, the purported transfer of title to John Doe Buyer necessarily occurred on navigable waters as the Vessel was in transit. On June 23, 2014, KRG caused a Bill of Lading to be issued in which the Cargo was "to be delivered . . . unto the order" of KRG. Compl. ¶ 20. Accordingly, as late as June 23, 2014, the KRG purported to hold title to the Cargo. That same day, the Vessel departed Ceyhan and has since remained on navigable waters. While the Cargo's presence on navigable waters has remained constant, the KRG's assertion of title to the Cargo has not. On August 22, 2014, when the Court questioned the parties as to whether the KRG owns the Cargo, the KRG only stated "they [referring to the MoO] don't own it either." *Id.* ¶ 21, Ex. D at 17. The KRG's use of the word "either" strongly implies that the KRG no longer purports to hold title to the Cargo, which is onboard a vessel in navigable waters. Based on these facts, Plaintiff has asserted that "purported transfers of title to the Cargo have occurred on navigable waters as the Vessel was in transit."

or control over stolen cargo on navigable waters clearly has a potentially disruptive effect on maritime commerce.[30]  John Doe Buyer's conversion of MoO's property while the property was cargo being transported aboard a vessel on navigable waters is sufficient traditional maritime activity.  *Grubart*, 513 U.S. at 541-42 ("[V]irtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction.") (internal quotation marks omitted).

> D.      **Plaintiff Is Entitled to Pre-Judgment Attachment Remedies.**

Iraqi Kurdistan argues that the Court should not grant a writ of sequestration under Texas state law because MoO fails to state an independent cause of action.  However, as described herein, MoO has stated several valid causes of action based on U.S. and Iraqi law.  It has met the requirements for pre-judgment sequestration pursuant to Federal Rule of Civil Procedure 64, Texas Rule of Civil Procedure 696, and Texas Civil Practice & Remedies Code § 62.001.

Iraqi Kurdistan also asserts that FSIA bars pre-judgment attachment of a foreign sovereign's property.  FSIA provides that property of a foreign state shall be immune from attachment, subject to exceptions.  28 U.S.C. §§ 1609-1610.  Iraqi Kurdistan must make a sufficient showing that it has a valid interest in property to warrant immunity from attachment under Sections 1609 and 1610 of FSIA.  *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 252-55 (2d Cir. 1999) (affirming preliminary injunction where defendant sovereign bank failed to prove ownership of subject property).  Here, as in *Brenntag*, Iraqi Kurdistan has not made any showing that it has a legal right to the Cargo.  In contrast, MoO has presented clear

---

[30]      As noted, Talmay Trading, either as KRG's agent or as John Doe Buyer entered into a contract dated July 17, 2014, with AET, Inc. Ltd. and AET Offshore Services, Inc. to provide lightering services to undertake final delivery of the Cargo.  Ex. 14, Tanker Lightering Contract.  Instead of performing under the contract, it sued for a restraining order in federal court in an attempt to escape their contract and avoid the obvious risk of lightering wrongfully converted cargo.  *See* Ex. 18, Plaintiffs' Complaint for Declaratory Judgment, *AET, Inc. Ltd. & AET Offshore Services, Inc. v. Talmay Trading Inc. & Republic of Iraq*, Cause No. 4:14-cv-2149 (S.D. Tex. filed July 28, 2014).  Filing suit to avoid a lightering contract is maritime disruption.

authority under the Iraqi Constitution that it has the exclusive right to export oil from Iraq on behalf of the true owners of said oil, the people of Iraq in all of its regions and governorates. MoO presents additional authority in this regard in the section below.  Accordingly, Iraqi Kurdistan's challenges to pre-judgment attachment are without merit.

## V.     PLAINTIFF'S COMPLAINT CONTAINS SUFFICIENT FACTUAL MATTER TO STATE A CLAIM TO RELIEF THAT IS PLAUSIBLE ON ITS FACE.

### A.     The Act of State Doctrine Does Not Bar Plaintiff's Claims.

Iraqi Kurdistan alleges that MoO's claims are barred by the act of state doctrine.  Dkt. 44-1 at ¶ 27.  The act of state doctrine is a decisional rule that U.S. courts will not examine certain domestic acts of "a foreign sovereign government, *extant and recognized by this [government]* at the time of suit." *Banco Nacional*, 376 U.S. at 428 (emphasis added).  The purpose of this rule is to "respect the independence of every other sovereign state." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *see also Callejo*, 764 F.2d at 1113 (focus is on "preventing frictions with coequal sovereigns.").  The act of state doctrine is implicated where a court in the U.S. is asked to "declare invalid the official act of *a foreign sovereign* performed *within its own territory*." *W.S. Kirkpatrick & Co., Inc., v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990) (emphasis added).  The party invoking the act of state defense bears the burden of establishing its applicability. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976).

