## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| MINISTRY OF OIL OF THE REPUBLIC OF IRAQ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION G-14-249 |
| | § | |
| 1,032,212 BARRELS OF CRUDE OIL ABOARD | § | |
| THE UNITED KALAVRVTA and the MINISTRY | § | |
| OF NATURAL RESOURCES OF THE KURDISTAN | § | |
| REGIONAL GOVERNATE OF IRAQ, | § | |
| | § | |
| *Defendants*. | § | |

### MEMORANDUM OPINION & ORDER

Pending before the court are several motions. At the outset, the court grants 1) the unopposed motion for leave to file excess pages (Dkt. 52) by defendant Ministry of Natural Resources of the Kurdistan Regional Government of Iraq (the "KRG"); 2) the unopposed motion for leave to file a surreply (Dkt. 54) by the Ministry of Oil of the Republic of Iraq (the "MoO"); and 3) the unopposed motion for leave to file a response (Dkt. 56) to the surreply by the KRG. The court accepts the briefs that the parties filed with the motions in Dkts. 52, 54 and 56 for its consideration. The court now considers the KRG's motion to dismiss (Dkt. 44-1), including the response (Dkt. 48-1), the reply (Dkt. 52-1), the surreply (Dkt. 54-1), the response to the surreply (Dkt. 56-1), and the applicable law, and determines that the motion should be granted in part and denied in part.

### I. BACKGROUND

This case involves a dispute between Iraq and the Kurdistan region of Iraq as to the ownership of more than one million barrels of crude oil. The oil has been laden aboard a tanker off the coast of Galveston, Texas since late July 2014. This court reviewed the facts alleged by the MoO

in its previous memorandum opinion and order from August 25, 2014, and because the basic facts have not changed, the court will not review them again.  Dkt. 25 at 2–4.[1]

The MoO filed a complaint in this court in late July, requesting the court to seize cargo from a tanker in the Gulf of Mexico, because the cargo was allegedly Iraq's oil that had been converted by the KRG.  Dkt. 1.  In response, a seizure order was granted and a warrant issued to be executed once the tanker entered United States ("U.S.") waters.  Dkts. 2, 3.  The MoO amended its complaint on August 1, 2014.  Dkt. 7.  The KRG responded by filing a motion to vacate the seizure order because the MoO lacked admiralty jurisdiction to sustain any of its claims.  On August 25, 2014, the court dismissed the MoO's amended complaint (Dkt. 7) without prejudice for want of jurisdiction and granted the KRG's motion to vacate (Dkt. 8).  Dkt. 25 at 13.  The MoO filed its second amended complaint on September 19, 2014.  Dkt. 39.  In response, the KRG filed a motion to dismiss (Dkt. 44-1) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The MoO filed a response (Dkt. 48-1); the KRG filed a reply (Dkt. 52-1); the MoO filed a surreply (Dkt. 54-1); and the KRG filed a response to the surreply (Dkt. 56-1).  The motion is ripe for discussion.

## II. LEGAL STANDARDS

### A.    12(b)1 Motion to Dismiss for Lack of Jurisdiction

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).  Parties may use this rule to challenge the subject matter jurisdiction of the district court to hear a case.  *Ramming v. United States*, 284 F.3d 158, 161 (5th Cir. 2001).  The burden of proof in such a challenge is on the party

---

[1] *Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil*, No. G-14-249, 2014 WL 4215357 (S.D. Tex. Aug. 25, 2014).

2

asserting jurisdiction.  *Id.*  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."  *Id.*  "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief."  *Home Builders*, 143 F.3d at 1010.

### B.      *12(b)6 Motion to Dismiss for Failure to State a Claim*

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.  As part of the *Twombly-Iqbal* analysis, the court proceeds in two steps.  First, the court separates legal conclusions from well-pled facts.  *Iqbal*, 556 U.S. at 678–79.  Second, the court reviews the well-pled factual allegations, assumes they are true, and then determines whether they "plausibly give rise to an entitlement of relief."  *Id.* at 679.

### III. LAW & ANALYSIS

*A. Political Question Doctrine*

*1. Law*

The political question doctrine presents a narrow exception to the judiciary's responsibility to decide cases properly before it. *Zivotofsky ex rel. Zivotofsky v. Clinton*, — U.S. —, 132 S. Ct. 1421, 1427 (2012). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Society, et. al.*, 476 U.S. 221, 230, 106 S. Ct. 2860 (1986). The reasoning is that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Id.* (internal quotation marks omitted). The Supreme Court set forth several tests to guide courts in identifying a political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691 (1962). If one of these factors is "inextricably" present, the case will be nonjusticiable. *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1203 (5th Cir. 1978). The analysis called for by *Baker* requires more than a generalization that an issue implicates

4

foreign relations, because not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211.