### (1)     Iraq Is the State Actor, Not Iraqi Kurdistan.

First, Iraqi Kurdistan cannot meet its burden to establish the applicability of the act of state doctrine because it is not recognized as a state by the United States.  As noted above, the U.S. recognizes the Republic of Iraq as an independent foreign state, but does not recognize Iraqi Kurdistan as an independent state.  It follows that, as a territory within a state, Iraqi Kurdistan

lacks the fundamental attributes of sovereignty to entitle it to the act of state defense.[31]   In

addition to recognition by the U.S., "[a]n entity is not a state unless it has competence, within its

own constitutional system, to conduct international relations with other states . . . ."   Restatement

(Third) of Foreign Relations Law § 201 cmt. e (1987).   A State of the U.S. is therefore "not a

state under international law since under the Constitution . . . foreign relations are the exclusive

responsibility of the Federal Government." *Id.* cmt g.   Under the Iraq Constitution, the Iraqi

Federal Government has the *exclusive* authority to conduct international relations.[32]

Accordingly, just as Texas is not a sovereign state, Iraqi Kurdistan is not a sovereign state. [33]

### (2)   Because Iraq Is a State Actor Seeking Relief in U.S. Court, the Act of State Doctrine Does Not Apply to Iraqi Kurdistan.

Second, the comity principles that underlie the act of state doctrine do not extend to

political subdivisions, particularly where, as here, the state itself is the plaintiff.   In *Republic of*

*Iraq v. ABB AG*, the district court rejected the assertion that the act of state doctrine applied in a

suit brought by Iraq, in large part because "the current government of Iraq itself has sought out

---

[31]      Iraqi Kurdistan's reliance on *Oetjen v. Central Leather Co.* is unavailing.   Dkt. 44-1 at 25-26.   There, the Supreme Court emphasized that it took judicial notice that the U.S. government "recognized the government of Carranza as the de facto government of the Republic of Mexico . . . and as the de jure government."   246 U.S. 297, 301 (1918).   Iraqi Kurdistan enjoys no such recognition.   Iraqi Kurdistan's reliance on *Spectrum Stores*, 632 F.3d at 955, is likewise unavailing.   Dkt. 44-1 at 26.   *Spectrum Stores* is distinguishable on its facts because it did not deal with a political subdivision located within a larger recognized foreign state seeking justification from a U.S. court for unlawful acts performed contrary to the policies of the recognized foreign state.   To extend *Spectrum Stores* to this dispute would turn the doctrine on its head.

[32]      *See* Iraq Const. arts. 110, 121 (Dkt. 39-4) (A region such as Iraqi Kurdistan only has the right to maintain "[o]ffices … in embassies and diplomatic missions, in order to follow cultural, social and developmental affairs.").   Iraqi Kurdistan itself has acknowledged this limited role with respect to foreign relations.   *See* Ex. 19, KRG Official Order No. 143 (Jan. 25, 2009) (establishing Kurdistan's Department of Foreign Relations whose responsibilities are limited to "strengthening the position" of KRG with foreign countries but always in coordination with the Ministry of Foreign Affairs of the Federal Republic of Iraq).

[33]      KRG argues throughout its brief that the act of state doctrine bars MoO's claims because KRG engaged in "sovereign acts."   However, even if KRG's illegal export, loading and sale of the Cargo were sovereign activities, KRG is not the proper sovereign entitled to engage in those activities.   The U.S. versus Texas is again instructive.   Texas is a state in the United States.   Printing U.S. Dollars is a sovereign activity performed by the U.S. Treasury.   U.S. Const. art. I, § 10.   If Texas began printing U.S. Dollars without the consent of the federal government, that would not make Texas a "State" protected by the act of state doctrine.   Rather, such actions would make Texas a counterfeiter, subject to prosecution by the federal government.   Likewise, Iraqi Kurdistan is not made a "State" by way of its illegal export, loading and sale of the subject oil.   The usurpation of sovereign rights and activities does not entitle a non-state bad actor to the protections enjoyed by the sovereign.

United States courts . . . [a]nd, to the extent that any party has called into question the validity of the prior government's acts, it is the current government of Iraq that has done so." 920 F. Supp. 2d at 534. Similarly, in *Republic of Philippines v. Marcos*, the Second Circuit rejected application of the act of state doctrine, in part, because it was the foreign state itself that asked that the legality of certain acts be determined by American courts. 806 F.2d 344, 359 (2d Cir. 1986) ("[W]hen a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker.").[34] Here, the act of state doctrine has no applicability to the actions of Iraqi Kurdistan because it is MoO, on behalf of the Republic of Iraq, that sought out the U.S. court.

Moreover, Iraq's interpretation of its own law is itself an act of state, and is therefore owed deference. In *Riggs National Corp. & Subsidiaries v. C.I.R.*, the D.C. Circuit held that a sovereign's determination of law could be an act of state. 163 F.3d 1363, 1368 (D.C. Cir. 1999) (considering deference to be given to an interpretation of Brazilian law). As described below, when a foreign sovereign has interpreted its own law, the U.S. should not disturb that interpretation.