Under the first test of whether a textually demonstrable constitutional commitment to another branch of government exists, the court must "find that all plausible sets of facts that could be proven would implicate particular authority committed by the Constitution to Congress or the Executive." *Lane v. Halliburton*, 529 F.3d 548, 559–60 (5th Cir. 2008). Because the first *Baker* test is primarily concerned with a direct challenge to the actions of a coordinate branch of the federal government, when the party moving for dismissal under the test is not a part of the coordinate branch, the party must satisfy a "double burden." *Id.* at 560. First, the movant "must demonstrate that the claims against it will require reexamination of a decision *by [a branch of government]*." *Id.* (emphasis in original; citations omitted). "Then, it must demonstrate that the [branch's] decision at issue is insulated from judicial review." *Id.* (citations omitted).

Under the second test of whether judicially manageable standards exist, the court should determine if the inquiry is legal in nature. For example, courts should consider whether the dispute is a purely legal question of statutory interpretation, calling "for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented . . . ." *Japan Whaling*, 478 U.S. at 230. As established long ago, "[i]t is emphatically the province of the judicial department to say what the law is." *Zivotofsky*, 132 S. Ct. at 1428–29 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). A court "cannot shirk this responsibility merely because [its] decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230.

*2. Arguments*

Defendant KRG argues that all of the MoO's claims fail on the basis that the claims raise "nonjusticiable political questions on issues of unmistakable import to the U.S. foreign policy . . . ." Dkt. 44-1 at 4, 14.  First, the KRG asserts that the Constitution textually commits the resolution of the dispute to the political branches because political branches are supposed to handle foreign affairs; the U.S. must stay neutral in matters involving the Middle East; and the Executive Branch prefers to handle disputes through diplomacy and not litigation.  *Id.* at 14.  To illustrate, the KRG points to the Department of State's description of its role in the ongoing negotiations between the KRG and Iraq as that of a "neutral broker in an international dispute."  Dkt. 52-1 at 3.  The KRG explains that a ruling on the merits in the case would reflect a value judgment on the acts of the KRG, which is a diplomatic determination reserved to the political branches.  Dkt. 44-1 at 16.  And "[t]he Fifth Circuit has twice held that disputes raising the validity of foreign sovereigns' exercise of control over oil resources, like the case at bar, present quintessential political questions." *Id.* at 14.

Second, the KRG argues that there are no judicially discoverable and manageable standards for resolving the dispute.  *Id.* at 18.  The KRG asserts that the Iraqi Constitution Article 111, advanced by the MoO to support its claims, does not speak directly to the claims advanced; the applicable Constitutional provisions have not been interpreted before; nor are there any other judicially manageable standards to aid in construction of the Constitution.  *Id.* at 20; Dkt. 52-1 at 4. The KRG explains that the MoO's own Oil Minister admits that Iraq and Kurdistan both interpret the Constitution differently with respect to who owns oil because a hydrocarbon law was never passed to further interpret the issue.  Dkt. 56-1 at 3–4.  Further, the KRG argues, the MoO's reliance on a 2012 decision involving the Waset Governorate[2] (the "*Waset Governorate* decision") is

---

[2] *Minister of Oil v. H.E. the Chair of Waset Governorate*, Decision No. 8/Federal/1021, May 2, 2012.  *See* Dkt. 48-13.

6

inapplicable because the Iraqi Supreme Court has never been properly constituted, nor does it interpret a relevant provision of the Constitution.  Dkt. 52-1 at 5.  The KRG also argues that the MoO has not pointed to any law giving it the authority to file the present lawsuit, and cannot, because none has ever been enacted.  Dkt. 44-1 at 19–20.

Third, the KRG argues that the remaining *Baker* factors also require dismissal because the case cannot be resolved without making policy determinations that are clearly for nonjudicial discretion.  Dkt. 44-1 at 20.  For example, the KRG argues that the court should not "take sides in a political and constitutional impasse over Iraq's most critical resource," or "supply a remedy that the Iraqi courts concededly do not offer."  *Id.*  Further, without dismissal, the KRG argues, "there is an acute potential" that the judiciary will interfere with or embarrass the executive in its policy role in foreign affairs and foreign energy policy, particularly given the importance of neutrality in the Middle East.  *Id.* at 20–21.  The KRG points to U.S. State Department daily press briefings that express support for an agreement between Iraq and Kurdistan on how to manage their energy resources.[3]  *Id.*  Finally, to the extent that the MoO asks for enforcement of an Iraqi ban on unauthorized KRG oil exports, the KRG contends that the claim is barred by the penal law doctrine. Dkt. 52-1 at 5.