### (3)     The Acts at Issue Did Not Occur in Iraqi Kurdistan.

Third, Iraqi Kurdistan cannot invoke the act of state doctrine because the acts made the basis of this suit occurred in Turkey and/or on navigable waters. The Fifth Circuit has expressly recognized that an "extra-territorial" exception to the act of state doctrine protects only acts of a foreign state completed within that state's territory. *See Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1024 (5th Cir. 1972); *accord Tabacalera Severiano Jorge, S.A. v. Standard Cigar*

---

[34]     In a subsequent case, *Republic of Philippines v. Marcos*, the Ninth Circuit explained that the act of state doctrine was not a "guarantee" to a government, but a "pragmatic device" or "practical tool for keeping the judicial branch out of the conduct of foreign affairs," which is intended to be "supple, flexible, [and] ad hoc." 862 F.2d 1355, 1360-61 (9th Cir. 1988) (*en banc*). The Ninth Circuit *en banc* panel held that where an existing government "seeks the recovery of what it claims [its former ruler] has stolen, the classification [of an act of state] has little or no applicability." *Id.*

*Co.*, 392 F.2d 706, 714-15 (5th Cir. 1968).  Plaintiff's Complaint alleges acts outside of the territory of Iraqi Kurdistan.  *See, e.g.,* Compl. ¶ 23.[35]

### B.    Plaintiff Has Stated a Claim for Relief under Iraqi Law.

KRG's Rule 12(b)(6) motion should be denied, as KRG does not challenge the sufficiency of MoO's maritime claims and its challenge to MoO's claims under Iraqi law fails for the following reasons.

### (1)    Iraq's Interpretation of Its Own Law Is Due Substantial Deference.

As a recognized foreign state, Iraq's interpretation of its own law is due deference under both the act of state doctrine, as mentioned above, as well as the *Chevron* Doctrine.  In *In re Oil Spill by Amoco Cadiz*, the Seventh Circuit held that "[a] court of the United States owes **substantial deference** to the construction France places on its domestic law." 954 F.2d 1279, 1312 (7th Cir. 1992) ("[c]ourts of this nation routinely accept plausible constructions of laws by the agencies charged with administering them.") (citing *Chevron U.S.A. Inc. v. National Res. Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984)).

### (2)    The Cargo Was Exported in Violation of Iraqi Law.

The Iraqi Constitution provides the Federal Government with exclusive authority over foreign trade policy and international agreements, which includes exclusive authority over oil exports and international agreements relating to oil.  Under Iraqi law, MoO exercises the Federal Government's exclusive authority in the oil and gas sector.  The Iraqi Federal Supreme Court recognized MoO's exclusive authority over oil exports in its *Waset Governorate* decision.[36]

---

[35]    Iraqi Kurdistan also asserts that MoO's lawsuit forces the Court to "adjudicate the validity of actions taken both by Turkey within its sovereign territory as well as by the KRG within its sovereign territory."  Dkt. 44-1 at 27. Turkey is not a party to this lawsuit, and MoO's claims do not ask this Court to declare invalid any official act of Turkey.

[36]    Ex. 1-D.1, *Waset Governorate* at 2, 3.

KRG exported the Cargo without authorization from MoO, and did so under international agreements that it entered into with Turkey without the participation of the Federal Government.[37]  KRG's exports have also been made without regard for Iraq's international obligations under United Nations Security Council Resolutions, which KRG is obligated to respect under the Constitution.  As a result of the foregoing, KRG violated the Iraqi Constitution and Iraqi law.

Iraqi Kurdistan contends, incorrectly, that its actions are authorized under the separation of powers provisions of the Iraqi Constitution.  Dkt. 44-1 at 29-34.  The Constitution gives the regions and governorates the right to participate in the Federal Government's management of oil resources and its formulation of strategic oil development policies, but does not give Iraqi Kurdistan ownership of the Cargo or the right to export it without MoO authorization.

> **(a)      By Exporting the Cargo Without Authorization from MoO, KRG Violated the Iraqi Constitution and Iraqi Law**

Under Article 111 of the Iraqi Constitution, oil and gas are the property of all Iraqi people, not any particular region or governorate.  Article 111 could not be more clear in stating that "[o]il and gas are owned by all the people of Iraq in all the regions and governorates."[38]  Oil and gas, including the oil that was illegally exported by KRG and loaded aboard the Vessel, belong to all Iraqi people, and not to Iraqi Kurdistan or KRG.

---

[37]      On November 27, 2013, KRG announced that it had entered into a series of energy framework agreements with Turkey.  *See* Ex. 20, Tim Arango & Clifford Krauss, *Kurds' Oil Deals With Turkey Raise Fears of Fissures in Iraq*, N.Y. TIMES, Dec. 2, 2013, http://www.nytimes.com/2013/12/03/world/middleeast/kurds-oil-deals-with-turkey-raise-fears-of-fissures-in-iraq.html?pagewanted=all&module=Search&mabReward=relbias%3Ar%2C%7B%221%22%3A%22RI%3A11%22%7D&_r=0; Ex. 21, Emre Peker, *Kurds Forge A Risky Oil Deal with Turkey*, WALL ST. J., Dec 2, 2013, http://online.wsj.com/articles/SB10001424052702304854804579234293171045128.  Neither the Ministry of Oil nor any other federal ministry was involved in the negotiation or signing of these agreements.  Moreover, the instruction given to Turkey and/or its pipeline operator BOTAŞ to load the Cargo aboard the Vessel (Compl. ¶¶ 17-20), represents, in and of itself, an illegal international agreement.