The MoO responds that the dispute raises legal, not political questions that can be properly resolved by the court.  Dkt. 48-1 at 5.  First, the MoO argues that the presence of international and political actors, or the need to construe a foreign country's constitution, does not automatically turn the dispute into a political question.  *Id.* at 7.  Rather, a political question only arises where the judiciary is asked to render a decision that would interfere with a political branch's policy choices and value determinations affecting U.S. foreign relations.  *Id.*  The MoO explains that because the

---

[3] A sentiment with which the court entirely agrees.

7

Department of State considers the dispute to be a commercial transaction in which the U.S. Government is not involved, and specifically warned the KRG that it could face legal ramifications, the KRG fails to show that resolution of the dispute creates a direct challenge to a decision by a coordinate branch of the U.S. government. *Id.* at 8; Dkt. 52-1 at 2.  The MoO also distinguishes the Fifth Circuit cases that the KRG relies upon, explaining that the dispute at hand does not involve a decades-old foreign policy determination; the U.S. has not involved itself in the dispute; the KRG is not a foreign nation; and there is no dispute regarding the sovereignty over the territory that constitutes Iraqi Kurdistan.  *Id.* at 10.

Second, the MoO also argues that judicially discoverable and manageable standards for resolving the legal dispute exist through the use of traditional rules of statutory construction.  *Id.* Use of such rules does not involve a policy determination.  *Id.*  Instead, the review is on the text of the Iraqi Constitution, relevant Iraqi laws; and prior decisions by the Iraqi Federal Supreme Court, such as the *Waset Governorate* decision.  *Id.* at 10–11.  The MoO contends that any argument that the *Waset Governorate* decision cannot be considered because the Iraqi Federal Supreme Court has not been properly constituted is barred by the act of state doctrine and contradicts Iraqi Kurdistan's public statements that the Iraqi Federal Supreme Court is the "highest court in the land."  Dkt. 54-1 at 4, n.12.  Further, the MoO argues that the ongoing negotiations between Iraq and the Kurdistan region do not represent a policy initiative of the U.S. and do not influence the question of justiciability.  *Id.* at 3.  Finally, the MoO explains that the Ministry of Justice of the Republic of Iraq authorized pursuit of this lawsuit.  Dkt. 48-1 at 1.

*3. Analysis*

The MoO describes its claim as one that deals with "title to, and the right to export, a commercial cargo of oil" because it alleges that "[t]he Cargo has been misappropriated by Iraqi Kurdistan and exported in violation of the Iraqi Constitution and Iraqi law."  Dkt. 48-1 at 5.

Under the first test of whether there is a textual commitment of a decision to another branch, the KRG must demonstrate that resolving the dispute requires reexamination of a decision by the Executive Branch.  *Lane*, 529 F.3d at 560.  The focused questions before the court are: 1) who holds title to oil developed in Iraq for export purposes under the Iraqi Constitution, and 2) whether the KRG converted the oil when it took the oil to sell it.  However, the KRG has not persuaded this court that resolution of these questions requires examination of a decision by the Executive Branch. Further, resolving this dispute consistently with the text of the Iraqi Constitution does not contradict, and appears to support, the daily press briefing statements by the U.S. State Department.  The briefings encourage resolution consistent with the Iraqi Constitution; promote dialogue as the best way to resolve the issue; and point out that dialogue is not the only way to resolve the issue, as the KRG's actions could have legal ramifications.  *See* Dkts. 44-1 at 12; 54-1 at 2.  Because the KRG must identify an Executive Branch decision that would be reexamined through resolution of this dispute in order to meet the first *Baker* test, and it has not, the court need not determine whether a decision would be insulated from judicial review.

The KRG relies on the *Spectrum* case for the principle that the U.S. prefers to achieve energy policy objectives with foreign countries through diplomacy and not litigation, and considers this another reason why the first the political question doctrine applies.  *Spectrum Stores*, 632 F.3d at 942.  The *Spectrum* case dealt with a claim by U.S. businesses to enforce U.S. antitrust laws against oil production companies mostly owned by Organization of Petroleum Exporting Countries member

9

nations.  Dkt. 44-1 at 15; *Spectrum Stores*, 632 F.3d at 942.  Unlike *Spectrum*, this case does not involve a private company from the U.S. trying to enforce laws against the KRG.  Further, the policy cited by the *Spectrum* court relates to actions taken by the U.S. to achieve its energy objectives and explains that in such circumstances, diplomatic efforts to achieve U.S. objectives are preferable to lawsuits in U.S. Courts.[4]  *Spectrum*, 632 F.3d at 951 n.13.  Such  a  preference is not applicable in this case because the U.S. is not a party and has no choice over whether to use diplomacy instead of a lawsuit.  Further, the U.S. State Department views the dispute as a commercial transaction for which the parties may face legal consequences.  Dkt. 44-1 at 12; 54-1 at 2.  The *Spectrum* case does not support dismissal of this dispute based on the political question doctrine.