[38]      Iraq Const. art. 111 (Dkt. 39-4).

Article 111 establishes the principle that Iraq's oil and gas wealth must benefit all of Iraq's people, and not only the people who live in regions from which it originates. This principle benefits the people of Iraqi Kurdistan, as the vast majority of Iraq's oil production comes from other areas of Iraq.[39] Despite having a miniscule share of Iraq's oil production, Iraqi Kurdistan receives substantial revenues from oil produced in the rest of Iraq.[40]

Iraqi Kurdistan is now trying to undermine this clear constitutional principle by appropriating all revenues from Kurdish exports for itself, including the Cargo aboard the Vessel. This violates Article 111 of the Iraqi Constitution. *See* Ex. 1-D.1, *Waset Governorate*, at 2, 3 (decision of the Waset Governorate Council to restrict exports deprived the Iraqi people of the revenue created by oil and gas wealth in violation of Article 111).

While conceding that Article 111 requires all the people of Iraq to receive the benefit of oil resources, Iraqi Kurdistan seeks to justify its illegal exports by arguing that Article 111 provides "no guidance" as to who is to oversee the production, extraction and sale of the oil.[41] Dkt. 44-1 at 32. However, this "guidance" appears in Article 110, which sets forth a list of matters over which the Federal Government has exclusive authority.[42] These exclusively federal

---

[39] Iraq's total oil production from 2009 to 2013 averaged 2.695 million barrels per day. *See* ENERGY INFORMATION ADMINISTRATION, IRAQ DATA OVERVIEW: PETROLEUM, *available at* http://www.eia.gov/countries/country-data.cfm?fips=IZ#pet. Only 146,000 barrels per day (or 4.9%) was produced in Iraqi Kurdistan. *See* Ex. 22, Presentation of Ashar Hawrami, Minister of Natural Resources of the Kurdistan Regional Government, at CWC-Iraq Petroleum Conference (June 17, 2014), at 14 ("Hawrami Presentation"); *see also* Dkt. 44-7, Sean Kane, *Iraq's Oil Politics: Where Agreement Might Be Found* (2010) ("Kane"), at 10 (quoting a Kurdish Member of Parliament as saying "[T]he Kurds would be crazy to want to leave Iraq and lose their share of Basra's oil.")

[40] Iraqi Kurdistan's right to receive such revenues was conditioned on it delivering specified volumes of oil to MoO for export. *See, e.g.,* Ex. 1-B, General Budget Law of the Federal Republic of Iraq for the Fiscal Year 2013 ("2013 Federal Budget Law"), Art. 1(First)(B). An unofficial English translation of relevant articles of the 2013 Federal Budget Law is set forth in Ex. 1-B.1. In 2013, Iraqi Kurdistan received its revenues but delivered almost no oil to MoO, instead engaging in illegal exports. *See infra* Section V.(B)(2)(c).

[41] Even if Iraqi Kurdistan's position were correct, which it is not, its concession regarding Article 111 would require that the Cargo or its proceeds be segregated for the benefit of all Iraqi people, to be held and used in accordance with Iraqi law. Iraqi Kurdistan and KRG would not have the right to appropriate the Cargo and its proceeds for their own benefit.

[42] Iraq Const. art. 110 (Dkt. 39-4).

prerogatives include "[f]ormulating foreign policy . . . negotiating, signing, and ratifying international treaties and agreements . . . formulating foreign sovereign economic and trade policy . . . [f]ormulating fiscal and customs policy . . . [and] regulating commercial policy across regional and governorate boundaries in Iraq."[43]   Article 110 provides the Federal Government with exclusive authority over foreign trade in, and international agreements relating to, Iraq's oil and gas assets.

Iraqi Kurdistan claims that Article 110's exclusive federal authority over foreign trade and international agreements excludes oil, which it asserts is managed under other provisions of the Constitution.  Dkt. 44-1 at 32, 33.  Article 110 provides for no such exclusion, and Iraqi Kurdistan's assertion is therefore wrong.  Moreover, given the importance of oil and gas in Iraq's foreign economic relations, Iraqi Kurdistan's assertion is highly implausible, as it would strip substantially all of Iraq's foreign trade from Article 110.[44]   According to Mr. Wael Abdulateef Alfahdel, a member of the Iraqi Constitutional Drafting Committee and a former judge, governor and member of Parliament:

> These exclusive Federal Government powers encompass federal jurisdiction over trade in the country's oil and gas assets, which are central to economic and trade policy and commercial policy across regional and international boundaries. … [T]he Federal Government's policy is that all oil and gas exports must be made through the state marketing company, SOMO, or must otherwise be authorized by the Ministry of Oil.[45]

Iraqi Kurdistan also argues that, even if Article 110 provides the Federal Government with the power to regulate foreign trade in oil, this does not rise to the status of an "ownership interest" in the underlying crude oil.  Dkt. 44-1 at 33.  This argument misses the point.  Article

---

[43]    *Id.*

[44]    *See* Ex. 23, United Nations Development Program and Inter-Agency Information and Analysis Unit, Briefing: Iraq and Oil at 1, Sept. 2011, http://www.jauiraq.org/documents/1729/Briefing_Iraq_and_oil.pdf ("The importance of oil in the Iraqi economy cannot be overstated. Oil contributes nearly 60% of Iraq's GDP, about 99% of exports, and over 90% of public revenue.").