The KRG also relies on the *Occidental* case to dismiss the dispute.  In *Occidental*, the Fifth Circuit dismissed a conversion claim related to a tanker of oil extracted from an area that had been the subject of conflicting claims by two sovereigns: Iran and Great Britain.  Dkt. 44-1 at 14–15; *Occidental*, 557 F.2d at 1204.  The case was dismissed as nonjusticiable even though the sovereigns implicated in the case were not before the court, because resolving the merits of the claim would have required a determination of (1) the sovereignty of [the island] Abu Masa, (2) the proper territorial water limit, and (3) the proper allocation of continental shelf.  *Id.*  The court determined that such determinations were committed to the Executive Branch by the Constitution.  *Id.*  To resolve the present case, however, the court need not decide the sovereignty of the territory from which the oil was extracted, nor draw any territorial lines or develop any land allocations.  This is

---

[4] The policy the court cited states: "The Administration believes that the appropriate means for achieving the nation's objectives involving international energy markets lies in diplomatic efforts by the United States with the countries involved in the energy trade, rather than lawsuits against those countries in U.S. courts."  *Spectrum*, 632 F.3d at 951 n.13 (internal citations and punctuation omitted).

also not a dispute between two separate, independent sovereigns such as Iran and Great Britain, but rather, Iraq and a region within Iraq. This case is not controlled by *Occidental*.

In evaluating the second *Baker* test as to whether there are judicially manageable standards, the court must consider whether this is a legal dispute, because courts should not "develop standards for matters not legal in nature." *Japan Whaling*, 476 U.S. at 230. The heart of this dispute is to whom the text of the Iraqi Constitution grants the right to export oil, and whether the KRG converted the oil here. U.S. courts regularly interpret other countries' laws, including constitutions. *See, e.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 970 F. Supp. 2d 524, 528–33 (E.D. La. 2013) (analyzing whether Mexico or the states of Mexico owned natural resources, based on a review of the Mexican Constitution, Mexican laws and statutes, and expert opinions). Further, KRG's contention that this dispute cannot be resolved because a law focused on oil has not been passed under the Constitution is unpersuasive. While such a statute could have provided guidance on how to interpret the Constitution, the parties' two competing interpretations of the Constitution show that the lack of a statute does not make interpretation of the Constitution impossible. To resolve the dispute, this court can at least review the text of the Constitution; the *Waset Governorate* decision[5] that discusses Articles 111 and 112 of the Iraqi Constitution; and a law passed in 2013 by the Iraqi Parliament that utilizes parts of the *Waset Governorate* decision.

Based on the court's analysis of the first two *Baker* tests, and the lack of any communication from the Executive Branch in the form of a letter or amicus brief, the court is not persuaded that remaining *Baker* tests relating to policy determinations, adhering to past decisions, or respecting other branches have been met. *See, e.g.*, *Occidental*, 577 F.2d at 1204 (court applying political

---

[5] This court will not consider contentions that the Iraqi Federal Supreme Court is not properly constituted. Even if it were inclined to do so, judicially manageable standards besides the *Waset Governorate* decision exist to decide this case.

question doctrine to demonstrate respect for Executive Branch after government's amicus brief and a State Department letter indicated that a decision on the case would infringe on the Executive Branch's goals in the Middle East).

The political question doctrine deals with "political questions," not merely "political cases." *Baker*, 369 U.S. at 217.  The MoO's claims seek an interpretation of the text of the Iraqi Constitution and application of that interpretation to the facts of the case to determine if the oil was converted. This does not involve political questions, but classic judiciary functions.  No matter how desirable it may be to avoid deciding a case like this one, a court "cannot shirk this responsibility merely because [its] decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230. "Viewing the facts in a light most favorable to the [MoO] . . . [the KRG's] conduct can be examined by a federal court without violating the [U.S.] Constitution's separation of powers." *Lane*, 529 F.3d at 560.  The KRG's motion to dismiss on the basis of the political question doctrine is denied.