[45]    Ex. 1, Decl. of Wael Abdulateef Alfahdel ¶ 7 (Nov. 11, 2014) ("Abdulateef Decl.").

110 gives the Federal Government the exclusive right to determine who can export oil from Iraq and under which international agreements.  Article 111 confirms that the owner of the oil is "all the people of Iraq," and not an individual region or governorate.  Only the Federal Government represents "all the people of Iraq".[46]  Taken together, these constitutional provisions demonstrate that KRG illegally exported the Cargo, and that neither KRG nor Iraqi Kurdistan owns the Cargo.

The Federal Government's exclusive authority over oil and gas exports is exercised by MoO, pursuant to the Law on the Organization of the Ministry of Oil ("Law No. 101").[47] Article 130 of the Constitution gives continuing effect to Law No. 101 by providing that all laws in existence at the time the Constitution entered into force "shall remain in force, unless annulled or amended in accordance with the provisions of th[e] Constitution."[48]  Law No. 101 was not annulled or amended, and therefore remains in full force and effect.[49]

The Iraqi Federal Supreme Court has held that the Ministry of Oil has exclusive authority over oil and gas exports, in its *Waset Governorate* ruling.  In that case, the court found that a decision of the Waset Governorate Council prohibiting certain exports of crude oil outside the borders of the Waset Governorate violated Article 111, because it "deprived the Iraqi people of the revenue created by [oil and gas] wealth by forbidding the export of oil and gas outside of the

---

[46]   *Id.* ¶ 5.
[47]   Ex. 24, Art. 5 (First), Law on the Organization of the Ministry (Law No. 101 of 1976), which provides that:

> The Ministry of Oil is in charge of the management of the oil sector.  For purposes of this law, the said sector includes operations of exploration, drilling, and extraction of oil and gas, the operations of refining and manufacturing of gas in addition to the transportation and marketing of crude oil, gas and their products, and the construction of oil projects and the importation of specialized supplies for the sector.

[48]   Iraq Const. art. 130 (Dkt. 39-4).
[49]   The Federal Supreme Court has ruled that Law No. 101 is in effect pursuant to Article 130.  Ex. 1-D.1, *Waset Governorate* at 3.

province."[50]  It also found that the restriction violated Article 5 of Law No. 101, which gives "exclusive authority to the Ministry of [O]il for the transport and marketing of crude oil."[51]

The allocation of exclusive authority over oil and gas exports to the Federal Government is not just an issue of power.  It is essential to ensure that Iraq's oil and gas revenues are used transparently and in compliance with Iraq's international obligations.  Under Article 8 of the Constitution, Iraq is required to respect those obligations.[52]

MoO's exports are conducted in a transparent manner.  MoO provides regular reports to the Iraqi Parliament and Council of Ministers,[53] and publishes detailed oil export information monthly on the MoO and SOMO websites.[54]  The proceeds of MoO's exports are deposited in the Development Fund for Iraq ("DFI"), an account originally established pursuant to United Nations Security Council Resolution No. 1483 (2003).[55]  The DFI is overseen by the Iraqi Committee of Financial Experts ("CoFE"), is audited by international auditing firms, and publishes its financial reports on CoFE's website.[56]  Under United Nations Security Council Resolutions 1483 (2003) and 1956 (2010),[57] Iraq is required to transfer five percent of revenues from oil and gas exports to the United Nations Compensation Fund, which is used primarily to compensate claimants for damages suffered in the first Gulf War.[58]

---

[50]    *Id.* at 3.

[51]    *Id*.

[52]    Iraq Const. art. 8 (Dkt. 39-4).

[53]    Abdulateef Decl. ¶ 13.

[54]    The Ministry's website is http:www.oil.gov.iq/en/.  SOMO's website is  http://www.somooil.gov.iq/en/.

[55]    Ex. 25, United Nations Security Council Resolution No. 1483, ¶ 20 (May 22, 2003) ("Resolution 1483"). Under Ex. 26, United Nations Security Council Resolution No. 1956 , ¶ 3 (Dec. 15, 2010) ("Resolution 1956"), the requirement of the Security Council that Iraq deposit oil and gas revenues in the DFI terminated as of June 30, 2011, but the requirement was maintained as a matter of Iraqi law.  *See, e.g.,* Ex. 1-B, 2013 Federal Budget Law, Art. 1(First)(B).

[56]    CoFE's website is http://www.cofe-iq.net/pages/e_dfi.htm.

[57]    Resolution 1483, ¶ 21; Resolution 1956, ¶ 3.  Unlike the requirement to deposit oil and gas revenues in the DFI, the 5% deduction for the United Nations Compensation Fund contribution was maintained in Resolution 1956.

[58]    Ex. 27, United Nations Security Council Resolution No. 687), ¶¶ 16, 18 (Apr. 3, 1991.