### B. Foreign Sovereign Immunities Act Jurisdiction

#### 1. Law

The Foreign Sovereign Immunities Act ("FSIA") provides foreign states with immunity from jurisdiction of U.S. Courts except in certain circumstances.  28 U.S.C. § 1604.  This immunity is presumed unless the party seeking to exercise jurisdiction over the foreign state can demonstrate that a specific statutory exception applies.  *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197, 127 S. Ct. 2352 (2007).  Relevant to this case is the commercial activities exception to immunity, which applies to cases

> [1] in which the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a

commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). "Once the defendant alleges that it is a 'foreign state,' the plaintiff must produce some facts to show that the commercial activity exception to immunity applies, but the defendant retains the ultimate burden of proof on immunity." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992).

The framework set forth by the Fifth Circuit for determining whether the commercial activity exception applies involves three steps. *De Sanchez v. Banco Cent. de Nicaragua*, 770 F.2d 1385, 1391 (5th Cir. 1985). First, courts must "define with precision the relevant activity," by isolating the defendant's acts that form the basis of the suit. *Id.* This ensures that the "conduct giving rise to the claim in question constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character." *Id.* (internal citation omitted). Second, courts must "determine whether the relevant activity is sovereign or commercial—a label which depends on the nature of the activity rather than on its purpose." *Id.* Third, if the activity is commercial, courts must find a jurisdictional nexus with the U.S. by showing that the activity is either carried on in the U.S., the activity occurring elsewhere caused a direct effect in the U.S., or some acts are performed in the U.S. in connection with commercial activity elsewhere. *Id.*

In terms of whether an activity is commercial, "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S. Ct. 2160 (1992). "[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* For example, the issuance of a regulation is a sovereign

activity, whereas contracting to purchase or sell things that can be held and traded by private parties is a commercial activity. *Id.* at 614–15. In terms of whether an activity has a "direct effect" in the U.S., it need not be substantial or foreseeable, but it also cannot be too remote or attenuated. *Republic*, 941 F.2d at 618. For example, a contract can create a direct effect in the U.S. if it is to be primarily performed in the U.S., such as if goods are shipped, processed or paid for in the U.S. *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 218–19 (5th Cir. 2009). Alternatively, a foreign country's rescheduling of its bond maturity dates on bonds to be paid in New York would not have a direct effect on the U.S. merely because the rescheduling might diminish "New York's status as a world financial leader." *Republic*, 941 F.2d at 618. Such an effect would be too remote or attenuated. *Id.*

   *2. Arguments*

   The KRG argues that, as a foreign state under the FSIA, it is immune from suit. Dkt. 44-1 at 23. Further, it argues that the "commercial activities" exception to the FSIA does not apply to the conversion claims or the tortious interference with a contract claims. *Id.* at 24. First, the KRG argues that the MoO's complaint involves title and control over the natural resources in a territory, which is a sovereign function and not a commercial activity. *Id.* Further, "[t]he KRG's actions of extracting and exporting oil from the Kurdistan Region had no "immediate consequence" in the U.S. because any immediate consequence occurred in Iraq. Dkt. 44-1 at 16. To the extent that there was any effect, it was indirect because of all the steps involved such as loading of oil, a many-month ocean-voyage, changed destinations, and an alleged title transfer. *Id.* at 16–17. Second, the act of loading oil on to the tanker in Turkey, the basis of the tortious interference of contract claim, also constitutes actions between the two sovereigns of Turkey and Kurdistan. *Id.* at 18. Further, no direct effects from the tortious interference were alleged in the U.S. *Id.*

The MoO claims that the KRG's acts are either commercial activities carried on in the U.S. by or on behalf of Kurdistan, or a commercial activity of Kurdistan occurred elsewhere that caused a direct effect in the U.S.  Dkt. 48-1 at 12.  Specifically, the MoO argues that the KRG has sold part of the cargo in the U.S., it intends to sell the rest of the cargo in the U.S., and these activities are commercial and have a direct effect in the U.S.  *Id.* at 13.  Further, and in the alternative, the KRG's exporting, loading and sale of the cargo either anticipated or involved sales in the U.S.  *Id.* at 14. The MoO also responds to the KRG's arguments about sovereign activities by explaining that the sovereign acts of deciding whether and how much to exploit a country's natural resources is different from the commercial act of exporting already extracted resources for sale to a buyer in the U.S.  *Id.* The MoO contends that the KRG's primary objective was to discharge and sell the oil in the U.S., making the claim "based on" the KRG's commercial activity.  Dkt. 54-1 at 6.