In stark contrast, KRG's oil exports have been conducted in secret without any regard for Iraq's international obligations.  KRG's oil export revenues are deposited in a bank in Turkey, under the exclusive control of KRG.[59]  There is no reliable public information regarding the amount of revenues received by KRG, nor is there any evidence of any audit or other external monitoring of KRG's clandestine account.[60]  While KRG publicly claimed that it intends to deposit 5% of its revenues into the United Nations Compensation Fund,[61] it has not done so. KRG has thus thwarted Iraq's conduct of foreign affairs and the arrangements it has made for payment of claims arising from the Gulf War.

      **(b)**      **KRG's Construction of the Iraqi Constitution Is Erroneous.**

Iraqi Kurdistan seeks to create a vision of a decentralized system of government designed to preclude using the proceeds of the country's oil wealth for the types of acts of tyranny that were conducted by the former regime.  Dkt. 44-1, at 29, 30.  The Constitution indeed places a high value on human rights, and contemplates the use of oil revenues in part to compensate regions that were damaged by the prior regime.[62]  The Constitution seeks to accomplish these goals through the development of policies designed to benefit all Iraqi citizens,[63] not by devolving the right to export oil to the regions and governorates in which oil deposits happen to be found.

---

[59]     *See* Ex. 28, KRG Statement on First Oil Sales Through Pipeline Export (May 23, 2014), http://www.krg.org/a/d.aspx?s=040000&l=12&a=51589 ("KRG Statement on First Oil Sales").

[60]     KRG published summary information relating to its illegal oil exports for the first time in a press release issued on November 7, 2014.  *See* Ex. 29, Update on Oil Export from the Kurdistan Region of Iraq (Nov. 7, 2014), http://mnr.krg.org/index.php/en/press-releases/422-update-on-oil-export-from-the-kurdistan-region-of-iraq.  This release provides information for the entire period since January 1, 2014, rather than monthly, and there is no indication that the revenue information has been audited.  It does not indicate the price per barrel received, although dividing the total revenue (including from product swaps) by the total number of barrels indicates that the price was approximately $83 per barrel (assuming the swapped products are properly valued), or almost $20 less than the average price received by SOMO during this period.  The release does not provide any information about this mysterious discount.

[61]     Ex. 28, KRG Statement on First Oil Sales.

[62]     Iraq Const. Section Two (Rights and Liberties)  & art. 112 (First) (Dkt. 39-4).

[63]     *Id.* at art. 112 (Second).

Iraqi Kurdistan relies on a complex and inaccurate interpretation of several provisions of the Constitution.  According to Iraqi Kurdistan, Article 112 gives the Federal Government management powers over "present fields," but no powers over other fields.[64]  Iraqi Kurdistan claims that none of its fields are "present fields."[65]  For this reason, Iraqi Kurdistan asserts that it has full management rights over its fields pursuant to Article 115 (Dkt. 44-1 at 31), which provides the regions with powers not within the exclusive authority of the Federal Government.

Iraqi Kurdistan's reasoning is fundamentally flawed.  Article 115 of the Constitution provides that "powers not stipulated in the exclusive powers of the federal government belong to the authorities of the regions . . . ."[66]  As demonstrated above, the "exclusive powers of the Federal Government" listed in Article 110 include the power to regulate foreign trade in oil and to enter into international agreements relating to oil.[67]  As a result, Article 115 by its terms does not reserve for the regions any authority over oil exports or international agreements relating to oil exports.[68]

Moreover, Iraqi Kurdistan's assertion that the Federal Government's powers relating to oil in Article 112 are limited to "present fields" (Dkt. 44-1 at 31, 32), is without merit.  Iraqi Kurdistan cites only Article 112 (First), which reserves the management of oil and gas extracted from "present" fields to the Federal Government, acting with the regions and producing governorates.  It ignores Article 112 (Second), which provides that the Federal Government has

---

[64]    Dkt. 44-1 at 31.
[65]    *Id.*; *see also* Dkt 44-6, James Crawford, *The Authority of the Kurdistan Regional Governemnt over Oil and Gas under the Constitution of Iraq* ¶ 21 (Jan 29, 2008) ("Crawford Opinion") (Prof. Crawford instructed by KRG that there were no "present fields" in Iraqi Kurdistan).
[66]    Iraq Const. art. 115 (Dkt. 39-4).
[67]     *see also* Ex. 22, Hawrami Presentation at 15.
[68]    *See* Ashley S. Deeks & Matthew D. Burton, *Iraq's Constitution: A Drafting History*, 40 Cornell Int'l L.J. 1, 66-67 (2007) (Art. 115 was added to the Constitution at the last minute, after the heavy negotiations relating to oil and gas were completed, and was not intended to override that compromise).

the power, acting together with the producing regional and governorate governments, to formulate strategic development policies relating to all of Iraq's oil and gas wealth.[69]

Iraqi Kurdistan's position is also inconsistent with the Federal Supreme Court's ruling in the *Waset Governorate* case.  The Court found that Article 112 (First) was not yet effective because no implementing law has been adopted, and that Article 112 (Second) relates only to the development of  oil and gas wealth, but not "other works and managerial matters" relating to oil.[70]  The Court did not find that these "other works and managerial matters" were within the powers of the regions and governorates under Article 115.  To the contrary, the Court ruled that the transport and marketing of oil, including the decisions relating to exports that were at issue in the case, were within the "exclusive authority" of the Ministry of Oil.[71]