*3. Analysis*

It is undisputed that under the FSIA, the Kurdistan Region qualifies as a foreign state.  Dkt. 48-1 at 12.  Therefore, it is given the presumption of immunity unless an exception can be demonstrated with some facts by the MoO.  Because the MoO argues that the FSIA commercial activities exception applies, the court begins its analysis by defining the relevant activity.  *De Sanchez*, 770 F.2d at 1391.  After a review of the complaint, the relevant activity that forms the basis of the complaint is the MoO's allegation that the KRG took Iraq's oil and sold it as its own.  Of course, determining who owns the oil will require interpreting the Iraqi Constitution, but the conduct being challenged in this court is the alleged converting and selling of Iraqi oil.  When considered in this way, the activity is clearly commercial.  Private actors transport and sell oil on a regular basis, and this is not solely a sovereign function.

Further, the cases cited by the KRG are distinguishable and do not persuade the court that this case is simply about a sovereign act. For example, the KRG claims that the *Rong* case supports its position. *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 890 (D.C. Cir. 2006). However, *Rong* deals with a private party's business interest that was expropriated by the government, and later a part of the interest was sold. *Id.* at 891. The court determined that expropriation constituted a quintessentially sovereign act. The present case does not involve the expropriation of the property of a Kurdish citizen by Kurdistan, it involves the alleged conversion of property from Iraq, or the Iraqi people, by Kurdistan. Additionally, the court finds the reasoning of the concurring opinion in the *Connecticut Bank of Commerce* case to be persuasive, even though not authoritative, for refuting the KRG's position and distinguishing the several cases it cites. *Conn. Bank of Commerce v. Congo*, 309 F.3d 240, 263–64 (5th Cir. 2002) (Dennis, concurring in vacating and remanding the district court judgment, but disagreeing in part with the majority as to the controlling principles of law). Even if some of the KRG's activities arguably could be considered sovereign, the KRG "went on to step down from its sovereign status and engage in a typical commercial activity," through the "production, and sale on the world market of oil and gas." *Id.* at 264. "This is not something that only a sovereign can do," but instead is an activity that private players engage in regularly. *Id.*

Considered differently, if this case was only about title to natural resources as the KRG argues, and a sale or potential sale of the oil was not the crux of the claim, it is highly unlikely that this case would be before this court. Dkt. 1 at 6; *see also* Dkt. 39 at 14. The complaint is not a declaratory judgment action simply seeking a determination of who owns the oil under the Iraqi Constitution. Instead, this case involves claims to remedy the conversion of the oil, including actions to sequester the oil to prevent it from being sold.

16

Because the court determines that the activity underlying the complaint is a commercial activity, the court must determine whether the proper jurisdictional nexus between the activity and the U.S. is present.  The MoO pleads that the direct effect is the sale in, and delivery of, the converted oil to the U.S.  Dkt. 39 at 12.  More specifically, the MoO asserts that the KRG and John Doe Buyer has, or imminently will, load the oil on the tanker in the Gulf of Mexico onto smaller vessels to sell or deliver the oil in the U.S.[6]  *Id.* at 8.  The activity complained of is the taking of Iraqi oil for sale, there are specific allegations that it has been sold in the U.S., and the sale of oil in the U.S. creates a direct effect in the U.S.

The MoO's burden at this point is to produce "some facts" that the commercial activities exception applies and the court is satisfied that this burden has been met.  The court finds that the commercial activities exception of the FSIA applies to provide this court with jurisdiction to hear the case.  Therefore, the KRG's motion to dismiss under the FSIA is denied.

### C. Writ of Sequestration

The MoO has sufficiently pled an application for a writ of sequestration.  However, the court will not hold a hearing on the application unless and until the cargo is brought into U.S. waters, at which point the MoO may move this court for such relief as it deems appropriate.  The KRG's motion to dismiss the application for a writ of sequestration is denied without prejudice.

### D. Admiralty Jurisdiction

As explained in detail in the court's previous memorandum opinion and order (Dkt. 25), a party seeking a federal forum for an alleged maritime tort claim "must satisfy conditions both [1] of location and [2] of connection with maritime activity."  *Jerome B. Grubart, Inc. v. Great Lakes*

---

[6] It is undisputed that the tanker has been sitting in the Gulf of Mexico, just outside of U.S. waters since late July during this pending litigation.

*Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043 (1995). The location test is satisfied if either the tort occurred on navigable waters or if the injury suffered on land was caused by a vessel on navigable waters. *Id.* 534. The connection test requires two inquiries. *Id.* First, a court must "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." *Id.* (internal citation and punctuation omitted). "Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (internal punctuation omitted).