Iraqi Kurdistan makes the flawed assertion that Article 121(Second) provides it with the authority to adopt laws to authorize oil exports, even if those laws are at odds with federal legislation.  Dkt. 44-1 at 30.  Article 121(Second) provides that, "[i]n case of a contradiction between regional and national legislation in respect to a matter outside the exclusive authorities of the federal government, the regional power shall have the right to amend the application of the national legislation within that region."[72]  As is the case for Article 115, Article 121(Second) by its terms applies only to matters "outside exclusive federal authority" and thus does not apply to oil exports or international agreements relating to oil.  Moreover, Article 121(Second) allows a region to amend the application of national legislation only "in that region," but not outside that

---

[69] Iraq Const. art. 112 (Second) (Dkt. 39-4); *see also* Dkt. 44-11, Rex Zidalis, *The Legal Dimensions of Oil and Gas in Iraq: Current Reality and Future Prospects* 36 (2009) ("Zidalis") (noting the federal government's lead role in formulating oil development policy).

[70] Ex. 1-D.1, *Waset Governorate* at 2, 3.

[71] *Id.* at 3, 4.

[72] Iraq Const. art. 121 (Second) (Dkt. 39-4).

region.   Article 121 does not authorize KRG to export oil outside Iraqi Kurdistan without authorization of MoO.[73]

In advancing its arguments, Iraqi Kurdistan cites five articles[74] (one of which was commissioned by KRG, and two of which were written by KRG advisors),[75]  However, these articles do not support Iraqi Kurdistan's position because they all focus on the right of KRG to **develop** its oil and gas resources, and to grant exploration and development contracts to international companies.  These matters are not at issue in this lawsuit.  Not one of the articles takes the position that KRG has the right to export oil without the authorization of MoO.  The only explicit statement relating to oil exports in any of the articles is that "KRG requires federal approval to export oil."[76]

### (c)   KRG Recognized the Federal Government's Authority over Oil Exports, But Failed to Comply with Its Obligations

KRG has in the recent past purported to live within the confines of the Iraqi Constitutional system relating to oil exports.  After commencing illegal exports of oil by truck in 2012 (prompting the Ministry of Oil's lawsuit in the Iraqi Federal Supreme Court, to which KRG

---

[73]   *See* Dkt. 44-11, Zidalis at 17 ("[Article 121(Second)] notes just that regions can amend the application of a conflicting federal measure within the region, whenever it concerns matters outside the exclusive authority of the federal government").

[74]   Dkt. 44-6, 7, 9. 10, & 11.

[75]   The Crawford Opinion was commissioned by the law firm Clifford Chance LLP on behalf of KRG, as noted in Dkt. 44-11, Zidalis, at 42, n.98. It has been displayed on KRG website in order to convince international oil companies to sign oil and gas development contracts with KRG.  *See* http://mnr.krg.org/index.php/en/media-center/publications.  One of the articles submitted by KRG was written by Peter Galbraith, a KRG advisor who has since admitted that, at the time he wrote the article, he held a significant undisclosed financial interest in a company whose principal asset was a development contract awarded by KRG.  Dkt. 44-10, Peter W. Galbraith, *The End of Iraq; How American Incompetence Created a War Without End* (2006); Ex. 30, Peter W. Galbraith, *A Statement on my Activities in Kurdistan*, NYBOOKS.COM, Dec. 17, 2009, http://www.nybooks.com/blogs/nyrblog/2009/dec/17/a-statement-on-my-activities-in-kurdistan/?printpage=true.  Another article written by a KRG advisor (Dkt. 44-9, Brendan O'Leary, *Federalizing Natural Resources*, in *Iraq: Preventing a New Generation of Conflict* 189 (Markus Bouillon et al. eds., 2007)) appears in a book that has been described in a review in *Foreign Affairs* as "not neutral" and as to which *Middle East Quarterly* noted that "[s]ome authors allow their sympathy for the Kurds to trump their analysis."  Ex. 31, L. Carl Brown, Review of B. O'Leary, *The Future of Kurdistan in Iraq*, Foreign Affairs Nov./Dec. 2005; Ex. 32, Michael Rubin, Review of B. O'Leary, *The Future of Kurdistan in Iraq*, 13 Middle East Quarterly No. 2 (Spring 2006).

[76]   Dkt. 44-7, Kane at 26 n.28 (emphasis added).

failed to respond (Compl. ¶¶ 28-30)), KRG agreed to export oil through MoO beginning in September 2012.  The agreement was reflected in Council of Ministers Decree No. 333 of 2012,[77] which provided for KRG to deliver specified quantities of oil to the Federal Ministry of Oil for export in 2012.  In exchange, the Ministry of Finance was to make payments to KRG.