The court concludes that admiralty jurisdiction does not exist for the same reasons set forth in its prior memorandum opinion and order. Dkt. 25. The MoO "has pled facts showing its claim for conversion accrued on land, when Kurdistan allegedly first exercised dominion over the crude oil without Iraq's authorization or consent." *Id.* "The location test for admiralty jurisdiction is not met . . . ." Therefore, the KRG's motion to dismiss on the basis that admiralty jurisdiction has not been established is granted.

As to the John Doe Buyer, the MoO may have met the location test, as it claims that the conversion or transfer of title occurred when the cargo was on navigable waters on its way to the U.S. Dkt. 39 at 14. Assuming without deciding this element is met, however, the MoO's claims of admiralty jurisdiction over the John Doe Buyer fail the connection test because the general character of the activity giving rise to the incident does not show a substantial relationship to traditional maritime activity. *Grubart*, 513 U.S. at 534. The Supreme Court explained that when considering this element, a court asks "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply . . . ." *Id.* at 539. This element can be satisfied by

18

the conduct of any of the alleged tortfeasors, but only if the "activity is claimed to have been a proximate cause of the incident." *Id.* at 539, 541.  Examples include navigation of boats, storing boats at a marina, a contract relating to a ship in its use as such, and maritime employment. *Id.*; *Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010).

Here, the alleged wrong is the conversion of oil that occurred when John Doe contracted to purchase the Cargo and took possession of it.  Dkt. 39 at 14.  The sale and conversion of oil does not have a substantial relationship to admiralty, because it can occur anywhere and occurs regularly all over the world.  Sale of oil does not traditionally occur only on the water, nor does the MoO plead any facts to show that it does.  The court's conclusion is supported by a case from the Fifth Circuit where one of the theories advanced was wrongful conversion.  *Gulf Coast*, 623 F.3d at 240.  The case involved a company that stored a boat while it was being refurbished with dredging equipment, and though the company promised to sell the boat to three men who paid $300,000, the company did not ultimately deliver the boat to them and instead transferred the title of the boat to another company.  *Gulf Coast*, 623 F.3d at 240.  The court found that the wrongful conversion claim centered around the transfer of title, because it was the activity giving rise to the incident.  *Id.*  The case related to the "possession and ownership of the dredge, not to the vessel in its use as such." *Id.* If a case about the possession and ownership of a dredge on a vessel that was intended to be used on navigable waters does not have a substantial relationship to maritime activity, then the ownership, possession, sale, or conversion of oil that just happens to be transported by a vessel as opposed to a train, truck,  pipeline, or other means also does not have a substantial relationship to maritime activity.  The MoO has not established admiralty jurisdiction as to the John Doe Buyer.  Therefore, the KRG's motion to dismiss on the basis that admiralty jurisdiction has not been established as to the John Doe Buyer is granted.

### E. Act of State Doctrine

"Every sovereign state is bound to respect the independence of every other sovereign state . . . ." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S. Ct. 83 (1897).  Therefore, "[u]nder the act of state doctrine, the courts of one country will not sit in judgment of the acts of another, done within its own territory." *Spectrum*, 632 F.3d at 954 (quoting *Underhill,* 168 U.S. at 252.).  This doctrine overlaps with the political question doctrine and is rooted in separation of power principles, under which courts should not act in a way that frustrates the Executive Branch's foreign policy acts. *Id.*  The burden to establish the application of the doctrine is on the proponent.  *Id.*

The KRG raises the act of state doctrine as a defense under which the court should dismiss the claims against it.  The KRG argues that it has been recognized as a foreign sovereign and to decide this case would require the court to judge the legality of its acts as a foreign sovereign, an area of foreign relations reserved to the Executive Branch under the separation of powers doctrine.  Dkt. 44-1 at 33–34.  Further, the KRG contends that "treating the KRG differently [from the FSIA] for purposes of the act of state doctrine is unsupported by any authority and would lead to absurd results." Dkt. 52-1 at 19.  The MoO argues that the KRG is not a state under the doctrine, and even if it was, the purposes of the doctrine are not served through application of the doctrine in this context. Dkt. 48-1 at 21–23.

Initially, it is the KRG's burden to demonstrate that the Kurdistan region is a foreign state for purposes of the act of state doctrine.  The KRG relies heavily on its status as a foreign state under the FSIA to establish its ability to invoke the act of state doctrine, but one does not follow from the other.  Kurdistan is a political subdivision of Iraq.  Under the FSIA, and *"for purposes of this chapter*," a foreign state "includes a political subdivision of a foreign state . . . ." 28 U.S.C. 1603(a)

20

(emphasis added).  This definition is specific to the FSIA and the KRG has not persuaded this court that the definition should also be applied to the act of state doctrine.