Decree No. 333 also called for KRG to estimate the quantities expected to be exported in 2013.  This estimate was reflected in the 2013 Federal Budget Law adopted by the Iraqi Parliament, which stipulated that a volume of 250,000 barrels per day of oil from Iraqi Kurdistan would be handed over to MoO in accordance with procedures set forth in Decree No. 333.[78]  The 2013 Federal Budget law expressly provided for all oil revenues, including revenues from exports of crude oil produced in Iraqi Kurdistan, to be deposited in the DFI.[79]  It further provided for Iraqi Kurdistan to receive 17% of the total federal budget, but for this amount to be reduced if Iraqi Kurdistan did not deliver the required volume of crude oil to MoO for export.[80]

KRG received payments in 2013, but it did not live up to its side of the bargain. According to KRG figures, exports from Iraqi Kurdistan through MoO fell from over 24 million barrels in 2012 to only 8,602 barrels for 2013 (for the full year, not per day).[81]  Rather than fulfilling its obligations to the Federal Government, KRG (a) exported approximately 11.5 million barrels of oil by truck in 2013 without the authorization of MoO;[82] (b)  spent 2013 negotiating a secret energy framework agreement with Turkey, without any Federal Government participation, which KRG signed and announced in November 2013; and (c) built a pipeline from its fields to the Turkish border, which it tied into the Iraq-Turkey Pipeline without

---

[77]     An unofficial English translation of Decree No. 333 is attached as Ex. 1-C.
[78]     Ex. 1-B, 2013 Federal Budget Law, Art. 1(First)(B).
[79]     *Id.*
[80]     *Id.*, Arts. 9(Second) and 10(Fourth).
[81]     *See* Ex. 22, Hawrami Presentation at 15.
[82]     *Id.*

authorization from MoO or any other body in the Federal Government.  In December 2013, KRG began to pump oil through this pipeline to Ceyhan.[83]  Starting in May 2014, KRG instructed Turkey to load this oil onto tanker ships, including the Vessel, in violation of the ITP Agreement. For the foregoing reasons, MoO states a claim under Iraqi law to ownership and control of the Cargo.

## VI.    CONCLUSION

Because the Court has constitutional and statutory authority to rule on this dispute and because MoO's Second Amended Complaint states several claims to relief, MoO respectfully requests that Iraqi Kurdistan's Motion to Dismiss be denied.

---

[83]     Compl. ¶ 12.

Dated November 13, 2014.                        Respectfully submitted,


**CLEARY GOTTLIEB STEEN &**                     **VINSON & ELKINS LLP**
**HAMILTON LLP**

**Boaz S. Morag**                               PHILLIP B. DYE, JR.
Federal ID No. 18019                            Attorney-in-Charge
One Liberty Plaza                               Federal ID No. 7216
New York, New York 10006                        State Bar No. 06311500
Telephone: (212) 225-2894                       **James L. Loftis**
Facsimile: (212) 225-3999                       Federal ID No. 29739
bmorag@cgsh.com                                 State Bar No. 12491210
                                                **John J. Michael**
**Andrew A. Bernstein***                        Federal ID No. 36495
* Admitted *Pro Hac*                            State Bar No. 24041480
12, rue de Tilsitt                              Telephone: 713-758-2048
75008 Paris, France                             Facsimile: 713-615-5766
Telephone: +33 1 40 74 68 00                    1001 Fannin Street
Facsimile: +33 1 40 74 68 88                    Suite 2500
abernstein@cgsh.com                             Houston, Texas 77002
                                                pdye@velaw.com; jmichael@velaw.com;
                                                jloftis@velaw.com

                                                **Liane Noble**
                                                Federal ID No. 2329197
                                                State Bar No. 24079059
                                                2801 Via Fortuna, Suite 100
                                                Austin, Texas 78746-7568
                                                Telephone:  512-542-8505
                                                Facsimile:  512-236-3234
                                                lnoble@velaw.com


                                                **ATTORNEYS FOR PLAINTIFF**
                                                **MINISTRY OF OIL OF THE**
                                                **REPUBLIC OF IRAQ**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document (and attachments, if any) has been provided to all known counsel of record by electronic service and/or certified mail, return receipt requested on this 13th day of November, 2014.

Harold K. Watson
Dimitri P. Georgantas
Eugene W. Barr
CHAFFE MCCALL L.L.P.
801 Travis Street, Suite 1910
Houston, Texas 77002
watson@chaffe.com;
georgantas@chaffe.com;
barr@chaffe.com

Michael J. Gottlieb
William C. Jackson
Samuel C. Kaplan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
202-237-2727 Telephone
202-237-6131 Facsimile
MGottlieb@BSFLLP.com
WJackson@BSFLLP.com
SKaplan@BSFLLP.com

Christopher E. Duffy
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
212-446-2300 Telephone
212-446-2350 Facsimile
CDuffy@BSFLLP.com

**ATTORNEYS FOR MINISTRY
OF NATURAL RESOURCES OF THE
KURDISTAN REGIONAL GOVERNMENT**

**OF COUNSEL:**

Gary Born
WILMER CUTLER PICKERING HALE AND DORR LLP
49 Park Lane
London W1K 1PS
United Kingdom
44-20-7872-1020 Telephone
gary.born@wilmerhale.com

David W. Ogden
David W. Bowker
David Z. Gringer
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-663-6000 Telephone
202-663-6363 Facsimile
david.ogden@wilmerhale.com
david.bowker@wilmerhale.com
david.gringer@wilmerhale.com

Liane Noble

US 3087165v.3