The Restatement of Foreign Relations Law is also instructive.  "Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 201 (1987).  The comments of the definition go on to explain that "[a]n entity is not a state unless it has competence, within its own constitutional system, to conduct international relations with other states . . . ."  *Id.* at cmt. e.  The court need not conduct a detailed analysis of how these definitions apply to the KRG, it merely points out that these definitions do not include political subdivisions; the KRG is governed by Iraq's Constitution; and the U.S.'s position on Kurdistan has been that it supports the "Kurdistan Region within the framework of Iraq's constitution."  Dkt. 48-25.

The cases the KRG cites for application of the act of state doctrine are distinguishable.  In *Occidental Petroleum*, the court considered the Sharjah and Umm al Qaywayn territories, finding that "the precise international status of these sheikdoms is at present unique and difficult to characterize . . . ."  *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 113 (C.D. Cal. 1971).  The court ultimately determined that the territories were states under the act of state doctrine, despite the fact that they delegated their foreign relations authority to Britain.  *Id.*  The dispute at hand does not concern an entity that has passed its foreign relations off to another state, nor is the status of Kurdistan "unique and difficult to characterize."  Kurdistan undisputedly is a region within Iraq.  Dkt. 44-1 at 1.

In *Oetjen*, the primary question before the court was whether the act of state doctrine allowed review of the actions of the government of General Carranza's military, because the actions had later

21

been recognized as those of the de facto government of the Republic of Mexico.  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 38 S. Ct. 309 (1918).  The court found the act of state doctrine applied and the action could not be reviewed, because "the conduct of one independent government [like Mexico] cannot be successfully questioned in the courts of another [like the U.S.] . . . ."  *Id.* at 303.  In this case, the KRG is not an independent government.

The court is not persuaded that the KRG can avoid enforcement of the Iraqi Constitution as a "state" against a lawsuit by the MoO of Iraq.  But even if this court were to determine that the Kurdistan region was a state for act of state purposes, "the policies underlying the act of state doctrine should be considered in deciding whether, despite the doctrine's technical availability, it should nonetheless not be invoked . . . ."  *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409, 110 S. Ct. 701 (1990).  Based on the policies underlying the act, the court is not persuaded that the doctrine should be applied.  First, as described in the court's political question doctrine analysis, adjudicating this case will not infringe upon the territory of the executive branch, and there is not a separation of powers concern.  Second, the MoO, representing Iraq, has asked this court to resolve its dispute with its own region in a way that is consistent with its Constitution.  Courts deciding whether the doctrine applies to cases brought by the state whose actions are to be reviewed, though factually distinguishable, explain that "when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker."  *Republic of Phil. v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986).  In the present case, "the current government of Iraq itself has sought out United States courts," a factor that "tilt[s] against the doctrine's application."  *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 534 (S.D.N.Y. 2013).  Further, the MoO only involved U.S. courts after unsuccessfully attempting to resolve the case in Iraqi courts.  Dkt. 39 at 9–11.  All of these factors

weigh against application of the act of state doctrine, even if it was technically available.  Therefore, the KRG's motion to dismiss on the basis of the act of state doctrine is denied.

### F. Merits of the Pleadings

As to the claims for which the MoO has established jurisdiction, the court finds that at this stage of the pleadings, the MoO has pled sufficient factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678.  Under Texas law, "[t]he elements of a cause of action for conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused plaintiff's demand for return of the property."  *Robin Singh Educ. Servs., Inc. v. Test Masters Educ. Servs., Inc.*, 401 S.W.3d 95, 97 (Tex. App.—Houston [14th Dist.] 2011, no pet.). At this point, where mere plausibility and not proof is required, the MoO has sufficiently pled that the Iraqi Constitution can be interpreted to give the MoO title to the oil as opposed to the KRG; the KRG took the oil when it exported and sold the oil despite plaintiff's title; and the MoO has demanded return of the oil and was denied.  Therefore, the KRG's motion to dismiss (Dkt. 44-1) based on a failure to state a claim is denied.

## IV. CONCLUSION

For the foregoing reasons, the KRG's motion to dismiss is **GRANTED IN PART &
DENIED IN PART**.  The court further **ORDERS** that the parties submit status updates on
settlement negotiations within 10 days of this order.

Signed at Houston, Texas on January 7, 2015.

_____

Gray H. Miller
United States District Judge